UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>–against–<br><br>RUTHERFORD TENANTS CORP. and JAMES RAMADEI,<br><br>         Defendants. | 21 CIV 10383 (JHR)(OTW)<br><br>**DECLARATION OF JAMES RAMADEI IN SUPPORT OF DEFENDANTS' MOTION FOR <u>SUMMARY JUDGMENT</u>** |

I, James Ramadei, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am currently the Board President of co-defendant Rutherford Tenants Corp. ("Rutherford") and am also designated as a defendant in my individual capacity.

2. I make this Declaration in support of the Defendants' motion for summary judgment dismissing this case with prejudice.

3. Rutherford is a New York cooperative housing corporation located at 230 East 15th Street, New York, New York (the "Building").

4. Lesser Meril Lesser, ("Lesser") is a shareholder at the Rutherford and is the owner of apartment 5J at the Building.

PRELIMINARY STATEMENT

5. The Rutherford,[1] which acts through its Board of Directors, merely sought to enforce the terms of its governing documents in light of Lesser's refusal to abate the noise caused by a flock of parrots she kept in her apartment.

---

[1] A review of the pleadings clearly reveals that there are no allegations of wrongdoing alleged against me and thus the complaint should also be dismissed with prejudice against me based upon the Plaintiff's failure to allege a cause of action.

1

6. The noise from the parrots was disturbing her neighbors and was so loud and persistent that it was interfering with her neighbor's health, and the services that the Rutherford is required to provide pursuant to the Rutherford's Proprietary Lease, House Rules and New York law, which all require that all its residents are ensured a quiet, peaceful and habitable environment.

7. Had Rutherford turned a blind eye to the noise caused by her flock of parrots, and Lesser's violation of her obligations under the Rutherford's governing documents, this would have subjected the Rutherford, and its community, to claims that New York's Real Property Law §235(B) had been violated, exposing the Rutherford to unnecessary risk, and damages based upon a failure to provide a habitable environment to all residents.

8. Rutherford acted in accordance with the U.S. Department of Housing and Urban Development ("HUD") Guidelines which prohibit emotional support animals if they either create a condition which alters the nature of a housing provider services or is a threat to the health of others.

9. In the instant case both reasons apply.[2]

10. Even though Lesser's request to continue to make noise was unreasonable in nature, Rutherford offered the Lesser a reasonable accommodation – the opportunity for the Lesser to soundproof her apartment.

11. Nor did Rutherford retaliate against Lesser when there was a subsequent rejection of a buyer for Lesser's apartment or when the Rutherford's managing agent placed certain legal fees onto Lesser's monthly rent statement, as set forth herein.

---

[2] FHEO-2013-01 (Ex CC)

## HISTORY OF THE PARTIES

12. On January 15, 2021, the HUD Secretary (the "Secretary") issued a charge of discrimination against Defendants pursuant to 42 U.S.C. § 3610(g)(2)(A). Compl. ¶ 48. A true copy of the Complaint is attached hereto as Exhibit [3]A.

13. Defendants elected, pursuant to 42 U.S.C. § 3612(o) to have the claims asserted in HUD's charge of discrimination decided in a civil action in United States District Court instead of in an administrative hearing. *Id.* ¶ 49. The Secretary consequently authorized the Attorney General to file this action pursuant to 42 U.S.C. § 3612(o)(1). *Id.*

14. Ms. Lesser acquired Apt. 5J at the Rutherford in 1999, after first having submitted a board package application, and having been approved to purchase the apartment, like all other prospective shareholders, in accordance with the Rutherford's standard proprietary lease.

15. At the time Ms. Lesser purchased her shares of stock in 1999, she signed both a Proprietary Lease and set of House Rules which agreements prohibited the creation of noise that would disturb her neighbors. All shareholders have identical leases. See portions/attached Exs. B and C.

16. Despite the allegations set forth in the complaint, at the time Lesser became an owner of apartment 5J, through to the present time, Rutherford was a "pet friendly building". Indeed, Ms. Lesser testified at her deposition that no permission was needed to keep birds in her apartment. Lesser TR/Page 28, Ex D.[4]

17. It is my understanding that at the time she moved into the Rutherford, she had two birds. Over the years, as one bird would die, it was replaced with another. Like all other residents

---

[3] Exhibits are referred to as "Ex"
[4] "TR" refers to a witness's deposition transcript, with the specific page numbers following.

at the Building, there was never any need to request permission from the Board of the Rutherford to replace any bird.

18. At the beginning of 2015, Ms. Lesser had at the time two parrots, Layla and Ginger.[5]

19. Up until the beginning of 2015, the Rutherford was unaware of any complaints from any shareholder about *those* two parrots, and of course, Lesser never received any letter or request about noise from those two parrots.

20. In or about the beginning of 2015, the composition of the birds changed. Ms. Lesser added a third parrot she took from a rescue center in Virginia named Curtis. When asked at her deposition why she acquired Curtis, her answer was because simply "I wanted to." Lesser TR/Page 141, Ex D.

21. With the arrival of Curtis at the Rutherford, now for the first time, neighbors throughout the building were complaining to the Management Company and our Staff about the unpredictable, excessive, intrusive, loud volume of parrots screeching they heard coming from the Lesser's apartment at all times of the day and night.

22. Representative complaints are annexed hereto as Exhibits E, F, and G which document just some of the dates, times and extent of the noise. These complaints were received before and after the Notice to Cure.

23. These complaints, and other testimony in this case demonstrate that these noises interfered with other residents' use and enjoyment of their apartments at the Building, and interfered with their health.

---

[5] Ms. Lesser testified that she actually bought Ginger for her mother and when her mother didn't want the bird, Lesser decided to keep it. Clearly, Ginger was not intended to be an emotional support animal. (Lesser TR/Page 29) (Ex D).

4

## NOISE ISSUE

24. According to the former Super, Eric Ortiz, the staff was getting complaints from various neighbors about the noise. Ortiz TR/Pages 8, 9, Ex H.

25. The Super went to the fifth floor where Lesser lived and confirmed for himself, loud screeching sounds coming from Lesser's apartment. Mr. Ortiz spoke to Ms. Lesser about the complaints and asked her to stop the noise from the birds; but the noise continued. Ortiz TR/Page 10, Ex H.

26. Lesser's next-door neighbor, Charlotte Kullen, shared with the Board the decline of her mental and physical health caused by the noise, sleep deprivation and stress she experienced with the arrival of Curtis. Kullen TR/Pages 43-223, Ex I.

27. Ms. Kullen, reported to the Board of Directors how distressed she was by virtue of the fact that the noise problem was unabated. Her sleep was constantly disturbed, and she was so distressed by the lack of sleep, that she was unable to work at home, conduct work phone calls or just go about day-to-day life in her apartment because of the noise. *Id.*

## NEIGHBOR'S HEALTH AFFECTED

28. Ms. Kullen reported that her health was affected, and she testified at her deposition that the noise caused her to experience sleep deprivation which resulted in her experiencing stress which led to grinding her teeth and ultimately problems with her teeth, her jaw, neurological problems and headaches which were being treated medically. *Id.*

29. On one occasion Ms. Kullen came to my apartment early one morning still in her nightgown. She looked terrible, she was crying and looked exhausted. She was unable to speak clearly, pleading with me to do something about the noise created by the parrots. (Ramadei TR/Pages 22,23,156) (Ex GG)

30. In response to numerous complaints from various shareholders, starting in May 2015, the Rutherford's Management Company sent several warning letters to Lesser advising her of the noise complaints and requesting she take steps to abate the noise. <u>Exs J and K</u>. There was no demand that the parrots be removed from Lesser's apartment.

31. The letters also stated, per the standard practice of the Rutherford, that in accordance with paragraph 28 of the Proprietary Lease, that like all shareholders who did not uphold their obligations under the House Rules and Proprietary Lease, Lesser would be responsible for legal fees incurred by the Rutherford <u>if</u> she failed to abate the noise.[6]

32. At no time, during this period did Management or the Board of Directors ever suggest or demand that the parrots be removed from the building. Rutherford patiently waited for the Lesser to abate the noise, but she failed to do so.

33. Finally in March 2016, almost a year after Curtis' arrival, a Notice to Cure was served which gave Lesser another thirty days for the Lesser to cure. However, she failed to cure the noise problem, and the complaints from her neighbors persisted.

34. Lesser understood that in order to comply with the Notice to Cure, all she had to do was to abate the noise. Lesser TR/Page 111, <u>Ex D</u>.

35. Instead of abating the noise, and prior to the service of the Notice To Cure, Lesser had her attorney send a threatening letter to Ms. Kullen, which was dated October 22, 2015, attacking Ms. Kullen for complaining about the noise. <u>Ex N</u>.

---

[6] The Government suggests that by placing the coop's legal fees on Lesser's maintenance statements, Rutherford was not acting in good faith. We treated Lesser the same as any other shareholder in accordance with the Proprietary Lease and warning letters. Prior to the filing of this case, as the Government recognizes in its complaint, legal fees we were removed from Lesser's ledger in an abundance of caution, to allow the Housing Court to approve the precise amount of fees. Moreover, there could be no retaliation with respect to legal fees which were provided to Lesser and her counsel a year and a half *before* she filed with HUD. See Livingston Ex. II.

6

36. As the annexed numerous text messages between Ms. Kullen and Ms. Lesser demonstrate, up until the arrival of Curtis, Ms. Lesser and her next-door neighbor Charlotte Kullen were the best of friends. <u>Ex O</u>. On numerous occasions Ms. Kullen testified that she often took care of the birds when Ms. Lesser left her birds and went away on trips. *Id.*

37. Before Curtis, Ms. Kullen and Lesser went out to restaurants and to the movies together, and watched television together, as well as sharing gossip about their dates. With the arrival of Curtis, the text messages reveal that Ms. Kullen tried to, in a lighthearted fashion, get Ms. Lesser to do something to abate the frequency and volume of noise coming from Lesser's apartment which was disturbing Kullen. *Id.* The text messages demonstrate that Lesser was aware of the problem.

38. The lighthearted approach did not work. Ms. Kullen first complained to the building staff and thereafter started sending written complaints about the noise to Management. <u>Ex F</u>. That led to the aforementioned threatening letter from Ms. Lesser's attorney.

39. The same attorney wrote a complaint letter to Rutherford's Management Company on September 15, 2015. In this letter, Lesser's attorney acknowledged that audio recordings of the bird noises were sent to Ms. Lesser. <u>Ex P.</u>

40. In addition to the text messages Lesser had received from her neighbor and friend, Ms. Kullen, Lesser not only received written notice about the noise problem, but also audio sound recordings of the noise. There can be no dispute that Lesser was aware of the noise which was a disturbance to others in the Building. Kullen also sent audio recordings to Management and the Board.

41. Notably, in the attorney's letter to the Rutherford's Management Company in September 15, 2015, he makes NO mention of his client, Lesser, having a mental disability or a need for emotional support parrots. *Id.*

7

HF 14862524v.23

42. In that same letter, Lesser's attorney falsely claimed that a prior Board of Directors granted specific permission to Ms. Lesser to have birds reside in the unit with her when she moved into the building. However, as Ms. Lesser testified at her deposition no permission was needed, it was a pet friendly building. Lesser TR/Page 28, Ex D.

43. Another neighbor across the hall from Lesser, Marcia Okon also testified to the stress she suffered by reason of not knowing when or for how long there would be outbreaks of loud screeching sounds from the birds. Okon TR/Pages 116, 117, Ex Q. Ms. Okon also submitted written complaint letters to Management. Ex G. Some of these letters were submitted to management after the Notice to Cure in March 2016.

44. Both Ms. Kullen, who lived next door, and Ms. Okon who lives across the hall from Lesser testified that they were so stressed out by the noise they contemplated selling their apartments. Okon TR/Page174, Ex Q.

45. Ms. Okon stopped inviting company to her home because of the noise. Okon TR/Page 173, Ex P.

46. Sam Keany, a neighbor who lives on the floor <u>below</u> Lesser's was also complaining that the loud screeching sounds from the birds, presumably coming through the air vents was disturbing his family. Ex E.

47. As a result of the complaints, Board members, including myself on different occasions took it upon themselves to visit the 5th floor, where Lesser lived to independently verify that the reports of loud screeching bird sounds coming from Lesser's apartment were indeed valid. Benedetto TR/Pages 63-66, Ex R.

48. Steven Troy, a Board Member who lived on the same floor as Lesser experienced the noise on a daily firsthand basis. Troy TR/Pages 22, 23, 52, Ex S.

HF 14862524v.23

## CITY INSPECTIONS

49. During the course of discovery, the Government produced several anonymous reports about noise complaints that were made to the City of New York. On a few occasions inspectors came to the building and didn't find excessive noise. However, a review of those inspection reports reveals that on a number of occasions the inspectors didn't even bother to come up to the 5th floor to inspect. One inspector stayed in the lobby and could not hear anything. Ex T.

50. Another inspector stayed outside in front of the building even though *Lesser's apartment faced the rear of the building.* Ex T. Another inspector didn't know the apartment number. Ex S. Others wrote they were in the "vicinity" but it's not clear if they ever went to the apartment or if Ms. Lesser and the birds were ever home in the apartment at that time.

51. One inspector did however inspect, on two occasions, when the Lesser was home in her apartment at the time and the animals were behaving. Ms. Lesser was in her apartment with the birds and not at her work studio so the birds were quiet. Ex T.

52. The Super also testified that one of the inspectors who came to the building didn't even bother to go to the fifth floor. Ortiz TR/Pages 11, 12, Ex H.

53. However, the complaints made to the City of New York, and the nature of the inspections is not even directly relevant here, because the noise issues created by Lesser's parrots did not require that there be a finding of a violation of the New York City Noise Code. Instead, Lesser was contractually obligated pursuant to her Proprietary Lease and House Rules; those obligations required that she adhere with the "no- noise" rules in the Building, and to be mindful not to disturb her neighbors.

54. During the discovery phase of this case, depositions were taken of current Board Members, neighbors, as well as members of the staff. The witnesses all confirmed there were, at all relevant times, loud screeching disturbing parrot sounds coming from the Lesser's apartment.

9

55. Neighbors who walked down the hallway on the fifth floor would be accosted by the sounds. Whenever an elevator opened on the 5th floor landing, the occupants in the car and the residents of the 5th floor would be "treated" to the screeching sounds of Curtis and the other birds. Ortiz TR/Page 11, Ex H.

56. Another neighbor, Dr. Mary Fedor complained that the sounds of the birds penetrated into her apartment but said that she didn't confront the Lesser because she was afraid of retaliation because she had small children at the time. Fedor TR/Pages 14, 15, Ex U.

57. Ms. Fedor's intuition was perhaps accurate, because Ms. Lesser testified she doesn't like children. Lesser TR/Page 51, Ex D.

## RUTHERFORD'S DUTIES TO ALL RESIDENTS

58. The Board of Directors of a cooperative corporation has an obligation to represent all the shareholders and cannot simply overlook the noise created by the Lesser's parrots.

59. Rutherford's shareholders, as tenants of the Rutherford, are all entitled to (i) the statutory warranty of habitability pursuant to New York's Real Property Law §235(b), (ii) the enforcement of their contractual rights pursuant to the Proprietary Lease and House Rules to quiet enjoyment of their apartments, and (iii) to the quiet enjoyment of their homes pursuant to New York's common law.

60. A failure on the part of the Rutherford to have Lesser abate the noise would subject the Rutherford to damages based on its failure to provide a habitable environment for its residents under contract, by statute and under New York's common law.

61. Moreover, had Rutherford overlooked the noise issue, this would have been a fundamental interruption of Rutherford's operations, which requires that the rights of all shareholders be protected.

HF 14862524v.23

62. In December 2015, the Board instructed its Management company to offer to meet with the Lesser to engage in a cooperative dialogue without attorneys present to resolve the matter. Ex V.

63. Lesser refused to meet. Ex W. As a result of the Lesser's failure to heed the warning letters and the Notice to Cure, and offer to meet, the Board had no choice but to go forward with a proceeding in Housing Court.

64. In March 2016, Lesser's attorney sent a letter to Rutherford's counsel, together with a letter from the Lesser's psychiatrist Dr. Adele Tutter. Dr. Tutter's letter did not set forth a specific diagnosis, but more importantly, it did not clearly establish a nexus between the parrots and any disability. Moreover, it incorrectly stated that the birds (including newly arrived Curtis) were long time companions which could not be separated. The letter was also factually incorrect because it stated that Lesser needed the birds to work from home but in fact, Lesser left the birds alone in the apartment and went to work at a studio. Ex X.

65. This was the very first time that there was even a mention of the need for parrots as emotional support animals.

66. Counsel for Rutherford responded to the Lesser's attorney that the noise created by the parrots constituted a violation of the Proprietary Lease and House Rules which prohibits causing disturbing noises in the building that interfered with the habitability rights, health, comfort and convenience of other Lessees. Ex Y. The import of the letter was that the existence of this noisy flock of parrots violated HUD Guidelines.

67. Thereafter, Lesser submitted an Answer to the Housing Court proceeding but did not allege having a disability that required her to have emotional support animals. Ex Z. However, months later she subsequently decided to amend her answer to allege the birds were emotional support animals. Ex AA.

11

68. Through her amended answer, Lesser requested an unspecified reasonable accommodation, to the effect that Rutherford should ignore the no-noise rule and permit Lesser's parrots to continue to make noise at the expense of her neighbors. Ex AA/Para 8.

69. The situation involving these birds is unlike the garden-variety request for an emotional support animal in a "no-pet" building, because the Rutherford is an animal-friendly Building, requiring no permission whatsoever in order to have a pet, or other animal in the apartments.

70. As the Court can see from warning letters from Management and correspondence from Defendants' Counsel, at no time did the Rutherford ever demand that Lesser remove her parrots, or any one of them. Shortly put, no one told the Lesser she couldn't keep the birds.

71. At issue here was Lesser's refusal and failure to uphold her contractual obligations to abate the noise, which was negatively affecting the health of others and the services Rutherford was required to provide to all residents.

## EFFORTS TO RESOLVE THE ISSUE
## AND OFFER OF A REASONABLE ACCOMOMODATION

72. Lesser denies that the birds made any noise. Lesser TR/Pages 69, 79, 82, 94, 113, 130, Ex D. However, this denial contradicts her text messages acknowledging the problem as well as the testimony of numerous witnesses including the staff, Board Members and neighbors about the intensity and frequency of the noise created by the birds.

73. In January 2016, prior to commencing the holdover proceeding, Rutherford offered to meet with Lesser to discuss an alternative reasonable accommodation being offered to

HF 14862524v.23

her, to suggest that she submit an alteration application to soundproof her apartment. Lesser ignored this request. Ex BB. The apartment has never been properly soundproofed to date.

74. As previously stated, the Board of Directors of the Rutherford also offered to meet Ms. Lesser to resolve the matter without the need for litigation and Ms. Lesser also refused the offer.

## HUD

75. The case brought by the Government is predicated on a Finding by HUD that the Defendants violated the Fair Housing Act Guidelines by failing to provide an unspecified accommodation for the Lesser. Ex CC. The same Guidelines, however, are also intended to protect the health of anyone who is adversely affected by prohibiting the parrots. Ex CC, Page 4 of 10.

## THE RETALIATION CLAIM

76. The Government contends that there was retaliation against the Lesser when a buyer for her apartment was rejected in 2019 and because legal fees were placed on Lesser's ledger in accordance with paragraph 28 of the Proprietary Lease.

77. In essence, the Government asserts that Rutherford allegedly retaliated against the Lesser because it didn't simply rubber stamp and approve *the buyer's* purchase application.

78. Contrary to the Government's contentions, Rutherford was fully justified in rejecting this applicant, and the rejection was made in our ordinary course of business.

79. The Court should be aware that in addition to containing provisions on transfer of apartments, the Rutherford's Proprietary Lease also specifies at paragraph 24, that lessees shall "always in good faith endeavor and promote the cooperative purposes for the accomplishment of which the Lessor is incorporated". Ex. B.

80. Therefore, it is of the utmost importance, in our standard business practices, that prospective applicants are reviewed, not solely based on their finances, as the Government seems to believe, but whether we believe that a prospective buyer would be the kind of person who will join our community with the willingness to uphold paragraph 24 of our Proprietary Lease.

81. There were several issues with the buyer's application that did not give those of us, who independently reviewed the application, the confidence that the buyer would be such a member of our community, because the application was incomplete, misleading, sloppy, and disingenuous.

82. The rejection of the buyer had absolutely no connection to Lesser's complaint which had been filed with HUD and this buyer would have been rejected irrespective of Lesser's complaint relating the Rutherford's refusal to permit her to make noise in the apartment.

83. Indeed, the absence of any connection between Lesser's complaint and the buyer's rejection, let alone any causative relationship is apparent because, as set forth herein, it would have been a benefit to our community to have been able to approve this buyer because our community receives a "flip tax" or "transfer fee" whenever an apartment is sold.

84. As to HUD's conclusory claim of retaliation for rejecting this buyer, the Court should be aware that no one on the Board even knew the Lesser and had no reason to retaliate against her. In fact, one of the members who voted to reject the buyer moved into the Rutherford more than a year <u>after</u> the Lesser had voluntarily left the building in 2016 and could not even identify Lesser if she passed her on the street. [7] I have never met the Lesser, never talked to her and never received any type of communication from her. The other members of the Board hardly knew her.

---

[7] The remaining three Board Members all testified they had no meaningful contact with the Complainant to know anything about her or even if she had a disability.

HF 14862524v.23

85. In fact, contrary to the claim of retaliation, Rutherford had a material incentive to approve her buyer. Had the Board approved the application, the controversy with the Lesser would have ended <u>and</u> Rutherford would have collected a flip tax on the sale in accordance with the Proprietary Lease.

86. The standards Rutherford users to evaluate this buyer's application is the same for all prospective shareholders. In fact, Ms. Lesser in her interview with HUD confirmed the following:

> "When a serious buyer comes along, they will have to submit a package containing both <u>financial and personal information</u>. The quality of the information in this package determines whether or not the board will set up a meeting to interview the potential buyer. All in all it is a pretty lengthy process. In 1999, I believe it took 2-3 months from the time I submitted my information to actually be approved for purchase". <u>Ex FF.</u> (emphasis added)

87. Ms. Lesser told HUD this seven and a half months before the buyer's package was submitted. As recognized by Ms. Lesser, it is the "quality" of the package both financial <u>and</u> personal information that count. In the instant situation, the package submitted missed the quality mark by a large margin.

88. The Board is charged with acting in the best interests of all shareholders and accordingly turned down the applicant based upon the selective information that the buyer chose to submit which gave the impression that this buyer, despite his apparent wealth, would not have been a good fit for this cooperative community. The fact that the Government claims the buyer has a low debt to income ratio is not enough. It is not. We are looking for individuals who care about living at the Rutherford, will uphold their obligations as shareholders and trusted members of our community. A prospective shareholder who cares about our community will put their best foot forward when submitting their applications. The buyer in this case fell short of these criteria.

89.     The Court should be aware that to this day, Lesser remains the record owner of the apartment, and receives all the same services as all other shareholders and residents at the Building.

## THE APPLICANT'S PACKAGE

90.     The Rutherford's Proprietary Lease at paragraph 16 specifies that no transfer of any apartment shall occur without the approval of the Board of Directors. <u>Ex B</u>

91.     In conjunction with this mandated process, and as with other co-ops in New York City, Rutherford uses the services of its managing agent to arrange for a buyer to submit a purchase application and supporting documents to the Board of Directors.

92.     At the Rutherford, each Board Member gets a copy of the package. Our process is that each board member reviews the package <u>without</u> consulting with the other members of the Board. In this way, we ensure that there is no collusion, and we all make our own individual determinations on a package and whether to invite the applicant to an in-person interview.

93.     Rutherford's standard board package process is that based on a four-person review, an applicant needs three votes to be invited to an interview. The President of the Board doesn't vote unless it is to break a tie. Contrary to the allegations in the complaint, I was *not* President at the time of this application; I was merely a director.  In the instant situation, all four members independently voted to reject the applicant.

94.     Although he didn't have to vote, the then-Board President, Steven Troy, testified at his deposition that he would also have voted to reject the candidate based upon similar reasons that the other Board Members stated. Troy TR/Page 67, <u>Ex R</u>.  For the Court's convenience some of the relevant portions of the Buyer's application is being provided. <u>Ex DD</u>.

95. The buyer's package as originally presented indicated that the buyer was in the form of a trust. But because Rutherford does not allow a trust or corporate entity to acquire apartments at the Building, the applicant was so advised.

96. The signatory of the contract then assigned the contract to an individual.

97. After the contract was assigned, upon review, it appeared that the applicant's employment letter was undated, failed to mention the applicant's specialty as a surgeon and omitted his annual salary. The individual applicant was advised to provide a more comprehensive employment letter. Ex DD, Page 0006. As the Court can see the application package that was ultimately submitted, is unsatisfactory, it was uncaring, sloppy, incomplete and misleading. This was not the type of application that demonstrated a candidate with a real interest in living in a co-op.

## THE COVER LETTER

98. For all co-ops in New York City, as with ours, it is standard practice for a "cover letter" to be submitted with the application. The document the buyer supposedly provided was undated, unsigned and merely states that (the buyer) might possibly live in the apartment. Ex DD, Page 0017.

99. The Board is always interested in knowing *via* a cover letter about a buyer and the buyer's interest in the building and the neighborhood, which gives us insight into a buyer's willingness to be a cooperative part of our community, and a buyer's willingness to uphold the obligations of a lessee under paragraph 24 of our Proprietary Lease.

100. Attached are just a few sample cover letters from other buyers around the same time period. Ex EE. The Court can easily see the difference. Other applications which the

HF 14862524v.23

Rutherford has approved included letters where folks clearly show their interest in having a home at the Rutherford and being a member of our community, and the larger community around us.

101.   Quite frankly, based on its appearance with the purchase application at issue here, Board Members didn't even know if the applicant prepared the "cover letter" or whether it was submitted by an unknown third party. Board Members had no way of knowing if the applicant ever saw the apartment or was buying it on speculation.

102.   The application also had many inconsistencies which gave me, and the other board members, concern about the reliability of this buyer, the credibility of this buyer, and our ability to trust this buyer. For example, on one page it states that the buyer, his wife, two grown daughters (who were living in the East Village) and two dogs would be living in this small straight line studio apartment. Ex DD/Page 0027. See attached drawing. Ex DD/Page 82.

103.   Later on in the application, the wife and one dog "disappear" as to who will use the apartment. Ex DD/Page 0364, and as to the use of the apartment, and the buyer states that the apartment will be used as a *pied a terre* for himself, his two daughters and one dog. The wife was also eliminated as his emergency contact. Ex DD/Page 0366. All in all, the content of the application gave the reader the sense that he just slapped the application together and was not really interested in purchasing and becoming a trusted member of our community.

## THE BUYER'S FINANCES

104.   As to a buyer's finances, the Rutherford provides a standard Monthly Cash Form for the applicant to use to set forth their monetary cash position. That makes it easy for the Board to quickly understand an applicant's finances and, if necessary, match it up to the

18

HF 14862524v.23

supporting documents that a buyer is required to provide. We are not all forensic accountants that can or should be required spend hours and hours of time doing the applicant's job.

105. In the case of this Buyer, he didn't try to be very careful and we could not trust that this buyer was being truthful and straightforward. The information on the form omitted details including unspecified monthly payments on the form to both Wells Fargo and Valley National Bank. Ex DD/Pages 0030, 0031. We discovered it elsewhere in the application.

106. On the applicant's tax return, we found rental real property he owned in Santa Fe, New Mexico Ex DD/Page 235-249. He did not care to include the fact that he owned a rental property in Santa Fe, NM, or that it was subject to a mortgage on his monthly cash form Ex DD/Page 249.

107. The application submitted was also missing pages for bank statements and there was a material misstatement of income. Ex DD.

108. The Court is directed to page 0090 of Ex DD wherein the applicant states in his loan application to his bank that his income for the years 2013-2017 was $250,000 a month. However, when matched up the W-2 he provided for the years (2016 and 2017) in question his income was $267,662 for 2016 and $184,657 for 2017. Ex DD/Page 0321.

109. All of these omission inconsistencies and mistakes indicated that this applicant was not serious about being approved, buying this apartment. Cooke TR/Pages 18, 27-30, Ex HH.

110. All in all, it was a sloppy, careless, misleading dishonest application and for those reasons and others the Board Members each independently decided on their own to reject the application without any consultation between members. Ramadei TR/Pages 258-260, 252-264. Ex GG.

HF 14862524v.23

111.     Based upon the foregoing it is respectfully requested that the Court dismiss the claims asserted against the Defendants with prejudice.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 16, 2023

_James Ramadei_

JAMES RAMADEI