UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

RUTHERFORD TENANTS CORP. and
JAMES RAMADEI,

Defendants.

21 Civ. 10383 (JHR) (OTW)

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033
Email: david.kennedy2@usdoj.gov

DAVID J. KENNEDY
Assistant United States Attorney
- Of Counsel -

## TABLE OF CONTENTS


**PRELIMINARY STATEMENT** ....................................................................................1

**STATEMENT OF FACTS**.........................................................................................1

**A. Complainant Resided With Her Emotional Support Animals in the Rutherford for Fifteen Years Until Her Neighbor Raised Exaggerated Noise Complaints**..................1

**B. Defendants Commenced Eviction Proceedings Against Complainant Based Upon Her Support Animals Despite Knowing Such Animals Are Necessary Accommodations for Her Disabilities** ...............................................................5

**C. Complainant Filed a Complaint with HUD, and Defendants Elected to Proceed in Federal Court** ...............................................................................................7

**ARGUMENT**...........................................................................................................9

**I. DEFENDANTS DISCRIMINATED AGAINST COMPLAINANT IN VIOLATION OF THE FAIR HOUSING ACT** ......................................................9

**A. The Legal Framework** ........................................................................9

**B. There Is No Genuine Issue of Material Fact as to Defendants' Failure to Accommodate Complainant's Disability** ..................................................10

**1. The Government Easily Meets Four of the Five Prongs of the Reasonable Accommodation Test**...................................................10

**2. The Accommodation Complainant Requested Was Reasonable**.........14

**II. DEFENDANTS RETALIATED AGAINST COMPLAINANT IN VIOLATION OF THE FAIR HOUSING ACT** ....................................................21

**A. Defendants Retaliated Against Lesser By Seeking to Evict Her** .....................23

**B. Defendants Retaliated Against Lesser By Seeking to Collect Legal Fees**.......23

**C. Defendants Retaliated Against Lesser by Rejecting a Qualified Buyer for her Unit** ...........................................................................................23

**III. DEFENDANTS' STATE COURT DEFENSES SHOULD BE DISMISSED** ......24

**CONCLUSION** .......................................................................................................26

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177 (D. Colo. 2016) ........................ 23

*Black v. Wrigley*, No. 21-2553, 2023 WL 2591014 (2d Cir. Mar. 22, 2023) ................................ 9

*Broome v. Biondi*, 17 F. Supp. 2d 211 (S.D.N.Y. 1997) .......................................................... 22

*Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798 (E.D. Cal. 2016) .......... 12, 22, 23

*Chavez v. Aber*, 122 F. Supp. 3d 581 (W.D. Tex. 2015) ................................................ 14, 22, 23

Doninger v. Niehoff, 642 F.3d 334 (2d Cir. 2011) ...................................................................... 9

*Elliott v. QF Circa 37, LLC*, No. 16-0288, 2018 WL 2933467 (S.D. Cal. June 12, 2018) .......... 11

*Evans v. 210 E. Pearson Condo. Ass'n*, No. 21-3941, 2023 WL 2711613
(N.D. Ill. Mar. 30, 2023) ........................................................................................................ 11

*Fair Housing Justice Center, Inc. v. Cuomo*, 18 Civ. 3196 (VSB), 2018 WL 4565152
(S.D.N.Y. Sept. 24, 2018) ................................................................................................. 9, 21

*Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266 (S.D.N.Y. 2019) ..................................... 22

*Fletcher v. Dakota, Inc.*, 948 N.Y.S.2d 263 (1st Dep't 2012) .................................................... 25

*Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545 (2d Cir. 2001) 22

*Hunter v. WPD Mgmt., LLC*, 476 F. Supp. 3d 731 (N.D. Ill. 2020) ............................................ 20

*Janush v. Charities Hous. Dev. Corp.*, 169 F. Supp. 2d 1133 (N.D. Cal. 2000) ......................... 12

*Kendrick v. Greenburgh Hous. Auth.*, No. 07-CV-5859 CS, 2011 WL 1118664
(S.D.N.Y. Mar. 22, 2011). ....................................................................................................... 23

*Martinez by Martinez v. Lexington Gardens Assocs.*, 336 F. Supp. 3d 270 (S.D.N.Y. 2018) ..... 20

*Matarese v. Archstone Communities*, LLC, 468 F. App'x 283 (4th Cir. 2012) .......................... 22

*Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402 (E.D. Va. 2011) ............................ 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)......................... 9, 10, 14

*Maun v. Edgemont at Tarrytown Condo.*, 67 N.Y.S.3d 660 (2d Dep't 2017) .......... 25

*MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) .......... 9, 15

*Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014) .......... 10

*Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850 (S.D. Ohio 2009) .......... 15, 20

*Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96 (3d Cir. 2017) .......... 20

*Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307 (E.D.N.Y. 2012) .......... 11

*Sook Kim v. Goldstein*, 04 Civ. 3755 (KMW), 2007 WL 1649902 (S.D.N.Y. June 6, 2007) .......... 11

*Toussie v. Allstate Ins. Co.*, 15 CV 5235 (ARR) (CLP), 2018 WL 2766140 (E.D.N.Y. June 8, 2018) .......... 10

*Tuman v. VL GEM LLC*, 15 Civ. 7801 (NSR), 2017 WL 781486 (S.D.N.Y. Feb. 27, 2017) 12, 14

*United States v. 111 E. 88th Partners*, No. 16 Civ. 9446 (PGG), 2020 WL 1989396 (S.D.N.Y. Apr. 27, 2020) .......... 12, 14, 25

*United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118 (S.D.N.Y. 2015) .......... 25

*United States v. Katz*, 10 Civ. 3335 (RWS), 2011 WL 2175787 (S.D.N.Y. June 2, 2011) .......... 25

**STATUTES**

42 U.S.C. §§ 3601 *et seq.* .......... 1

42 U.S.C. § 3602 .......... 10

42 U.S.C. § 3604 .......... 9

42 U.S.C. § 3610 .......... 7, 8

42 U.S.C. § 3612 .......... 8

42 U.S.C. § 3617 .......... 21, 23

Plaintiff United States of America (the "Government"), by and through its attorney Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum in support of its motion for summary judgment.

## PRELIMINARY STATEMENT

The Government brings this action alleging that Rutherford Tenants Corp. and its President ("Defendants") violated the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA") by denying a reasonable accommodation to an owner-tenant with a disability, Meril Lesser ("Complainant" or "Lesser") and interfering with the exercise of her rights under the FHA. Defendants denied Lesser's reasonable accommodation request to keep her emotional support birds, and instead sought to evict her. Even worse, Defendants sought to further intimidate and retaliate against Lesser for filing a complaint with the U.S. Department of Housing and Urban Development ("HUD") by bringing eviction proceedings, charging Lesser with attorney's fees on her rent, and rejecting a qualified purchaser for her apartment. There is no genuine issue of fact that Defendants made no effort to comply with the FHA or applicable HUD Guidelines, and summary judgment should therefore be entered on the Government's claims.

## STATEMENT OF FACTS

### A. Complainant Resided With Her Emotional Support Animals in the Rutherford for Fifteen Years Until Her Neighbor Raised Exaggerated Noise Complaints

The Rutherford is a residential cooperative apartment building that contains 175 units, located at 230 East 15th Street in New York, New York (the "Rutherford"). Defendant Rutherford Tenants Corp. is the shareholder cooperative association. (Gov. 56.1 Stat. ¶ 1.) Defendant James Ramadei was a member or the President of the Cooperative's Board of Directors (the "Board"). (Gov. 56.1 Stat. ¶ 2.) Since 1999, Lesser has owned unit 5J at the Rutherford. (Gov. 56.1 Stat. ¶ 3.) From before 1999 to at least 2017, the Rutherford allowed

pets, and Defendants did not have any policy or procedure for evaluating requests made by shareholders to reside with assistance animals. (Gov. 56.1 Stat. ¶ 4.)

Lesser has been diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder. (Gov. 56.1 Stat. ¶ 5.) Lesser's conditions affect her ability to "sleep, eat properly engage in public without panic attacks," and run her jewelry business. (Gov. 56.1 Stat. ¶ 6.) Lesser's anxiety and depression comprise a mental health-related disability that interferes with her day-to-day functioning. (Gov. 56.1 Stat. ¶ 7.) Lesser takes medication and participates in therapy to manage her symptoms. (Gov. 56.1 Stat. ¶ 7.) Lesser has been treated for her disability by Dr. Adele Tutter since 2009. (Gov. 56.1 Stat. ¶ 9.) Lesser has been treated by Dr. Teresa Yonker since August 2018. (Gov. 56.1 Stat. ¶ 9.) Lesser relies on her three parrots to "mitigate the mental health symptoms she experiences," and maintain a basic level of functionality. (Gov. 56.1 Stat. ¶ 10.) Removing the birds would likely cause Lesser a "complete breakdown" requiring hospitalization. (Gov. 56.1 Stat. ¶ 11.) Two birds, Layla and Ginger, have lived with Lesser for approximately twenty years. Lesser acquired a third bird, Curtis, in or about January 2015, following the death of two other birds, Cassie and Sadie, who lived with Lesser for over a decade, until 2014. (Gov. 56.1 Stat. ¶ 12.)

Charlotte Kullen ("Kullen") purchased the unit next to Lesser's on the fifth floor after Lesser had purchased her own unit and resided with her birds. (Gov. 56.1 Stat. ¶ 13.) Prior to March 31, 2015, Lesser and Kullen had an amicable relationship in which they often texted one another, ate at restaurants together, and took care of each other's animals. (Gov. 56.1 Stat. ¶ 14.) Lesser and Kullen had a verbal argument on March 31, 2015, which resulted in Lesser slamming the door upon Kullen. (Gov. 56.1 Stat. ¶ 15.) This dispute appears to have precipitated Kullen's complaints.

On or about April 2015, for the first time in the fourteen years that Kullen had been living next door to Lesser and her birds, Kullen complained about the noise from the birds. (Gov. 56.1 Stat. ¶ 16.) On May 15, 2015, Defendants through their managing agent Halstead Management ("Halstead") sent their first notice to Lesser about alleged noise from her apartment, citing "numerous complaints from various neighbors." (Gov. 56.1 Stat. ¶ 17.) This statement was false, because only Kullen complained about noise prior to May 15, 2015. (Gov. 56.1 Stat. ¶ 18.) By email dated May 26, 2015, Lesser contacted Marcia Okon, a member of the Board, and stated that "I spoke to [Halstead] earlier today to see if the board, along with all those with grievances could arrange a time to meet with me in order to work towards a collective solution." Lesser further advised that she would be engaging in soundproofing measures and requested documentation of any complaints. (Gov. 56.1 Stat. ¶ 19.)

On August 19, 2015, Defendants sent their second notice to Complainant about alleged noise. (Gov. 56.1 Stat. ¶ 20.) But as of August 19, 2015, only Kullen had raised any noise complaints about the birds. (Gov. 56.1 Stat. ¶ 21.) On September 15, 2015, Ramadei responded to one of Kullen's complaints:

> Your noise complaint is gaining legal traction. However, if we do not get a noise complaint from one or two more tenants, there will be little we can do. Noise complaints require collaboration or they can be interpreted as spite suits. Spite suits never win. Do you know of anyone else who is bothered by these birds? I have asked and people [sic] while they can hear them … they are not bothered by the noise. I need some help here.

(Gov. 56.1 Stat. ¶ 22.) Ramadei asserted in his deposition that he meant to say "corroboration" (Kennedy Decl. Exh. 35, at 106:6-10), but event still, he plainly asked Kullen for help supporting her claim since everyone with whom he spoke was not bothered by the birds.

From October 9, 2015, through February 26, 2016, Kullen — and only Kullen — placed 24 noise complaints to 311, prompting investigations by the New York City Department of

Environmental Protection ("NYC DEP"). (Gov. 56.1 Stat. ¶ 23.) NYC DEP conducted a total of fifteen site inspections during varying hours of the morning, afternoon, evening, and night from October 13, 2015, through March 3, 2016, all in response to Kullen's complaints. The first visit from NYC DEP was announced, but subsequent inspections were unannounced. All fifteen inspections found that even though parrot sounds could occasionally be heard, there were no loud, unreasonable, or excessive noises; and the DEP issued no notices of any noise violations. (Gov. 56.1 Stat. ¶ 24.) And on five of those visits, the NYC DEP inspector made highly specific findings:

> **October 13, 2015, at 2:30 PM**: Inspector spoke with Lesser at her apartment door for 15 minutes and found "[t]here was no excessive loud noise from parrots, screaming, squawking or screeching heard or detected" (US_01479)
>
> **October 19, 2015, at 8:00 PM**: Over the course of half an hour, inspector interviewed the doorman and patrolled the fifth floor and found "no loud noise made by an animal/bird noted or detected" (US_01480)
>
> **October 28, 2015, at 8:30 AM**: Inspector toured the fifth floor for half an hour, rang the doorbell, and "did not hear any parrots inside" Lesser's apartment. (US_01487)
>
> **October 31, 2015, at 11:15 AM**: Inspector toured the fifth floor for a full hour and heard "no excessive loud noise from parrots screaming or shrieking." Inspector rang the doorbell and spoke with Lesser, "knows that the complaint is from her neighbor who is upset after they broke up their friendship." (US_01490)
>
> **February 20, 2016, at 3:30 PM**: Inspector found "there was no unreasonable or excessive noise (animals) noted or detected . . . . Observations made on fifth floor of above premises. Inspection revealed there to be squawking detected upon first arriving to fifth floor . . . . After speaking with respondent, noise of parrots ceased." Inspector was present for forty-five minutes. (US_01477)

(Gov. 56.1 Stat. ¶ 24.) The House Rules of the Rutherford require that "Complaints regarding other residents shall be made in writing to the Managing Agent. If the complaint requires immediate action or occurs during non-business hours, verbal notice shall be given to the doorman and confirmed in writing to the Managing Agent." (Kennedy Decl. Exh. 11.) Although

Halstead maintained at least some records relating to complaints, Defendants have lost the logbooks that the Rutherford's doormen maintained in 2015 and 2016 to, among other things, record complaints. (Gov. 56.1 Stat. ¶ 26.) Beginning in January 2016, nine months after Kullen had begun complaining about bird noises but three months after Ramadei told Kullen "I need some help here," Sam Keany, Lesser's downstairs neighbor, began complaining to the Board about alleged bird noises. (Gov. 56.1 Stat. ¶ 27.) On a single occasion, on April 3, 2016, Board member Marcia Okon — who lived across the hall from Lesser — complained about alleged bird noises. (Gov. 56.1 Stat. ¶ 28.) Lesser had emailed Okon in 2015 in response to the alleged noise complaints, but Okon never responded. (Gov. 56.1 Stat. ¶ 19.) In all, over the course of more than a year, two residents out of the fifteen units on the fifth floor of the Rutherford complained about alleged bird noises, and three residents out of the 175 units complained. (Gov. 56.1 Stat. ¶ 29.)

## B. Defendants Commenced Eviction Proceedings Against Lesser Based Upon Her Support Animals Despite Knowing They Were Necessary Accommodations

Defendants issued a Notice to Cure to Lesser on or about March 7, 2016. (Gov. 56.1 Stat. ¶ 30.) On or about March 28, 2016, an attorney for Lesser sent a letter to the Board explaining the soundproofing measures Lesser had taken to reduce alleged objectionable noises from escaping her apartment: plugging electrical outlets; installing more carpeting throughout the unit; covering her birds' cages at night and whenever she left the apartment; and installing a professional sound panel to hang on the birds' cages. (Gov. 56.1 Stat. ¶ 31.) The March 28, 2016, letter also expressly advised the Board that Lesser was a person with a disability who required emotional support animals, and attached a letter from Dr. Tutter stating that:

> I am licensed by the state of New York to practice Medicine with a specialty in Psychiatry. I am writing to certify that Ms. Meril Lesser, [date of birth redacted],

> has a mental health related disability recognized by the Diagnostic and Statistical Manual, 5th Edition.
>
> Ms. Meril Lesser has been under my professional care for her mental health related disability since 2009, i.e. 7 years. I am thus intimately familiar with her history and with the functional limitations posed by her mental health-related issues, which interfere with her ability to manage what would otherwise be considered normal, but significant day to day situations. In order to function optimally, Ms. Lesser requires the presence of three emotional support animals: a bare eyed Cockatoo parrot named Layla (17 years old); a white fronted Amazon parrot named Ginger (15 years old); and a Goffins Cockatoo parrot named Curtis (20 years old). Two of these birds have been with her as long as she has lived in her current apartment, 17 years. It is important to emphasize that the presence of these animals is necessary for [ ] the optimal functioning of Ms. Lesser, [who] works from home, as their presence helps to mitigate the mental health symptoms she experiences. All three birds must be present as they are long-term companions of each other and cannot be separated without negative consequences.

(Gov. 56.1 Stat. ¶ 32; Kennedy Decl. Exh. 1B.)

By letter dated March 30, 2016, from the law firm of Rosenberg Livingston & Cholst, Defendants refused to accept Complainant's request for an accommodation, "since it is axiomatic that a tenant is not entitled to harbor an animal in the premises that disturbs her neighbors, even if it qualifies as an emotional support animal." (Gov. 56.1 Stat. ¶ 33.) On or about May 17, 2016, Defendants issued a Notice of Termination to Complainant with a vacate date of May 31, 2016. (Gov. 56.1 Stat. ¶ 34.) On or about June 13, 2016, Defendants initiated a Notice of Petition for a Court Eviction hearing, which commenced on or about June 29, 2016, in the Civil Court of New York, Housing Part. (Gov. 56.1 Stat. ¶ 35.)

Defendants never provided Lesser with any complaints of excessive noise. (Gov. 56.1 Stat. ¶ 41.) At no point did Kullen — or anyone else — provide Defendants medical or psychiatric evidence that Lesser's birds posed a direct threat to her health or safety. (Gov. 56.1 Stat. ¶ 42.) Defendants never met with Lesser. (Gov. 56.1 Stat. ¶ 43.) Defendants never retained an expert to measure the decibel level of the alleged noise. (Gov. 56.1 Stat. ¶ 44.) Defendants

did not review the NYC DEP's reports prior to commencing eviction proceedings against Lesser. (Gov. 56.1 Stat. ¶ 45.) Defendants never retained the services of a soundproofing expert or engineer to address the alleged noise. (Gov. 56.1 Stat. ¶ 46.) The Rutherford has never commenced eviction proceedings against anyone other than Lesser. (Gov. 56.1 Stat. ¶ 47.) The Board's decision to commence eviction proceedings against Lesser is nowhere reflected in the official minutes of the Board. (Gov. 56.1 Stat. ¶ 48.)

On July 30, 2016, Lesser left her apartment on Dr. Tutter's recommendation. (Gov. 56.1 Stat. ¶ 50). On September 29, 2016, Lesser's attorney wrote to counsel for the Board and advised that Lesser and the birds were no longer in the apartment, and that Lesser would agree to not maintain her birds at that residence, provided that Lesser would not pay the co-op's legal fees. (Kennedy Decl. Exh. 19.) As of December 14, 2016, the total legal fees charged by Defendants' counsel (including their current lawyer) was only $6,286.26. (Kennedy Decl. Exh. 20.) Notwithstanding the fact that Lesser vacated her apartment on July 30, 2016, and the entire matter could have been resolved by the end of 2016 had Defendants simply agreed to bear less than $7,000 in legal fees, as of this date nearly seven years later, Defendants continue to maintain eviction proceedings against Lesser, *see Rutherford Tenants Corp. v. Meril E. Lesser*, LT-066886-16/NY (Kennedy Decl., Exh. 21), and pay fees to defend this action.

### C. Lesser Filed a Complaint with HUD, and Defendants Elected to Proceed in Federal Court

On May 14, 2018, Lesser filed a timely complaint against Defendants with the Department of Housing and Urban Development ("HUD"), pursuant to 42 U.S.C. § 3610. (Gov. 56.1 Stat. ¶ 54.) Under the FHA, when an "aggrieved person" files a complaint with HUD alleging discrimination, HUD is charged with investigating the complaint and determining if

there is reasonable cause to believe that a discriminatory housing practice occurred. 42 U.S.C. § 3610(g). Two months later, in July 2018, Defendants, for the first time, placed on Lesser's July 9, 2018, monthly maintenance bill a charge of $62,241, allegedly for legal costs incurred by Rutherford in the eviction proceedings. Defendants escalated the amount to $72,588.04 on the October 25, 2018, bill. (Gov. 56.1 Stat. ¶ 55-56.) Eventually, by May 1, 2019, Defendants removed the charges. (Gov. 56.1 Stat. ¶ 56.)

On August 16, 2019, Lesser entered a contract of sale for her unit 5J with a prospective purchaser (the "Applicant") for the purchase price of $467,500. (Gov. 56.1 Stat. ¶ 57.) The Applicant submitted his application to Defendants for their approval of the sale on October 11, 2019, and provided supplemental information on October 25, 2019. (Gov. 56.1 Stat. ¶ 58.) Defendants never interviewed the Applicant. (Gov. 56.1 Stat. ¶ 60.) On December 16, 2019, the Board denied the application. (Gov. 56.1 Stat. ¶ 61.) At all relevant times, Defendants had no written policies, guidance, or criteria for the Board to use to assess applications. (Gov. 56.1 Stat. ¶ 63.) There is no contemporaneous documentation of the Board's reasons for rejecting the Application. (Gov. 56.1 Stat. ¶ 64.)

On January 15, 2021, the Secretary issued a Charge of Discrimination pursuant to 42 U.S.C. § 3610(g)(2), charging Defendants with engaging in discriminatory housing practices and retaliation in violation of the Fair Housing Act. (Gov. 56.1 Stat. ¶ 70.) On February 2, 2021, Defendants chose to have this matter decided in federal court, pursuant to 42 U.S.C. § 3612(a). (Gov. 56.1 Stat. ¶ 71.)

Both Dr. Tutter and Dr. Yonker have reported that Defendants' actions, from 2015 through the present, have had severely negative consequences for Lesser's mental health and have triggered Post-Traumatic Stress Disorder. (Gov. 56.1 Stat. ¶ 72.)

# ARGUMENT

## POINT I

## DEFENDANTS DISCRIMINATED AGAINST COMPLAINANT IN VIOLATION OF THE FAIR HOUSING ACT

### A. The Legal Framework

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and cite "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see also Black v. Wrigley*, No. 21-2553, 2023 WL 2591014, at *1 (2d Cir. Mar. 22, 2023) (summarizing standard).

The Fair Housing Act ("FHA") prohibits a "wide variety of discriminatory housing practices," *MHANY Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016). The FHA makes it unlawful to discriminate "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling," because of a disability of "the person residing in . . . that dwelling." 42 U.S.C. § 3604(f)(2). Discrimination includes a refusal "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(b); *see also Fair Housing Justice Center, Inc. v. Cuomo*, 18 Civ. 3196 (VSB), 2018 WL 4565152, at *11-12 (S.D.N.Y. Sept. 24, 2018) (failure to accommodate is a type of discrimination under the FHA).

## B. There Is No Genuine Issue of Material Fact as to Defendants' Failure to Accommodate Complainant's Disability

### 1. The Government Easily Meets Four of the Five Prongs of the Reasonable Accommodation Test

For the Government to prevail on its claim that Defendants discriminated against Lesser by failing to accommodate her disability, the Government as plaintiff must show:

> (1) that [Complainant] . . . had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation.

*Olsen v. Stark Homes, Inc*., 759 F.3d 140, 156 (2d Cir. 2014). Defendants cannot create a dispute — genuine or not — with respect to four of these five prongs:

***First,*** it cannot be disputed that Lesser is a person with a disability. Dr. Tutter and Dr. Yonker have both diagnosed Lesser with major depression and anxiety. (*See* Gov. 56.1 Stat. ¶ 5.) Courts have recognized these mental conditions as impairments within the meaning of the Fair Housing Act. *See Olsen*, 759 F.3d at 153-54 (recognizing major depression and anxiety as "disabling condition[s]"). Defendants did not retain any medical or psychological expert to challenge these findings, and thus bring to this motion nothing more than the "metaphysical doubt" insufficient to avoid summary judgment. *Matsushita*, 475 U.S. at 586. Moreover, on June 21, 2022, the Government served Defendants with a Fed. R. Civ. P. 36 Request to Admit that Lesser "is an individual with a disability within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(h)." (Kennedy Decl. Exh. 34.) Defendants never served an adequate response. (*See* Dkt. No. 40.) The Request should therefore be deemed admitted. *See, e.g.*, *Toussie v. Allstate Ins. Co.*, 15 CV 5235 (ARR) (CLP), 2018 WL 2766140, at *11 (E.D.N.Y. June 8, 2018) (deeming requests admitted); *Sook Kim v. Goldstein*, 04 Civ. 3755 (KMW), 2007 WL 1649902,

at *2 (S.D.N.Y. June 6, 2007) (deeming request admitted and granting summary judgment). And as explained *infra*, none of the Board members who received Lesser's request dispute that she is a person with a disability.

***Second,*** Defendants were notified by letter from Dr. Tutter dated March 28, 2016, that Lesser "has a mental health related disability recognized by the Diagnostic and Statistical Manual, 5th Edition." (*See* Kennedy Decl. Exh. 1B.) Defendants were accordingly on notice of Lesser's disability well before they filed eviction proceedings against her on June 13, 2016. A letter notifying a housing provider of a request for accommodation and attaching that proof of disability is sufficient to establish knowledge of that disability. *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 339 (E.D.N.Y. 2012) (finding such knowledge through a plaintiff's verbal request for a reasonable accommodation). "A disabled individual 'need not "speak any magic words" ' to request a reasonable accommodation under the FHA or ADA." *Evans v. 210 E. Pearson Condo. Ass'n*, No. 21-3941, 2023 WL 2711613, at *3 (N.D. Ill. Mar. 30, 2023) (citation omitted); *Elliott v. QF Circa 37, LLC*, No. 16-0288, 2018 WL 2933467, at *7 (S.D. Cal. June 12, 2018) ("a plaintiff need not use the 'magic words' of 'reasonable accommodation' or the 'Fair Housing Act' to trigger a defendant's duty to provide an accommodation so long as the plaintiff's request contains sufficient information to place a defendant on notice that the request is one for a reasonable accommodation"). Particularly in light of Defendants' response letter on March 30, 2016, citing Dr. Tutter's note (Kennedy Decl. Exh. 13), Defendants cannot contest that they were on notice.

***Third***, Dr. Tutter's letter specifically advised that "[i]n order to function optimally, Ms. Lesser requires the presence of three emotional support animals," naming each one and adding: "All three birds must be present as they are long-term companions of each other and cannot be

separated without negative consequences." (Kennedy Decl. Exh. 1B.) Both Dr. Yonker and Dr. Tutter (as well as Lesser) testified that the birds are necessary to Lesser's well-being. "[T]he FHA encompasses all types of assistance animals regardless of training, including those that . . . ameliorate a mental disability." *Tuman v. VL GEM LLC*, 15 Civ. 7801 (NSR), 2017 WL 781486, at *6 (S.D.N.Y. Feb. 27, 2017) (citation omitted); *see, e.g.*, *United States v. 111 E. 88th Partners*, No. 16 Civ. 9446 (PGG), 2020 WL 1989396, at *17 (S.D.N.Y. Apr. 27, 2020) (emotional support dog); *Castellano v. Access Premier Realty, Inc.*, 181 F. Supp. 3d 798, 807 (E.D. Cal. 2016) (cat); *Janush v. Charities Hous. Dev. Corp.*, 169 F. Supp. 2d 1133, 1134 (N.D. Cal. 2000) (birds and cat). During her deposition, Dr. Tutter expanded upon the diagnoses in her March 28, 2016, letter as follows:

[redacted]

(Kennedy Decl. Exh. 4 (Tutter Dep.), at 44:3–45:4.) Similarly, Dr. Yonker testified:

> [KENNEDY]: Did you conclude that Ms. Lesser's birds assist her in dealing with these diagnoses?
>
> MR. LIVINGSTON: Objection.

> [DR. YONKER]: Yes. [redacted]

(Kennedy Decl. Exh. 5 (Yonker Dep.), at 49:4–18.) Lesser testified:

> [LIVINGSTON]: Well, let's not put the bird before the horse here —
> [LESSER]: The what?
> [LIVINGSTON]: The cart before the horse, the saying —
> [LESSER]: Are you making a joke?
> [LIVINGSTON]: Yes, I am.
> [LESSER]: You think this is funny?
> [LIVINGSTON]: No, I don't.
> [redacted]
> [LIVINGSTON]: Should we call 311?
> [LESSER]: 311?
> COUNSELOR KENNEDY: Perhaps you should withdraw the joke, apologize and we can move on.
> [LESSER]: I don't appreciate being triggered. You understand I have PTSD. You're deposing my psychiatrist tomorrow and she'll let you know exactly what you've done.
>
> * * *
>
> [KENNEDY]: Can you explain to us how your parrots provide you with assistance or services or emotional support that alleviate your disabilities?
> [redacted]

(Kennedy Decl. Exh. 3 (Lesser Dep. 109:11–110:12; 191:24–193:25.) Testimony by both a complainant and their treating physician establishing the value and necessity of an emotional support animal is sufficient to establish such necessity. *See, e.g.*, *Tuman*, 2017 WL 781486, at *6 (relying on doctor's note to show necessity for companion dog). Moreover, Defendants failed to retain any medical or psychological expert (or any lay witness, for that matter) to challenge Lesser's testimony, buttressed by the diagnoses and analyses of two doctors, and therefore have nothing to challenge this evidence. Indeed, as detailed further below, the four testifying Board members stated that they had no basis to challenge Dr. Tutter's determination that Lesser's birds were emotional support animals. Because Defendants on this point cannot point to any "specific facts showing that there is a genuine issue for trial," *Matsushita*, 475 U.S. at 587, summary judgment is appropriate.

***Finally,*** Defendants refused to allow Lesser to maintain the birds in her apartment, in that they filed eviction proceedings against her on June 13, 2016, causing Lesser to leave the Rutherford in July 2016 to avoid worsening her symptoms. (*See* Gov. 56.1 Stat. ¶ 50.) *See 111 E. 88th Partners*, 2020 WL 1989396, at *17 ("[C]ourts have found constructive denial where landlords pursue eviction proceedings or take other adverse action against tenants after reasonable accommodation requests are made.") (citing, *inter alia*, *Chavez v. Aber*, 122 F. Supp. 3d 581, 600 (W.D. Tex. 2015) (finding denial where "[d]efendants responded to [plaintiff's] accommodation request by ... filing suits for eviction")). Seeking to evict a person who seeks a reasonable accommodation is plainly the opposite of granting the accommodation.

2. **The Accommodation That Complainant Requested Was Reasonable**

The sole prong of the test for reasonable accommodation claims upon which there could be any dispute is whether the accommodation that Complainant requested was reasonable.

Applying the guidance that HUD has issued regarding such requests, however, demonstrates that there is no genuine issue of material fact with respect to this prong either:

> Housing providers are to evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests. After receiving such a request, the housing provider must consider the following:
>
> (1) Does the person seeking to use and live with the animal have a disability — i.e., a physical or mental impairment that substantially limits one or more major life activities?
>
> (2) Does the person making the request have a disability-related need for an assistance animal? . . . .
>
> Where the answers to questions (1) **and** (2) are "yes," the FHAct and Section 504 require the housing provider to modify or provide an exception to a "no pets" rule or policy to permit a person with a disability to live with and use an assistance animal(s) . . . . The request may also be denied if: (1) the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation, or (2) the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation.

(Kennedy Decl. Exh. 29.) HUD's Guidance is entitled to deference. *See, e.g.*, *MHANY*, 819 F.3d at 618 ("Because Congress afforded HUD the authority to implement the FHA, under *Chevron* . . . this Court must defer to the agency's reasonable interpretation unless 'the intent of Congress is clear.'"); *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850, 859 (S.D. Ohio 2009) (applying HUD guidance). The testimony of the four Board members who denied Lesser's reasonable accommodation request in March 2016, and decided to file eviction proceedings against her instead, demonstrates that Lesser was entitled to an accommodation yet Defendants failed to provide her one (*see* Kennedy Decl. Exhs. 37 (Benedetto), 36 (Keany), 38 (Okon), 35 (Ramadei)):

| | | | |
|---|---|---|---|
| **HUD: "Housing providers are to evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests."** | | | |
| Q. Did anyone ever give you guidance as a Board member regarding the Rutherford's obligations under fair housing laws?<br><br>A. I have no idea specifically what we're talking about.<br><br>(Benedetto 94:8-12) | Q. Did you ever consult any guidance from the Department of Housing and Urban Development as to how to evaluate reasonable accommodation requests?<br><br>A. No. All of this would have been provided by counsel.<br><br>(Keany 48:5-10) | Q. So Government Exhibit 29 is a ten-page document dated April 25, 2013 on the letterhead of U.S. Department of Housing and Urban Development. Have you ever seen this document before?<br><br>A. Not prior to receiving the package that you sent.<br><br>(Okon 111:18-24) | Q. Were you aware of this guidance from HUD at the time Ms. Lesser made her request for a reasonable accommodation?<br><br>A. No.<br><br>(Ramadei 221:23-222:2) |
| **HUD: "Does the person seeking to use and live with the animal have a disability?"** | | | |
| Q. So even after reading Dr. Tutter's letter of March 2016, you did not have an opinion on whether or not Ms. Lesser had a disability?<br><br>A. That is correct.<br><br>(Benedetto 98:19-22) | Q. Do you dispute that Ms. Lesser is a person with a disability?<br><br>A. That's — are you asking do I believe she has a disability?<br><br>Q. No. I'm asking you whether you dispute it or not?<br><br>A. No. I don't dispute it.<br><br>(Keany 43:18-24) | Q. Do you have any basis to doubt Dr. Tutter's assessment as to whether Ms. Lesser has a disability?<br><br>A. I believe I answered that, but I will answer it again. I don't have the psychiatric or psychological expertise to validate one way or the other, validate or invalidate.<br><br>(Okon 114:10-17) | Q. Do you dispute that Ms. Lesser has disability as defined in this document?<br><br>A. Do I dispute whether she has a disability?<br><br>Q. Yes.<br><br>A. I cannot say one way or the other.<br><br>(Ramadei 223:2-7) |
| **HUD: "Does the person making the request have a disability-related need for an assistance animal?"** | | | |
| Q. And did you have an opinion back in 2016, as to whether Ms. Lesser had a disability-related need for an assistance animal?<br><br>A. I had no opinion about it.<br><br>(Benedetto 99:9-12) | Q. Do you dispute that Ms. Lesser has a disability-related need for an assistance animal?<br><br>A. I don't know whether she does or doesn't.<br><br>(Keany 45:22-25) | A. Again, I can't substantiate one way or the other. I don't have the professional expertise to make a determination as to whether or not she had a disability.<br><br>(Okon 115:8-13) | Q. Do you dispute whether Ms. Lesser has a disability-related need for an assistance animal?<br><br>A. No. I don't see what that has to do with anything.<br><br>(Ramadei 223:22-224:2) |

| **HUD: "The request may also be denied if: (1) the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation, or . . ."** | | | |
|---|---|---|---|
| Q. Did Ms. Lesser's parrots pose a direct threat to the health or safety of others?<br><br>A. I don't know.<br><br>Q. Do you have any basis to believe that they did?<br><br>A. I — I don't know. I don't know anything about the parrots.<br><br>(Benedetto 100:3-9) | Q. To your knowledge, did Ms. Lesser's birds pose a direct threat to the health or safety of others?<br><br>A. Yes.<br><br>Q. Let's do the safety part first. To your knowledge, did Ms. Lesser's birds pose a direct threat to the safety of others?<br><br>A. Probably not the safety. But, you know, if you -- this is bleeding into what we define as safety and what define as health and those two things can go hand in hand. And in terms of, you know, I know that she was — her — the birds were causing a lot of — of — of health problems with Charlotte Kullen.<br><br>Q. Specifically what health problems did Ms. Kullen allege the birds were causing?<br><br>A. Loss of sleep, stress.<br><br>Q. Did Ms. Kullen ever provide to the board any evidence of any harm to her health occasioned by Ms. Lesser's birds?<br><br>A. That I don't recall whether she did or didn't honestly.<br><br>(Keany 46:19-47:16) | Q. To your knowledge, did Ms. Lesser's parrots pose a direct threat to the health or safety of others?<br><br>A. Well, I can only speak for myself there and I would answer that as a yes.<br><br>Q. And how did they pose a direct threat to your health or safety?<br><br>A. As a result of the unpredictability of their high-pitched screeching, I encountered a lot of stress when I came home. I wasn't sure what was going to happen when those elevator doors opened. I was very tense as a result of that and I would consider that a health issue, potentially.<br><br>Q. Did you seek any medical treatment for these alleged threats to your health?<br><br>A. No.<br><br>Q. Did you seek any psychiatric treatment for these alleged threats to your health?<br><br>A. No.<br><br>Q. Did you take any medication to address these alleged threats to your health?<br><br>A. No. But I did increase my physical activity exercise routine . . . , to try to alleviate the stress or mitigate.<br>(Okon 116:17-117:19) | Q. . . .Did they pose a threat to anyone's safety?<br><br>A. No.<br><br>Q. Did they pose a threat to anyone's health?<br><br>A. Yes.<br><br>Q. Whose health?<br><br>A. Ms. Kullen's.<br><br>Q. And did Ms. Kullen ever provide you with any documentation or other evidence of any alleged threat to her health?<br><br>A. No, not specifically. I didn't ask for any, either.<br><br>(Ramadei 225:7-20) |

| HUD: "(2) the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation." | | | |
|---|---|---|---|
| Q. . . Do you know whether Ms. Lesser's parrots would cause substantial physical damage to the property of others?<br><br>A. I do not know that.<br><br>(Benedetto 100:16-19 | Q. To your knowledge, did Ms. Lesser's birds cause substantial physical damage to the property of others?<br><br>A. I don't think they caused physical damage.<br><br>(Keany 47:24-48:4) | Q. To your knowledge, did Ms. Lesser's parrots cause substantial physical damage to the property of others?<br><br>A. Not to my knowledge.<br><br>(Okon 119:4-7) | Q. To your knowledge, was there any prospect of Ms. Lesser's parrots causing "substantial physical damage to the properties of others"?<br><br>A. No. No.<br><br>(Ramadei 226:7-11) |

The members of the Board who received the accommodation request have therefore all conceded that they do not contest whether: (1) Lesser is a person with a disability; (2) Lesser required the birds to assist her with her disability; and (3) the birds posed no direct threat to anyone's safety; and there was no claim that the birds caused any property damage. (Gov. 56.1 Stat. ¶¶ 36, 37, 38, 40.)

The only point capable of dispute is whether the noise of the birds "posed a direct threat to the health . . . of others." On this issue, the testimony of the Board members was inconsistent: Benedetto said she did not know; Keany pointed to Kullen, but conceded that he could not recall any evidence; Okon claimed a threat to her health, "potentially," but conceded that she never sought any medical or psychiatric treatment; and while Ramadei pointed to Kullen, he freely conceded that the Board never asked Kullen to substantiate her claims. As a preliminary matter, cannot avoid summary judgment by conflicting testimony. Kullen, for her part, eventually conceded after some evasiveness that she never provided Defendants with any evidence of any alleged threat or harm to her health:

> Q. Now, you have mentioned that you felt that Ms. Lesser's parrots had a negative effect on your health, right?
>
> A. Correct.

> Q. Did you ever provide any medical information to the Board indicating that the presence of Ms. Lesser's parrots was having an adverse health affect upon you?
>
> A. I told them I wasn't able to sleep. I told them I'm feeling broke. I told them many things related to my health and the stress it was causing me. It was 18 months of not being able to sleep when I wanted to sleep or be able to sleep through the night.
>
> Q. Did you ever provide the Board with medical records, whether in the form of physician's notes or anything else about the alleged health effects of Ms. Lesser's parrots on you?
>
> A. My doctors were dealing with my other health issues, so they did not give me a report about the stress from the birds. It was part of overall discussions about my health.
>
> Q. Did you ever provide the Board of Directors at the Rutherford with these reports about the overall state of your health that, in any way, mentioned the allegedly negative health effects of the parrots?
>
> A. No. It was unnecessary because she was blatantly breaking the building rules. There was no need to go into anything more than that. The building knew she was breaking the rules. The building tried to get her to stop breaking the rules. She continued to break the rules. So there was no need for me to provide medical records because there wasn't any dispute about the noise.
>
> Q. I understand you felt that there was no need for you to do something, but people often do things that they don't need to do. So I'm not asking you whether there was a need to ever provide the Board with medical records relating to the alleged health effects of Ms. Lesser's parrots on you. I'm asking you whether you, in fact, at any point, provided the Board of Directors with any medical evidence or records relating to the alleged health effects of Ms. Lesser's parrots upon you?
>
> A. I don't recall providing any medical records.

(Kennedy Decl. Exh. 39, at 279:10–281:15.) As Kullen herself said, in response to Ramadei's "I need some help here" email, "It's not about anything but chronic, persistent, ongoing, strident noise." (Kennedy Decl. Exh. 9, at US_01336.) Accordingly, there is simply no evidence to support the Board's decision in 2016 to deny Lesser's reasonable accommodation request.

The specific response that Defendants made to the reasonable accommodation request on March 30, 2016, moreover, provides insight into Defendants' thinking and demonstrates that the dispute here turns on the law. The Board members all readily conceded that the Rutherford did not have a reasonable accommodation policy in place in 2016 (Gov. 56.1 Stat. ¶ 4), and that none of them consulted HUD's guidance on how to respond to reasonable accommodation requests. Instead, Rutherford's counsel — including the lawyer representing Defendants in this action — asserted: "it is axiomatic that a tenant is not entitled to harbor an animal in the premises that disturbs her neighbors, even if it qualifies as an emotional support animal." (Kennedy Decl. Exh. 13.) This statement is wrong as a matter of law. As the court explained in *Martinez by Martinez v. Lexington Gardens Assocs.*, 336 F. Supp. 3d 270, 281 (S.D.N.Y. 2018):

> requiring a landlord to "violate its own policies" is *precisely* what a reasonable accommodation may be and what federal law requires. The plain text of § 3604(f)(3)(B) requires landlords "to make reasonable accommodations in *rules, policies, practices*, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."

*Id.* at 281 (emphases in original); *see also Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 111 (3d Cir. 2017) ("As a matter of law, [defendant] may have refused a reasonable accommodation by declaring [plaintiffs] in violation of the 'no dogs' rule [and] by fining them fifty dollars a day...."); *Hunter v. WPD Mgmt., LLC*, 476 F. Supp. 3d 731, 736-37 (N.D. Ill. 2020) ("A reasonable accommodation, however, may require changing a practice or service that generally applies to everyone 'as is necessary to provide that person with access to housing that is equal to that of those who are not disabled.'") (citation omitted); *Overlook*, 666 F. Supp. 2d at 856 ("[T]his Court cannot agree with Overlook that it is free to set pet policies for its tenants. On the contrary, such policies must comply with the FHA."). Summary judgment is therefore appropriate because the reasoning Defendants gave at the time for their decision was incorrect

as a matter of law. *See, e.g.*, *FHJC*, 2018 WL 4565152, at *13 (determining whether defendants failed to offer a reasonable accommodation based on the "contemporaneous evidence").

Even if Defendants had considered the Fair Housing Act at all when they denied Lesser's request for a reasonable accommodation (which they failed to do), and then, following HUD's Guidance, made an effort to determine whether there was a direct harm to the health of other tenants (which they failed to do), and Kullen, or anyone else, provided evidence to support a claim of direct harm (which they failed to do), the question would still remain whether the alleged noise from the birds could "be reduced or eliminated by another reasonable accommodation," such as soundproofing. Defendants conceded, however, that they never provided Lesser with Kullen's complaints of excessive noise (Gov. 56.1 Stat. ¶ 41), never met with Lesser (Gov. 56.1 Stat. ¶ 43), never retained an expert to measure the decibel level of the alleged noise (Gov. 56.1 Stat. ¶ 44), never considered that NYC DEP did not substantiate Kullen's allegations (Gov. 56.1 Stat. ¶ 45), and never retained the services of a soundproofing expert or engineer who might be able to address the problem professionally (Gov. 56.1 Stat. ¶ 46). Instead, Defendants appear to have decided that Lesser could be easily bullied, and, instead of absorbing $7,000 in legal fees to resolve this matter, continued to make bad decisions based upon incorrect legal advice and pay even more fees — for seven years and counting.

## POINT II

## DEFENDANTS RETALIATED AGAINST COMPLAINANT IN VIOLATION OF THE FAIR HOUSING ACT

The Fair Housing Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed . . . any right granted or protected" by the FHA. 42 U.S.C. § 3617. "'Interference' has been broadly applied to reach all practices which have the effect of interfering with the exercise of rights under federal fair

housing laws." *Castellano*, 181 F. Supp. 3d at 809. Here, there is no genuine issue of material fact that (1) Lesser "engaged in protected activity" under the FHA by requesting a reasonable accommodation in March 2016 and then filing a complaint with HUD in 2019; (2) Defendants knew of that activity; (3) Defendants "subsequently took adverse action" against her by filing eviction proceedings against Complainant, adding legal fees to her maintenance bill, and refusing to approve a potential sale of her apartment; and (4) "there is a causal connection between the protected activity and the adverse action." *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 278 (S.D.N.Y. 2019) (citations omitted).

To establish causation, courts consider whether there is close temporal proximity between the protected action and adverse activity. *Chavez*, 122 F. Supp. 3d at 600 (finding that the close proximity between a request for accommodation and eviction established cause). The Second Circuit has refused to adopt "a bright line" rule on outer limits of temporality. *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). Because the Government has established a "prima facie showing" of retaliation, Defendants must articulate a "legitimate, nondiscriminatory reason" for their adverse actions, and courts must determine "whether the proffered reason is the actual reason for the challenged action." *Broome v. Biondi*, 17 F. Supp. 2d 211, 217 (S.D.N.Y. 1997). Courts have found unwritten policies, differential treatment, and inconsistent explanations for an action — all present here — to be pretextual and therefore not legitimate reasons. *See, e.g.*, *Matarese v. Archstone Pentagon City*, 795 F. Supp. 2d 402, 438 (E.D. Va. 2011) ("Defendants' inconsistency in the reasons for the nonrenewal of Plaintiffs' lease demonstrates the falsity of their nondiscriminatory reason and that the discrimination was the real purpose."), *aff'd in part, vacated in part sub nom. Matarese v. Archstone Communities*, LLC, 468 F. App'x 283 (4th Cir. 2012).

**A. Defendants Retaliated Against Lesser By Seeking to Evict Her**

Lesser's request of a reasonable accommodation was a protected activity under the FHA. *Chavez*, 122 F. Supp. 3d at 600 (requesting reasonable accommodation for an emotional support pet was a protected activity). Defendants then sought to evict her. Courts have found adverse actions to include eviction proceedings. *See Castellano*, 181 F. Supp. 3d at 809. Defendants maintained these proceedings, moreover, despite obtaining in September 2016 an agreement from Lesser to give them what they wanted — she agreed not to live in her unit with her birds, and in fact has not lived there since. (Gov. 56.1 Stat. ¶ 51.)

**B. Defendants Retaliated Against Lesser By Seeking to Collect Legal Fees**

Lesser's filing a complaint with HUD was also a protected activity because she did so "in protest of statutorily prohibited discrimination." *Kendrick v. Greenburgh Hous. Auth.*, No. 07-CV-5859 CS, 2011 WL 1118664, at *9 (S.D.N.Y. Mar. 22, 2011). After she filed, Defendants attempted to collect their legal fees (growing from $6,286 in December 2016 to $72,558.04 in 2018) in the guise of maintenance. In *Arnal v. Aspen View Condo. Ass'n, Inc.*, 226 F. Supp. 3d 1177, 1188 (D. Colo. 2016), the court concluded that a Board's fining of the plaintiff for attorney's fees could be adverse action under § 3617. That Defendants eventually conceded this point suggests they knew their actions were unlawful.

**C. Defendants Retaliated Against Lesser by Rejecting a Qualified Buyer for her Unit**

Most significantly, Defendants refused to permit Lesser to sell her apartment to a qualified buyer. While this transaction would have had the beneficial effect of ending Defendants' intimidation of Lesser, Defendants appear to have concluded that they are more likely to recover their fees through a foreclosure proceeding in housing court.

Analysis by the Government's expert Heather Albright, a Certified Fraud Examiner, demonstrated that Applicant, a physician whose application to purchase Lesser's unit was rejected, compared favorably to other applications that the Board approved during the same time period, using the criteria commonly used by New York City co-ops to assess applications: percent of down payment paid, FICO score, post-closing liquidity ratio, debt-to-income ratio, and housing expense ratio. (Gov. 56.1 Stat. ¶ 66.) And all the reasons that members of the Board gave in deposition testimony, over two years after the decision, uncorroborated by any contemporaneous evidence, are purely pretextual. First, Board members asserted that they rejected the Applicant because he initially applied as a trust, but as Albright shows, the Applicant amended the application to apply personally. (Gov. 56.1 Stat. ¶ 67.) Second, Board members claimed that they were concerned that the Applicant might not live in the unit year-round, but as Albright shows, the Board approved another application during the same term where it was not clear that the applicant family would live year-round in the unit. (Gov. 56.1 Stat. ¶ 68.) Third, Board members asserted that the application contained discrepancies, but Albright's independent assessment concluded that the application contained no material discrepancies and all of the other applications that the Board approved during the same term contained equal or greater discrepancies. (Gov. 56.1 Stat. ¶ 69.)

## POINT III

## DEFENDANTS' STATE COURT DEFENSES SHOULD BE DISMISSED

In addition to granting the Government summary judgment on its two claims, the Court should dismiss all of Defendants' defenses, only four of which require further analysis. Three of Defendants' defenses are redundant and frivolous. Defendants' Fifth Defense asserts that Lesser's actions "are or by attribution should be deemed to be the acts of the Plaintiff and the

Plaintiff is responsible for and bound by such actions"; their Seventh Defense is that collateral estoppel and res judicata bind the United States to Lesser's choices in housing court; and their "Tweleth" [sic] defense is that, applying these principles, the Government cannot argue that Lesser is a person with a disability. (Kennedy Decl. Exh. 33 (Answer). This Court routinely rejects such defenses: "The general rule is that governmental agencies are not bound by private litigation when the agency's action seeks to enforce a federal statute that implicates both public and private interests." *United States v. Katz*, 10 Civ. 3335 (RWS), 2011 WL 2175787, at *5 (S.D.N.Y. June 2, 2011); *see also id.* at 6 ("The United States, in enforcing the Fair Housing Act, is 'not merely a proxy for the victims of discrimination,' but safeguards public interests independent of those of the Intervenor Plaintiffs."). "This position is buttressed by the structure and language of the FHA, which demonstrate Congress's intention to distinguish the interests of the Attorney General from those of aggrieved private parties." *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 149 (S.D.N.Y. 2015) (rejecting defendant's assertion that the United States was bound by prior state court determinations); *see also 111 E. 88th Partners*, 2020 WL 1989396, at *13 (same).

Finally, the Eighth Defense cites the "business judgment" rule. But "arbitrary or malicious decision making or *decision making tainted by discriminatory considerations* is not protected by the business judgment rule." *Fletcher v. Dakota, Inc.*, 948 N.Y.S.2d 263, 267 (1st Dep't 2012) (emphasis added); *see also Maun v. Edgemont at Tarrytown Condo.*, 67 N.Y.S.3d 660, 662 (2d Dep't 2017) ("Here, the plaintiff alleges unlawful discrimination by the defendants, which is inherently 'incompatible with good faith and the exercise of honest judgment.' Accordingly, the business judgment rule is not applicable.") (citing *Fletcher*; additional citations omitted).

**CONCLUSION**

The Court should grant the Government summary judgment on all claims and conduct an inquest into damages.

Dated: New York, New York
June 21, 2023

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/ David J. Kennedy
DAVID J. KENNEDY
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2733
david.kennedy2@usdoj.gov