UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------X
UNITED STATES OF AMERICA,

PLAINTIFF,

-against- Case No.: 1:21-cv-10383

RUTHERFORD TENANT CORP. and JAMES RAMADEI,
DEFENDANTS.
-----------------------------------------------X

DATE: September 28, 2022
TIME: 10:41 A.M.

DEPOSITION of a Non-Party Witness, MERIL EILEEN LESSER, taken by the respective parties, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held at the offices of The United States Government Office, 86 Chambers Street, 3rd Floor, New York, New York 10007, before Amanda Tartaglia, a Notary Public of the State of New York.

A P P E A R A N C E S:

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America
86 Chambers Street, 3rd Floor
New York, New York 10007
BY: DAVID J. KENNEDY, ESQ.

HERRICK, FEINSTEIN, LLP
Attorneys for Respondents
THE RUTHERFORD TENANTS CORP. and
JAMES RAMADEI
2 Park Avenue
New York, New York 10016
BY: PETER LIVINGSTON, ESQ.

ALSO PRESENT:
ADAM BURTON
Intern
UNITED STATES GOVERNMENT
JULIETTE DEEN
UNITED STATES GOVERNMENT

* * *

M. E. LESSER

MERIL EILEEN LESSER, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY COUNSELOR LIVINGSTON:

Q. Please state your name for the record.
A. Meril Eileen Lesser.
Q. What is your address?
A. 364 John Joy Road, Woodstock, New York 12498.
COUNSELOR LIVINGSTON: This deposition was called for 10 o'clock this morning. It's now 10:41 so we're starting late.
Q. Before you came into the room, I understand you met with Mr. Kennedy; is that true?
A. That's correct.
Q. What did you discuss?
A. My feelings.
Q. Other than your feelings, what

M. E. LESSER

did you discuss?

A. How you destroyed my life, Peter.

Q. Oh, I destroyed your life?

A. Under your Counsel, Rutherford Tenants Corp and James Ramadei, took actions which destroyed my life.

Q. Okay. And did Mr. Kennedy show you any documents this morning?

A. Nope.

Q. Have you seen any documents in this case?

A. Can you please explain?

Q. Sure. Do you know what a document is? It's a piece of paper and has information --

COUNSELOR KENNEDY: Objection. Let the witness answer.

A. I know what a document is.

Q. Okay. Have you seen a copy of the Complaint?

A. Which one?

Q. Is there more than one Complaint that you're aware of in this

M. E. LESSER

Q. I understand that --

A. I -- I just took on a different role in 2015.

Q. Okay. Now, have you ever been a participate in a lawsuit unrelated to the case involving The Rutherford?

A. No.

Q. Okay. Have you ever had your deposition taken before?

A. No.

Q. Now, did there come a time when you moved into The Rutherford Cooperative?

A. Come again?

Q. Yeah. Did there come a time when you moved into The Rutherford Cooperative apartment building on East 15th Street?

A. I'm -- I became a shareholder. I purchased the apartment in 1999.

Q. Well, did you purchase the apartment in 1999 or did your parents and you purchase the apartment in 1999?

A. I purchased it with my money. My parents were co-signers.

M. E. LESSER

that particular witness was that you could not provide her with any of the documents unless and until she signed a confidential agreement and I'm taking that same position.

COUNSELOR KENNEDY: Objection. The record will show that's not what happened, but continue.

COUNSELOR LIVINGSTON: That's fine.

Q. Now, when you first moved into your -- the building, we'll call it The Rutherford, is that okay?

A. If that's what you would like to call it, that's fine.

Q. Great. Did you have any animals at the time?

A. Yes.

Q. And what kind of animals did you have?

A. Two parrots.

Q. Two parrots?

A. Parrots.

Q. Parrots. And what -- what were

M. E. LESSER

their names?

A. Cassie and Sadie.

Q. Okay. And did you require any type of permission from the building to have those birds?

A. No. It's a pet friendly building.

Q. So you moved in with Cassie and Sadie, were there any complaints about those birds that you're aware of?

A. There -- no, there was never any complaints until Charlotte Kullen.

Q. Okay, first I'm taking and Cassie and Sadie, okay? No complaints, correct?

A. No complaints.

Q. Now, there came a point in time when you no longer had Cassie and Sadie, correct?

A. They -- Cassie and Sadie have passed away.

Q. Right. So you -- you don't have them anymore, you replaced them with other birds?

M. E. LESSER

A. I didn't replace them.

Q. Sorry?

A. Within the first two years of moving in, I -- I -- Ginger, well, Layla came first and then Ginger came.

Q. Okay, first came Layla, correct?

A. Mm-hmm.

Q. And how many years did you have Layla before you had Ginger?

A. A year, about.

[redacted]

M. E. LESSER

[redacted]

Q. Okay. When was it that you got that second bird?

A. Let me --

Q. Approximate.

A. It was 2001.

Q. Okay. So from 2001 to 200 -- the end of 2014, you had two birds, correct, Layla and Ginger, correct?

A. I had Cassie, Sadie, Ginger and Layla --

Q. Right, but --

A. -- all four.

Q. But after Cassie and Sadie passed on, you had Layla and Ginger, correct?

A. I believe Sadie passed -- Cassie passed first, while I was on -- I'm

M. E. LESSER

trying to think about when Sadie passed -- Sadie passed away in 2014.

Q. So --

A. So there was a small period of time where it was just Ginger and Layla.

Q. Up until the end of 2014, is it fair to say that no complaints that you knew about concerning noise from these birds?

A. There was no complaints.

Q. Okay. Did there come a time when you got a bird named Curtis?

A. Correct.

Q. And that was some time in January of 2015?

A. As I recall, about that time, yes.

Q. Now, are you familiar with an individual by the name of Steven Troy?

A. Yes, that's my neighbor.

Q. Okay. And can you describe your relationship with him?

A. He was my neighbor.

Q. That's it? Just neighbors?

A. Yes.
Q. And who was Mr. Santos?
A. The doorman.
Q. Okay.
A. One of the doormen.
Q. And what relationship, if any, did you have with him?
A. I had a very positive interaction. It was professional, you know, I didn't -- I didn't see the people who worked for the building on a social level.
Q. Okay. And you knew Charlotte Kullen, correct?
A. Yes.
Q. And you had been neighbors with Ms. Kullen since 1999 when you first moved in, about that time?
A. I moved in first.
Q. And can you describe up until 2015 your relationship with Ms. Kullen?
A. She's my neighbor.
Q. Well, it was more than just being neighbors; is that true?

M. E. LESSER

A. Well, what -- what are the --

Q. Well, did you go to restaurants together?

A. Occasionally.

Q. And --

A. May I complete?

Q. Sure.

A. Are you -- Charlotte and I weren't friends. She was my neighbor. We had what I would call a working relationship. I -- I took care of her cat when she went away and she would sit for my birds when I went away. I felt really sorry for Ms. Kullen because she didn't have any friends and I would occasionally go out with her as she was my neighbor, but she -- I found her to be very unpleasant, so I had to have very limited social --

Q. That was around 2015 when she became unpleasant?

A. She was always unpleasant. She's -- she was not -- she's never been a happy person since I've known her.

Q. And up until, say, 2015, how

often would you interact with Ms. Kullen, either in person or by text or e-mails; was it a rare event or --

A. Charlotte Kullen was not a significant person in my life.

Q. So you didn't have very much to do with her; is that a fair way of looking at it?

A. She was my neighbor. We moved in at the same time. We're in the same age range.

Q. Well, I'm talking about social interactions with her?

A. I don't -- I don't -- I did not see her very often.

Q. And you didn't talk to her, text her, e-mail --

A. No, we did. It was -- I was nice to her because she was my neighbor.

Q. Right.

A. And Charlotte was also a troublemaker and she was always flipping out about things in the building and she was very abusive to the staff. She was

M. E. LESSER

constantly e-mailing Halstead for the -- Lawrence properties, the management, I just --

Q. Yes, but I'm asking you how often did you interact with her, that's what I'm asking you, once a week, once a month, you tell me?

A. I -- it's, I mean, I haven't seen her in years. I really don't recall.

Q. You don't recall having very much -- no terms of interactions with her, is that a fair way of looking at it?

A. Well, she was my next door neighbor.

Q. I know she was your next door neighbor. I understand that.

A. So I mean, I'm sure I saw her.

Q. Mm-hmm.

A. I don't know -- considering she didn't really have friends, I don't know how she would have defined our relationship. It might be differently.

Q. Okay.

A. But I was kind to Charlotte

M. E. LESSER

[redacted]

Q. So it's fair to say Charlotte Kullen never took care of Curtis during the time that you had that bird, correct?

A. No.

Q. No, she didn't or no, she did?

A. No, she did not.

Q. Okay. Now, before -- did there -- was there an incident which led to the two of you not talking to each other in 2015?

A. Oh, yeah. When she came banging on my door and came into my apartment and screamed at me and scared me

M. E. LESSER

and I shut the door and then she went downstairs and told Noel Santos that I shut the door on her and that she would make me regret that.

Q. And what did she say when she came into your apartment?

A. This was about 1:00 in the afternoon, I had just gotten back from Trader Joe's and she just went batshit crazy. I know I'm not supposed to curse, but I don't have any other words to describe Charlotte Kullen, saying that the birds are making noise.

Q. What was she complaining about, that the birds were making noise?

A. Yeah.

Q. Was that the first time that she complained about the birds making noise?

A. No. She would text me when I was at my jewelry studio and I would come home immediately. She would say the birds are going crazy, I would come home, the birds were quiet. This happened repeatedly

M. E. LESSER

until the day when she had texted me when I had been home working all day and she texted me where are you, your birds have been screaming all day and that's when I realized she was just fabricating. She also, when I was away with Curtis, I don't recall where we were, she called me on the phone accusing Curtis of screaming when we were out of state. So I mean, it's...

Q. Okay.

A. That's when I stopped.

Q. So up until the time you slammed the door on her --

A. I didn't slam the door, I just like shut it because I was scared. Somebody is coming into my face. Charlotte is significantly larger than me and I -- I -- it's an assault.

Q. Okay.

A. But I'm -- she went down to the doorman and she told them, Noel, that I shut the door on her and that she would make me regret it and this is when all the problems started.

M. E. LESSER

Q. And how did you learn that?

A. From Noel.

Q. Okay.

A. He -- he let me know.

Q. Now up until the time that you got Curtis, you weren't getting any complaints from anyone, you told me, with respect to noise, correct?

A. No. And I did have Curtis for about a month and Charlotte didn't know he was there and then when she found out I had him there, that's when she started having complaints, so little did she know she was living next to Curtis for about a month.

Q. So there was no -- when you first got Curtis, there was no adjustment period --

A. There was -- there was a couple weeks adjustment period -- okay, so in a flock, there's a bird -- certain birds are called callers, so they're flock animals, so it's safety in numbers. So what was happening was, when the sun was going down at first, he was vocalizing, so I had to

M. E. LESSER

then -- but this was -- I figured this out because Marcia was concerned one day that she heard -- she thought that -- she thought Curtis was -- or like the birds were in distress and so just based on the timing and I looked it up and I just had to make sure that if I was there -- like I had to get there before the sun was going down and then there was no problem because he was just basically doing his -- his job of being -- he was trying to call the flock in, so he was calling.

Q. He would call -- what's the connection with him calling in the flock and the sun? I don't understand. I'm sorry.

A. Well, at night there are predators. I mean, birds are flock animals, you do understand how that is? That's a way for them to survive, safety in numbers.

Q. Okay.

A. Okay? So birds, they -- it's in their DNA. They don't choose their --

M. E. LESSER

it -- they're callers, so it's -- it's you know, if you hear birds, when the sun goes down, you'll start hearing birds. They're calling everyone home. So Curtis considered me his flock, part of his flock, and so if I wasn't there, he was just -- I just had to make sure I was there and that stopped.

Q. Mm-hmm. So the sun would go down is when he would start making noise?

A. Mm-hmm.

Q. Correct?

A. If I -- he -- that's -- that's what I was able to -- if I was there, there was no problems.

Q. Right.

A. But I figured out quickly, very quickly after Marcia told me that -- I don't remember when Marcia -- yeah, so I -- that's when she told me -- yeah, so basically the way to not have that issue occur was to make sure that, so when the sun is -- like starts going down, for me to be in the home.

M. E. LESSER

Q. Right.

A. And once it's dark, they go to bed. And if I wanted to, I could leave the apartment without any problems, but I didn't because after -- by -- by October, Curtis arrived in January 2015, by October '15, I wasn't leaving my house.

Q. You weren't leaving your house?

A. No. No. Once Charlotte started calling 311 and there were all these federal people coming to check and the Board was directed -- the Board directed the doormen not to tell me, so -- which, I mean, it's -- let me finish.

Q. Sure.

A. So you threw me off. Forget it.

Q. Sorry.

A. They -- they -- they -- okay, so when people -- I recall. So the Board, which I would presume to be perhaps James Ramadei as the president, I don't know who else, whoever else was on the Board told -- gave directive to the doormen, do not buzz

M. E. LESSER

her. Don't let her know when the federal people come. So it was -- it was very violating, so I became very afraid to leave my house because I was being attacked.

Q. Yeah.

A. Mm-hmm.

Q. So when you're in your apartment, the birds are quiet because you're there?

A. Yes.

Q. So you don't have to cover their cages or anything, correct?

A. No.

Q. Did you, when you left the apartment, cover the cages or did you think that was cruel to cover their cages?

A. I partially covered their cages.

Q. What would be the reason that you would do it partially?

A. Well, what -- I mean, once I -- I was doing it to -- to -- after -- how do I explain this? When I received the first noise complaint from Yessenia Camilo

M. E. LESSER

(phonetic) and from Halstead in May of 2015, which by the way, the first documented Complaint was August of 2015, so I'm not really quite sure what information I was being contacted, but I -- I was told that there's been -- the parrots were being disruptive and I asked to meet with the Board. Nobody would meet with me and I just, I can't see sound, so what I did learn was that putting soft -- anything soft absorbs sound. So anything that lays flat, so I tried to just put blankets and put carpet and tapestry everywhere.

Q. Right, but now I'm talking about covering the cages; did you think it cruel to cover the cages?

A. They weren't covered. They were...

Q. What would be the reason to cover a bird cage?

A. To keep them warm.

Q. To keep them warm?

A. Warm and also, I was being accused -- my birds were being accused of

making noises and I can't see sound and I did leave my apartment sometimes and I was just trying -- nobody was helping me about what to -- there's noise complaints, nobody would tell me anything and I was in -- trying to do the best that I could to create a -- as much soundproofing.

Q. We'll get to that. Let me ask you this --

A. You're asking me about the blankets. They weren't covered, but they were -- they were covered enough, like if there -- if this is their house (indicating), it would be like -- and this was the front, they would have blankets like this (indicating).

COUNSELOR LIVINGSTON: Okay, the witness is showing us that she's covering the top of a tissue box with a tissue.

Q. Was the backside covered, too?

A. I guess we need more tissues. Do you want me to take all the tissues out, Peter? I'll do that then. Let's stick it

M. E. LESSER

back in. So this is the front (indicating). So what I did, I put blankets like here (indicating) and blankets here (indicating) and blankets like this (indicating) and blankets like this (indicating).

Q. So the entire cage was covered then?

A. No, because that's where -- that's where they face, so they could see each other.

Q. Okay. I'll take a picture of that if you don't mind.

A. Okay.

COUNSELOR LIVINGSTON: Yeah, it will be -- would you like to be in the picture, Mr. Kennedy?

COUNSELOR KENNEDY: No, thank you.

THE WITNESS: This is so desperate.

COUNSELOR LIVINGSTON: Thank you.

THE WITNESS: I think -- I

think this is a better representation, Peter. I think I see a little spot that's not covered. Do you want to take a picture of the other sides, Peter, so you can --

COUNSELOR LIVINGSTON: Is the other side covered?

THE WITNESS: I think you should look.

COUNSELOR KENNEDY: I'm going to object because on the grounds of completeness, if you're going to take a picture of one side, you should take a picture of all sides.

THE WITNESS: Do you want me to like -- just so that you understand?

COUNSELOR LIVINGSTON: I understand fine. Thank you. Thank you very much okay. That's fine.

THE WITNESS: I think you missed this side (indicating).

COUNSELOR LIVINGSTON: We're going to get this side.

THE WITNESS: You're in my

M. E. LESSER

personal space.

COUNSELOR KENNEDY: Could you not touch the witness, please.

COUNSELOR LIVINGSTON: You have to be kidding.

THE WITNESS: I think it's reasonable to ask not to touch the witness.

COUNSELOR LIVINGSTON: We're not going to go there today, Mr. Kennedy.

THE WITNESS: Obviously this is a tissue box.

COUNSELOR LIVINGSTON: I understand. I recognize it. Thank you.

THE WITNESS: You seemed confused about blankets.

COUNSELOR LIVINGSTON: You did fine.

Q. Now, did you ever tell Ms. Kullen if the birds are making noise, just to bang on the door if you're not home?

A. What? Why would -- banging on

M. E. LESSER

the door upsets them.

Q. Mm-hmm.

A. Because if it's -- just like any -- have you ever heard animals in an -- in an apartment before in a hallway, Sir?

Q. Have you ever come off the elevator and you heard the birds squawking or screeching?

A. No.

Q. Never?

A. Never.

Q. Do you know if any of your neighbors besides Ms. Kullen ever heard the birds squawking or screeching?

A. Well, when I got the first letter, I happened to be on the roof deck and I can list the names of my neighbors who were up there and I asked them if there was a problem. Marcia, Steven, Steven's husband, Sandy Berger and a woman, I don't know -- I don't know her name and I asked -- I was concerned, I said are my parrots a problem and they said no, they weren't. So I did -- as far as I know, my next door

M. E. LESSER

neighbor, Myrtle, nobody had any problems, but Charlotte.

Q. Only Charlotte?

A. Mm-hmm.

Q. And you never heard the birds squeaking or making any kind of noise, correct?

A. I mean, they vocalize, but not -- I mean, I'm -- I -- we're not in -- I -- I'm allowed to have sound. They talk.

Q. Right.

A. They sing. I mean, they were no louder -- louder than -- I mean, there were things -- I mean what I could hear, what I did hear, I do recall, coming off the elevator and hearing Ms. Kullen, what I presumed, is [redacted] hallway.

Q. I didn't ask that question.

A. No. You're asking me about sounds in the hallway and so I'm kind of going through and saying what I hear. And you could hear people putting away their cutlery. I heard Marcia Okon on a very

long help call, I mean, for her computer. Yeah.

Q. Did you ever make an audio or a video of any sounds that Ms. Kullen ever made?

A. No.

Q. Okay. That never happened, correct?

A. I -- did I record when I heard Ms. Kullen what sounded -- what -- [redacted]

Q. No, recorded anything, music, sounds, radio, anything, did you ever record any of that?

A. I don't recall at this time.

Q. Okay. Did you have an occasion to go to Virginia and leave Layla and Ginger in your apartment to be taken care of by someone but you took Curtis with you?

A. Not that I recall.

Q. Can you think any reason why you would have taken Curtis back to the --

A. What are you -- what?

Q. Can you think of any reason why

M. E. LESSER

When I object, I'm just objecting to the question and I could be objecting on a variety of grounds. I'm not directing you not to answer.

THE WITNESS: Okay.

A. Nobody gave me any information.

Q. That's not the question.

A. I did not -- I was not aware.

Q. Did there ever come a time that you learned that neighbors, besides Ms. Kullen, were complaining about the noise?

A. Not until -- you were in Housing Court and I received the Bill of Particulars. That's the only time I was given any information about anything regarding the birds. At no time did anybody provide me with information, nor did anybody ask to speak to me.

Q. Okay. When people came off the elevator onto the 5th floor, did that ever cause the birds to make any type of noise when they heard that?

A. Not that I recall.

Q. What about people talking in

the hallway --

A. I lived right across from the compact room and -- I lived right across the room from the compact room and you can hear everything that goes on in the hallway, so sometimes the birds would hear people outside congregating in front of my door while they were putting out the trash --

Q. Right and what, if anything, would the birds do when they heard the people outside?

A. They were trying to talk back. They were -- nothing -- they weren't screaming, but they would be like (indicating). I can't make -- I can't properly represent their sound, but they would, you know, but I found it rude and irritating when people were standing right outside my door talking. I mean, the walls are paper thin. There's about a quarter inch between my wall and Charlotte's. From what I understand, I don't think the building is even under fire code.

M. E. LESSER

A. I wasn't aware. I'm not aware.

Q. By the way, when you moved into your apartment, it had wall to wall carpeting, didn't it?

A. Correct.

Q. And you also had popcorn celling?

A. Correct.

Q. And you took down the popcorn ceiling, right?

A. So did Charlotte, right after I did mine.

Q. Confine yourself to what I'm asking you, Ma'am.

A. Well, we're talking about -- we are talking about two apartments, like, in tandem so.

Q. So anything -- you did attempt to soundproof your apartment, correct?

A. Just to kind of move things along, Peter, everything in the HUD file, everything, all these things that I purchased, it was almost $2,000 worth of things, nobody would speak to me. Your

clients refused to meet with me. I didn't know how to resolve a problem that wasn't happening that I wasn't experiencing. That being said, I do leave -- I did leave the apartment to go to the post office, like, maybe every other day. Sometimes I wouldn't leave at all, but nobody -- it didn't really seem -- I -- I -- nobody wanted to -- I can't see sound. Can you see sound? Because I can't see sound. So I wasn't disputing that. We all make noise. I mean, the apartment -- the -- the -- the -- those buildings, I mean, you can hear everything.

Q. Mm-hmm.

A. I can hear peoples' phones ringing. I heard more than I ever wanted to hear from my neighbors, so it's -- what I'm saying is that the apartment building, I -- I know that what you're trying to say is that my birds vocalization exceeded some level of sound, but the fact is that you can hear everything that was going on in everyone's apartments around you, so it

M. E. LESSER

just seems that children screaming and crying was okay. My birds certainly did not scream as loud as the babies that lived down the hall.

Q. Finished?

A. Are you finished?

Q. Are you finished with that response?

A. The response is that your clients would not -- weren't -- I mean, I think -- it's the Board's job is -- would have been to, you know, Ms. Kullen, I know made complaints about my emotional support animals to the Board and they spoke to her and I know that you spoke to her in 2015 and -- but you wouldn't speak to me.

Q. Did you ever ask to speak to me, Ms. Lesser?

A. Do you remember when we spoke Mr. Livingston?

Q. That's not a question I'm interested in.

A. Because you don't remember when I called you?

M. E. LESSER

Q. No, I don't.

A. Because you charged my co-op for that call.

Q. I'm not here to answer your questions. Let's go on with what I want to ask.

A. No, but I think it's relevant because --

Q. Save it.

A. Easy, Peter.

Q. So the efforts you made to soundproof your apartment were things that you thought about to help soundproof your apartment; is that correct?

A. I was acting in good faith as a good faith gesture. I didn't have to do anything because what my birds were being accused of wasn't happening, but I wanted to be left alone.

Q. Right.

A. And in the case that there was sound escaping somewhere, I did my best effort to go online and research because you wouldn't speak to me or facilitate a

M. E. LESSER

meeting between the Board and I after receiving a Notice to Cure and the Board wouldn't respond to me after my requests to meet. I -- I don't really know what -- what else I was to do. I know that I didn't have to do anything.

Q. Okay.

A. But I'm a decent person, so...

Q. Okay. Did you talk with your attorney about some ideas about soundproofing your apartment?

A. Which -- oh, Peter, by the time I had an attorney, you made my life a living hell.

Q. I heard that already five times. Let's stick with the question.

COUNSELOR KENNEDY: Let the witness answer the question.

A. With Ms. Wenig?

Q. Beg your pardon?

A. By the time my attorney, Ms. Wenig, I was out of that apartment in July of 2016 after being harassed and tormented and terrified in -- in after -- after,

let's see.

Q. Ms. Lesser, it's a yes or no question?

A. I think I'm allowed to take as much time as I would like to answer your questions.

Q. You can do that.

A. Can you stop talking so I can think. Why are you laughing?

Q. I'm not laughing, Ms. Lesser.

A. What were you doing? Are you okay?

Q. I'm ready. Waiting for you to finish.

A. Are you okay? Okay, you charged telephone conference with Lesser regarding parrot noise complaints from shareholders, that's March 9, 2016. PIL, is that you? You charged them $475 for that conversation.

Q. Okay.

A. And let's see. Hold on.

Q. Ms. Lesser, the question was whether you talked to any of your attorneys

M. E. LESSER

about soundproofing the apartment, not me.

A. With Sam Himmelstein for a minute about the door, yes.

Q. And you had other attorneys besides Mr. Himmelstein and Ms. Wenig; is that true?

A. When I was served the second -- Halstead sent me two letters. I got one in May of 2015 and one in August of 2015. At that point, I did have a lawyer, not a landlord-tenant attorney like you. They weren't really, you know, qualified. So, yeah, we did talk about it.

Q. Okay.

A. And we talked about putting in heavy curtains, which was done.

Q. And you bought carpeting?

A. Mm-hmm.

Q. Okay. Before you bought the carpeting, did you have any carpeting?

A. Yeah.

Q. Was it wall to wall?

A. No, I had --

Q. Scatter rugs?

M. E. LESSER

A. Large area rugs.

Q. You can see all the dimensions. It's all in the --

THE WITNESS: What is the file? I'm sorry. There's the file with all of the HUD investigation.

COUNSELOR KENNEDY: What I believe Ms. Lesser is referring to are documents previously provided to Defendants in our initial disclosures, which included the entirety of the HUD files including the -- depicting copies that Ms. Lesser made of receipts and photographs of the materials that she used to soundproof the apartment. I don't know that range off the top of my head whatsoever.

COUNSELOR LIVINGSTON: Thank you.

A. I put carpet wherever I could.

Q. Okay.

A. Even in, there is like a small vestibule between -- that was right, like,

M. E. LESSER

there's a doorway and then there is like, before you got into my bathroom, so there was carpet wherever I could put it.

Q. Now, after you got -- you told me you got two letters from Halstead?

A. Mm-hmm.

Q. So after you got the second letter, you knew that Halstead or the building was taking a position that whatever efforts you were making for soundproofing wasn't working; is that true?

A. I don't know. I mean I -- I was kept in the dark about this.

Q. Well, do you think they would send you letters if the soundproofing was working?

COUNSELOR KENNEDY: Objection. But you can --

A. No, I don't -- I don't believe that this was really about the parrots, Sir. I think there was -- there was a -- there was other things that -- I think that there was another agenda, Sir.

Q. What was the other agenda?

M. E. LESSER

A. Well, considering I left in July of 2016 and you're still trying to evict me, I mean all that's left there is that apartment. Seems like somebody wants it and doesn't want to pay for it.

Q. What makes you think that The Rutherford would want your apartment, Ma'am?

A. Because, let me show you, sorry. What would make me think -- I just don't know why -- what else is left? I left with the parrots.

Q. Do you have an understanding what would happen upon termination of your lease for your apartment?

A. You would have to have a Holdover Proceeding.

Q. And what would happen as a result of the Holdover Proceeding?

A. Well, you're trying to seize my apartment after I left it.

Q. Well, who would get the apartment? What is your understanding of who would get the apartment after you left?

M. E. LESSER

A. That would be in the possession of the -- of the co-op.

Q. That's your understanding?

A. Am I understanding incorrectly?

Q. I'm not here as a witness. I can't help you. So you thought the agenda of the co-op was to get your apartment; is that true?

A. I -- I have no -- I have no reason to -- to understand what the reasons behind any of these things are.

Q. But your belief was they were doing this to get your apartment, true?

A. My opinion?

Q. Your opinion or your belief?

A. What's the difference?

Q. I don't know. You tell me?

A. You're a lawyer, you tell me.

Q. Did you believe the co-op was doing this to you so they could get your apartment?

A. Now I do.

Q. Okay. And they would have benefitted by getting your apartment,

M. E. LESSER

correct?

A. I don't know, Sir.

Q. Well, would you have gotten any benefit from that if they terminated your lease and got your apartment?

A. It doesn't seem like that puts me in a good position, does it?

Q. I don't know. You tell me. Were you afraid that the co-op was doing this so they could take over and get your apartment?

A. In retrospect, I think there was a lot of underhanded things going on.

Q. But I'm asking you, with respect to your apartment, this proceeding was brought, you told me the co-op had an agenda and is it your belief their agenda was to take this apartment from you?

A. You want to know my belief?

Q. Yes.

A. Considering Ms. Kullen from the time that she moved in always said, Meril, I hope you get married first because I'm going to buy your apartment and break down

M. E. LESSER

the wall and make it a huge apartment and she wanted that apartment.

Q. You think the co-op conspired with Ms. Kullen to get your apartment?

A. I don't know what they were doing, Sir.

Q. But what was the co-op's agenda that you believe they had with respect to your apartment?

A. Honestly, my life was destroyed in that apartment and I don't really care at this point.

Q. But now you have to answer my question, so please do so.

A. Can you repeat your question.

Q. Sure. You told me that the co-op had an agenda that was not just with respect to quieting the birds, but another agenda and that was to get your apartment, did you not?

A. Well, I can't -- considering that there are false acc -- I was -- I ended up in Housing Court on lies and fabricated evidence.

M. E. LESSER

A. Can you be a little more respectful? Rambling? I didn't comment on my feelings about your lack of eloquence.

Q. Anything further to your statement?

A. Well, I believe that your name should be on that -- what is it called? The filing -- should be charged.

Q. Okay.

COUNSELOR LIVINGSTON: Thank you. We'll take a break.

COUNSELOR KENNEDY: Okay.

(Whereupon, a brief recess was taken.)

THE WITNESS: When do I get to tell my story?

COUNSELOR KENNEDY: I'm not here to give you legal advise.

THE WITNESS: I'm wondering, I'm here to be deposed and clearly I'm not allowed to talk about certain things that are of great importance, but I guess at the trial.

Q. Ms. Lesser, you were served in

M. E. LESSER

connection with a Notice to Cure, correct?

A. Yeah.

Q. In which the co-op asked you to cure the noise --

A. That wasn't happening.

Q. And this is after you received two warning letters, correct?

A. I received -- so this is the timeline. In May of 2015, I received the first letter from Halstead which preceded any documented complaints. The first documented complaint was in August of 2015 and August of 2015, I did receive that letter. That's when I did have -- I felt very afraid and hired a lawyer because it -- this felt -- this felt very -- it -- this was -- there's almost 200 apartments in Rutherford Tenants Corp. and Charlotte, who is a pathological complainer to Halstead, couldn't believe that, as I never had any problems with anybody in the building, I kept to myself, and I didn't understand why in May, before there were any documented complaints, I was being

M. E. LESSER

threatened with legal action. In August, when Charlotte was the only person complaining, I received another notice of legal action where you were threatening me.

Q. And you also received a Notice to Cure, did you not?

A. Correct. And that's when Sam Himmelstein -- that's when you become aware that these were emotional support animals.

Q. Well, let's not put the bird before the horse here --

A. The what?

Q. The cart before the horse, the saying --

A. Are you making a joke?

Q. Yes, I am.

A. You think this is funny?

Q. No, I don't.

[redacted]

Q. I don't --

[redacted]

M. E. LESSER

[redacted]

Q. Should we call 311?

A. 311?

COUNSELOR KENNEDY: Perhaps you withdraw the joke, apologize and we can move on.

[redacted]

Q. Very good. Now you received a Notice to Cure, did you not?

A. Correct.

Q. And what was your understanding of the Notice to Cure?

A. Let me look at it.

Q. Would you like me to give you a copy?

A. No, I have it. I don't think I brought the Notice to Cure.

Q. I can give it to you.

A. I don't need to see it.

Q. Beg your pardon?

M. E. LESSER

A. I don't need to see it.

Q. What's your understanding as to --

A. Well, it -- I mean, it was basically I had 30 days to stop the bird noise which wasn't happening, so I retained Sam Himmelstein and his response to the Notice to Cure, you were informed, by my psychiatrist, Dr. Tutter, who is an MD, that these are emotional support animals. Under the Fair Housing Act, that is all that is required to submit to the landlord and it was the co-op's job to provide reasonable accommodation and your partner didn't take that very seriously.

Q. Okay.

A. And you broke the law.

Q. Okay. So with respect to the Notice to Cure, the co-op was asking you to cure, meaning eliminate the noise that was disturbing neighbors, correct?

A. The alleged noise that I was never experiencing while I lived in the apartment.

M. E. LESSER

advance with the building as to how you could move out?

A. I --

Q. Or you just --

A. I didn't move my -- my belongings. I -- I ordered new cages and had them delivered to my parents and I just left. My dad came and picked me up. Let me see, specifically, what date it is.

Q. I don't need the date.

A. I would like the date on the record. I vacated -- it's 5:45 p.m. on July 30th.

Q. And did you, at that point or any time thereafter, remove your furniture in your apartment or you left everything there?

A. I left everything.

Q. And it's still there to the present time?

A. No, most of it was thrown out.

Q. When did you do that?

A. I don't know. I don't know. Are you saying that I broke rules in moving

M. E. LESSER

out?

Q. I'm asking you questions --

A. I wouldn't have done anything to further upset the co-op. I had a couple of things -- I, little by little, just took duffle bags and left.

Q. So Ms. Lesser, it's your testimony that the co-op first learned that the birds were emotional support animals when they got a letter from Dr. Tutter around --

A. You received it.

Q. -- 2016; is that true?

A. That's correct. When I received the Notice to Cure.

Q. That's the first time of the claim that this was emotional support animals?

A. I believe my mental health -- that it's my privacy and there was never any need to explain to people and it's a pet friendly building and as it escalated to the point where I'm being threatened, it was -- that was the time where you did have

M. E. LESSER

to understand that these weren't just pets, these are emotional support animals and there are laws that protect my rights as a person with a mental disability.

Q. Okay.

A. And in serving me the court order, you broke the law.

Q. Okay. Now, you got a letter from Dr. Tutter in 2016 that you referred to, did she charge you for that letter? Did you pay for the letter?

A. Did she charge me for it?

Q. Yes, for writing the letter?

A. I don't think so.

Q. Did she charge on an hourly basis for her time?

A. I paid her. She's not insurance. I give her checks. I didn't give her a check. Are you trying to ask if I paid her to write the letter? The answer is no.

Q. That's all I asked.

A. Are you insinuating something, Peter? That's --

aren't you?

A. I -- I -- I'm not -- I don't feel bound to be paying this maintenance.

Q. Aren't you concerned this may affect your ownership of the apartment?

A. I'm not concerned about my maintenance.

Q. Okay.

A. Considering how much -- I mean, I'm not being charged here. Your clients are. My maintenance is -- that's pennies compared to the amount of money...

Q. What amount of money?

A. The amount of money that -- the legal fees that I had to pay for. The interfering with the sale of the apartment, I mean.

[redacted]

[redacted]

while living in my apartment, people telling me there was bird noises in my apartment that aren't happening, it's very upsetting and confusing and scary and -- and I -- everyone is entitled to quiet enjoyment and peace in their apartment and that was taken away from me.

Q. So --

A. By the manufactured accusations and assault and continuous litigations and...

Q. Okay. So if I take what you're saying then, independent of you, anyone who lives at The Rutherford, such as Mr. Keany, Ms. Okon, Ms. Kullen, Mr. Troy, they equally would be entitled to enjoy their apartment, something called quiet enjoyment --

A. Correct. As I said many times,

M. E. LESSER

I have no idea what anyone is talking about.

Q. I'm just asking about the principle. You mentioned quiet enjoyment, in other words, to live in the apartment, have a habitable apartment --

A. Nobody left their apartment but me, Sir. I would argue to say that I was -- the interference of this situation affected me the greatest. I left my apartment.

Q. Right.

A. Because of the harassment.

Q. What was the harassment?

A. Saying that my -- accusing me of something that's not happening and taking measures to evict and seize my apartment.

Q. Seize your apartment, so we're back on that.

A. Yeah. Let's -- I mean, that's -- let's see. So this is -- this was a notice from James Ramadei saying -- telling me that I had to quit, vacate and surrender

M. E. LESSER

Q. The question is, did you ask your attorney what the consequences of this notice mean?

A. At this point, this -- I was already getting ready to leave because my mental health had deteriorated to the point I never -- I -- I needed to leave.

[redacted]

Q. I understand that.

A. And so I didn't really ask because I -- I had no intention of staying in that disgusting environment with these awful people who had nothing better to do than harass a woman with a mental illness.

Q. Did you ask your attorney as to what would happen with your ownership equity in the apartment upon the Notice to Cure not being executed?

A. I wasn't concerned about anything other than getting out of that apartment.

M. E. LESSER

Q. Now my question is, did you speak to your attorney with regard to whether you would get the proceeds of a sale of that apartment if the co-op did, in fact, seize it as you --

A. As I was told, they can sell it for how much -- however much they wanted. They could sell it to Charlotte for a dollar and if they did sell it to Charlotte, that would actually be -- if Charlotte was, as she had wanted, to buy that apartment, they could have given her a friends and family discount and she could have taken the wall down and would have increased the value of the building so that's what they would have to gain.

Q. So you think there was a plot to do that?

A. I don't know. As I said, I don't think about these people.

Q. Okay.

A. But I just know how badly Charlotte Kullen wanted that apartment.

Q. Really? Okay.

M. E. LESSER

A. Oh, yeah. She made it clear from the time I moved in. You know, they're really small apartments. 400 square feet. You know...

Q. Now, you told me that between 2016 and 2019, you did not have the apartment listed for sale. Then there came a time that you did list it for sale and you got a potential buyer, right?

A. Mm-hmm.

Q. And that sale did not go through?

A. That's because -- everything was cleared except for the Board's approval and when Mr. Conaka (phonetic) called -- called Halstead, I think her name is Julie Brown and asked what the -- why the -- what the status was of the application and why it was taking so long, the next business day we received -- I received notice from my real estate attorney that the application was denied and they did not give any reason.

Q. Do you have any evidence that

M. E. LESSER

the co-op was retaliating against you by not approving this buyer?

A. I don't understand. I don't really understand. I mean, at the time, the apartment, it was being bought as a pied-a-terre. It was over market value. It would have been in the best interest of the co-op to have let that sale go through and considering how much they didn't want me part of that community, I -- I don't understand why they -- why they objected to my buyer other than to be discriminating against me in line with how they had been treating me.

Q. Why would they discriminate against you if in fact that would result in you leaving the building?

A. Excuse me?

Q. Sure. You're saying that they were discriminating against you, that they didn't like you --

A. I don't know what their feelings are.

COUNSELOR KENNEDY: Objection.

M. E. LESSER

COUNSELOR LIVINGSTON: About a half hour.

COUNSELOR KENNEDY: So about 1:45.

(Whereupon, a lunch was taken.)

Q. I'm not sure I asked you this question, Ms. Lesser, but at the time that you had both Layla and Ginger, why did you take Curtis as a third bird to your apartment?

A. Because I wanted to.

Q. Did you discuss with anyone before you took Curtis that you needed --

A. I didn't need permission.

Q. Let me finish the question. Did you discuss with anyone before you took Curtis that you needed a third emotional support animal?

A. Did I discuss that I needed another emotional support animal?

Q. Yes, ma'am.

A. He bonded to me and I bonded to him and that's how he ended up with me.

Q. Birds can bond to you, but not

M. E. LESSER

necessarily be emotional support animals at that point?

A. I don't know that you can speak to that, if you -- unless you're moonlighting as a psychologist.

Q. How many times had you seen Curtis before you took him?

A. I can't recall.

Q. More than two?

A. Yeah.

Q. More than ten?

A. I -- I don't -- I can't -- if I can't answer with absolute certainty, I cannot recall.

Q. Well, can you approximate for me?

A. I cannot say with absolute certainty. That's my final...

[redacted]

M. E. LESSER

[redacted]

Q. Okay. Now, getting back to the -- you mentioned that inspectors from the City of New York came to your apartment, correct?

A. Mm-hmm. That's in the HUD file. It's all in the HUD file.

Q. On how many occasions did you meet with an inspector in your apartment?

A. I met with the -- all that I could recall is the inspector from the Board of Health, that there was a 311 call I guess saying that there were smells -- I don't know. I'm not going to paraphrase

M. E. LESSER

it, but I met him.

Q. Just one person?

A. That's all who I met, yeah.

Q. You never met anyone else from the Department of --

A. I don't recall, Peter. This isn't something that like -- this is a horrible thing that happened and I really have gone out of my way to not think about the apartment or the people who destroyed my life.

Q. Okay. Thank you.

A. So that, you know, I don't -- trying to stay alive, you know.

Q. Now, did you ever hear anything about the quality of the application that had been submitted by your buyer for your apartment?

A. Nobody gave me anything except that the application was denied.

Q. Did you ever speak to --

A. Nobody would speak to me, Sir.

Q. Let me finish the question. Did you ever speak to your broker about the

M. E. LESSER

A. Yeah. I never went to any. Any. Because why would I? I don't have to.

Q. Okay.

A. I'm not under no obligation. What does sandbagged mean? What does sandbagged mean, though?

Q. I'm not here to answer your questions --

COUNSELOR KENNEDY: Objection. She's trying to understand the question you're asking.

THE WITNESS: I'm trying to --

Q. Tricked or baited into doing something that would have been against your best interest.

COUNSELOR KENNEDY: Objection, but you should answer.

A. Well, I understand that they can proxy a quorum.

Q. Now, you say that the building failed to give you a reasonable accommodation because you had these emotional support animals?

M. E. LESSER

A. Yeah. I got evicted.

Q. What was the reasonable accommodation the building should have given you?

A. Not evicting me. Maybe sitting down and talking to me. Maybe, I mean, let's -- let's go back a little bit before about asking for a reasonable accommodation. It is illegal to evict a person with emotional support animals. I provided what was -- I was legally obligated to present to the landlord and under the Fair Housing Act, the landlord is not allowed to ask anything about my -- anything about my medical condition. It's Fair Housing Act.

Q. Well --

A. You can look it up.

COUNSELOR LIVINGSTON: Can you read that back for me.

(Whereupon, the referred-to answer was read back by the reporter.)

Q. So is it your testimony that

is taking my maintenance bill, I know that they weren't paying it for me, okay? But I think that -- it's -- I mean, this is just my opinion as a layperson, that by thinking that I was stupid that if I didn't get my maintenance bill, that I wouldn't pay my maintenance and they could get my apartment that way.

COUNSELOR LIVINGSTON: Do we have documents over there that have to be marked still?

COUNSELOR KENNEDY: Yes.

COUNSELOR LIVINGSTON: These two.

COUNSELOR KENNEDY: Eleven appears to be a group of documents pertaining to medications Ms. Lesser has provided.

[redacted]

Q. What other doctors do you have?

M. E. LESSER

[redacted]

COUNSELOR LIVINGSTON: Is this document marked?

COUNSELOR KENNEDY: It is not.

(Whereupon, a Group of Documents were marked as Defendant's Exhibit 11 for identification as of this date by the reporter.)

(Whereupon, an E-mail was

marked as Defendant's Exhibit 12 for identification as of this date by the reporter.)

COUNSELOR LIVINGSTON: 12 appears to be an e-mail from an Andrew Bart to an Andrew Wagner. It states "As I told you yesterday, my client does not have birds in the apartment and is willing, in the spirit of settlement, not to keep the birds there. However, she will not pay the co-op's legal fees."

THE WITNESS: Can you please state the date for the record?

COUNSELOR LIVINGSTON: September 29, 2016.

You may inquire.

COUNSELOR KENNEDY: That means I'm going to ask you a couple of questions.

THE WITNESS: Gladly.

EXAMINATION BY

COUNSELOR KENNEDY:

Q. Ms. Lesser, Mr. Livingston made

M. E. LESSER

a reference to legal fees and there was a document that you referenced earlier relating to legal fees billed to the cooperative by Mr. Livingston; do you recall that discussion today?

A. Yes. Would it -- would it be --

Q. I'm going to make it easier for you by giving you a copy.

A. Okay.

COUNSELOR KENNEDY: I am now handing the court reporter a document which has been previously marked Governments Exhibit 81 because we're on a different sequence. I'm providing a copy to -- I'm going to give you a copy for yourself to touch yourself. So this is Government Exhibit 81.

Q. Ms. Lesser, would you mind taking a look at this document and letting me know what it is.

A. Okay. This is the -- this is, I guess, this is Rosen, Livingston &

M. E. LESSER

Cholst.

THE WITNESS: I assume that was your -- your firm, Sir, Mr. Livingston?

A. Yeah. So I'm looking at the history of services rendered to date beginning January 25th, 2016.

Q. Okay and can we just reflect that this is a, let's see, it's a 13-page document with number stamp US001590 through US001602?

A. Sorry. Can you repeat that again?

Q. Sure. Government Exhibit 81 is a 13-page document?

A. Let me go to the front.

Q. US001590 through US001602?

A. Let me check. Yes.

Q. All right. Now, let's turn your attention to Page US001593.

A. Okay.

Q. Do you see three quarters of the way down the page there's a reference to a conversation on March 9, 2016 with a

PIL?

A. Yes, I see that.

Q. Is that the telephone conference that you were referring to earlier in your testimony?

A. Yes.

Q. And what do you remember about that telephone conference?

A. This is -- I made that call from the lobby as soon as I received the Notice to Cure. I was very concerned and scared and I wanted -- so I called the number that's on the -- that was on the letterhead and asked for Peter as he was the one who sent me the Notice to Cure and I asked him if he could ask -- I asked him what I had to do and that I couldn't see sound and that nobody would talk to me and he was really nasty with me. He told me he doesn't represent me. He represents the Board. I said, but I'm a shareholder, so I -- I -- I -- I felt really -- I was really taken aback by how nasty he was with me considering how willing I was to pick up

M. E. LESSER

the phone immediately and ask how to reconcile this and he told me to stop the parrot noise and I said I don't -- I don't know what you mean. At this point, I was not leaving the apartment very much and I felt, you know, it's -- it was -- it's just gas lighting. People are constantly, you know, I'm getting people who work for the government at my door. I'm getting threats for litigation, a Notice to Cure and I was really upset and I wanted to know how to -- how to fix this. I didn't want -- I wasn't discounting that my parrots vocalize and that if -- I wanted to know how to resolve the problem because I can't see sound and I had done everything that I could -- with Googling and just, I was not willing to sign a -- I wasn't going to do any work on the apartment that would require me to sign the -- I forget what it's called. When you do renovations, you have to sign an agreement, because at this point, it -- I understood that I -- that I had been stalked. I felt really -- I was being

M. E. LESSER

hunted and I just wanted help and I thought that it would be met with -- that Mr. Livingston would be happy that I wanted to -- to resolve whatever was going on, but he was nasty and told me that I might have to get rid of my birds and I told him that that would never happen and that was the end of my conversation.

Q. Now, I don't want to ask about conversations that you had with your attorney at the time, but I simply want to ask, again, narrowly, did your attorney at the time forward you this bill for services rendered from Rosen & Livingston? And, again, simple yes or no. I don't want to go through any conversations with your attorney.

A. This was -- came -- Andrew Wagner forwarded this to Andrew Bart who works for works for Saltiel --

Q. So Mr. Bart was your attorney at the time?

A. He worked for Meryl Wenig.

Q. Who was your attorney?

M. E. LESSER

A. He was someone I dealt with, yeah.

Q. And according to this bill, drawing your attention to US001955 as of May 31, 2016, the legal fees incurred by the co-op was $6,257.50, is that what this bill says?

A. That's what I'm looking at, yes.

Q. Is that your understanding as to the amount of fees that the co-op incurred thus far relating to dealing with alleged noises from your apartment?

A. I was told by Andrew Bart that it was $10,000 and I -- I just wanted -- there's been several times that I did try to settle and this was one of the times where I just wanted to settle and so I asked for these bills, but Meryl -- I was under extreme stress. I received these in December during the busiest time of my year. I never opened the document. I have a hard time looking at anything. It's triggering. I didn't open this until a

M. E. LESSER

couple of weeks ago.

Q. You can put that document to the side. Just a couple of general questions.

THE WITNESS: Is this for me?

COUNSELOR KENNEDY: It's a copy of your e-mails, sure.

Q. Has anyone from The Rutherford or Halstead ever disputed whether you have a disability, to your knowledge?

A. Can you repeat the question.

Q. Has anyone to your knowledge from either The Rutherford or Halstead disputed whether you have a disability?

A. Not to my knowledge.

Q. Did there come a time that you made a request to maintain your parrots as emotional service animals?

A. While living there?

Q. Yes.

A. Just the Notice to Cure, that was -- that was it.

Q. Can you explain to us how your parrots provide you with assistance or

M. E. LESSER

services or emotional support that
alleviate your disabilities?

[redacted]

THE WITNESS: Can you not make sounds like that. It's really --

COUNSELOR LIVINGSTON: I didn't even make a sound.

A. My animals, they comfort me. [redacted] wherever I am in the house, they know, and they come to me and they sit with me and I feel safe with them. That's the only sense of safety that I have.

Q. Okay.

[redacted]

M. E. LESSER

[redacted]

M. E. LESSER

Q. Ms. Lesser, when you got water out of your purse earlier, I saw you had a jar in your purse.

A. Yeah.

Q. Just so the record is clear, this looks like a --

A. It's a little jar.

Q. Okay and what's in the jar?

A. It's one of each of their feathers. There's a couple of duplicates, but those are feathers from Layla and Ginger and Curtis.

Q. And why do you keep that with you?

A. They're always with me. They're always with me.

Q. Do you always keep that jar with you?

A. I always have their feathers, but this jar, I just have little pouches of crystals and in all of my bags, but I took this one. I have a locket that I wear usually, but I broke the chain so I keep the feathers in the locket.

M. E. LESSER

Q. And what -- does it help you to have those feathers with you?

A. Yeah.

Q. Okay. And how does it help you?

A. Because -- because I know I'm loved and I'm needed. And it makes -- it fills me with gratitude. They don't -- they don't ask for anything of me and they've done more than anyone could have ever done for me and it's helped that I can touch the feathers, too, but they're -- it doesn't -- I am -- I just know that I -- I left today, it was dark, you know, I -- they were still sleeping and I didn't want to wake them up.

COUNSELOR LIVINGSTON: Can you say it louder?

A. They were sleeping this morning when I left and I didn't get to physically spend time because I didn't want to disrupt them, but it gets me through these days just knowing that I'm going home and they're going to be there and I'm going to

M. E. LESSER

be okay and everything is going to be okay just as long as they're there.

Q. Do you need a minute or --

A. No, I'm okay. It just pains me so much that these animals are being villainized and persecuted. I mean my life might not mean a lot to Mr. Livingston or the co-op, but I'm a person and I do have people who love me and -- and as long as they are here, I'll stay.

Q. So just two or three technical questions, has anyone ever told you that your birds pose any threat to the health or safety of others?

A. No.

Q. Has anyone ever told you that your birds would cause substantial physical damage to the property of --

A. No.

Q. My last question is -- sorry, two more questions. So there's four medications that are listed on Exhibit 11.

A. That's my -- yes.

COUNSELOR KENNEDY: I'm going

to probably mark this section of the deposition confidential.

(Page 197, Line 4 through Page 201, Line 17 were deemed confidential and bound under separate cover.)

M. E. LESSER

[redacted]

M. E. LESSER

[redacted]

Q. I'm really sorry to hear that. I'm sorry to bring it up.

A. It's okay. I have -- I feel -- I'm just feeling a lot of things.

Q. Unless there's more you would like to say, I really have nothing further that I need to ask you.

COUNSELOR LIVINGSTON: I have just a few.

CONTINUED EXAMINATION BY COUNSELOR LIVINGSTON:

Q. Ms. Lesser, you referred to the bill in which there was allegedly a conversation with me on March 9th and --

A. Sorry. "Allegedly" a conversation?