UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

Plaintiff,

Civil Action No.:
21-CV-10383 (PGG)

-against-

RUTHERFORD TENANTS CORP. and JAMES RAMADEI,

Defendants.
- - - - - - - - - - - - - - - - x

October 3, 2022
10:00 a.m.

DEPOSITION of JAMES RAMADEI, a Defendant, taken by the Plaintiff, in the above-entitled action, held at the above time and place, pursuant to Notice, taken before AMY BOGUSZEWSKI, a Shorthand Stenotype Reporter and Notary Public within and for the State of New York.

it, to be honest with you.

Q. Did you ever discuss the birds with Ms. Lesser?

A. With who?

Q. With Ms. Lesser?

A. I've never had a conversation. To make it easier for you, I have never spoken to her about anything ever, period. I have never written to her ever. I have never sent a message to her from other people, by the way, too, you know, nothing. No communication at all.

Q. Does the Rutherford allow tenants to maintain animals in their apartment?

A. Yes. There are lots of animals in the building.

Q. What kind of animals?

A. We have dogs. We have cats. We have fish. We have -- let me see. What else do we have in there? No other exotic pets, but it's a pet-friendly building. And as a matter of fact, during interviews, if there is a pet, we ask to please bring the pet to the interview. They don't usually have a lot

to say, but it's nice to see how big they are. And also, we are a very pet-friendly building.

Q. Are there any restrictions --

A. And I had a dog, by the way.

Q. Well, let's do that first. How long did you have a dog?

A. I had a dog for about ten years.

Q. About what approximate time period?

A. 2000 to 2013. I'm sorry. 2002 to 2013.

Q. Did anyone ever complain about noise from your dog?

A. No.

Q. What kind of dog was it?

A. It was a Cairn Terrier.

Q. I'm sorry?

A. A Cairn Terrier.

Q. I'm not familiar with that. Can you spell that first word?

A. Cairn, C-A-I-R-N. It's the original breed of Terrier. All of the Terriers are forms of Cairn Terriers. He weighed 11 pounds, it wasn't a big dog. It was very

mentioned that the Board asks the tenants to bring the pet to the interview?

A. Yes.

Q. But is there a requirement that residents notify the Board if they have a pet in their apartment?

A. No. We are in the process of changing that, though, for a couple of reasons, but we are mostly concerned about oversized dogs because these are small apartments. And oversized dogs, even at their best when they are friendly, can scare people. So you get a big dog jumping on you, you know the dog is actually giving you affection, but you are this high and the dog is ready to knock you over. So I believe now we have a weight-and-size limit for the dog because we have had people slide it by with big dogs in the building, but that's really what we look for. We also look to see what the breed is, if it's an aggressive breed, and if the dog is spayed, that sort of thing. We have a dog park across from the building. So we get lots, you know. It's a great place

to have a dog.

Q. I am now going to ask you a series of questions about Board minutes. So the next exhibits will be a long series of Board minutes. So I'm going to start by giving you a document that has been pre-marked as Government Exhibit 2.

MR. KENNEDY: I'm giving a copy to the Court Reporter, as well, and as well as Mr. Livingston.

Q. When you have a moment, sir, if you could just familiarize yourself with that document, you know, sufficiently to answer questions about it. So just let me know when you are ready?

A. Okay.

Q. Do you recognize this document that's in front of you as Government Exhibit 2 number-stamped R-0411 to R-0413?

A. I do.

Q. What is it?

A. It is a copy of the Board minutes of our meeting from January 20th of 2015.

Q. And were you present at that

because it was a fire hazard.

Q. And you were concerned about the welfare of other tenants in the building?

A. That's right, but I wasn't expecting parrots to burst into flames.

Q. Well, no. If there is a complaint from another tenant about noise from Apartment 5J, couldn't you send in an engineer to figure out how the apartment could be made more soundproof in the same way that --

A. Yeah, but --

Q. Hand on. -- in the same way that you sent in an engineer to evaluate conditions in 10B?

MR. LIVINGSTON: Objection.

A. No, that would not be appropriate.

Q. Why not?

A. It's the tenant's responsibility to take care of problems like that. Those are not building-code issues. There is a difference between a structural code and a behavioral issue.

Q. Now, in this e-mail, Ms. Kullen also

break.

(Whereupon, a recess was taken at this time.)

Q. Mr. Ramadei, did you become aware, at any point, that residents of the Rutherford were calling up 311 to make complaints about the birds?

A. At any point?

Q. Yes.

A. No, actually.

Q. So it's news to you?

A. Yeah.

Q. Have you ever learned what the outcome was of those calls to 311?

A. No.

Q. So I'm going to hand you a series of documents that have been stapled together as Government Exhibit 14.

MR. KENNEDY: I am handing a copy to everyone else.

Q. These aren't continuous, so it's pages US_1479, 1480, 1483, 1484, 1487, 1490, 1495, and 1497. So my first question to you, Mr. Ramadei, is whether you have ever seen

these documents?

A. I have.

Q. You have?

A. Yeah. I didn't know these were 311 calls.

Q. I'm sorry. When did you see these?

A. I saw them in the package I was given by my attorney.

Q. And did these documents refresh your memory as to the events of this case?

A. Didn't add, no.

Q. Were they news to you?

A. No, they weren't news. I never read them in their entirety before, but, you know, I have never --

Q. Had you ever previously seen these reports of city inspections of the Rutherford?

A. No.

Q. You mentioned that your attorney provided some documents to review for you in advance of this deposition, right?

A. Yes.

Q. Did any of those documents refresh

neighboring apartments, okay, as much as noise can go into neighboring apartments, but vermin has more of a lasting impact. So we felt that an immediate health crisis was in our midst.

Q. Did you ever feel that there was an immediate health crisis taking place relating to the noises coming from Apartment 5J?

A. I felt that way.

Q. Why did you feel that way?

A. Because I thought Ms. Kullen's health was deteriorating.

Q. Did Ms. Kullen ever provide you documentation of any adverse effects to her health caused by the noises from Apartment 5J?

A. I didn't ask her for any.

Q. Do you know whether anyone ever asked her for any?

A. No. I doubt if they would.

Q. Why?

A. It's not something you normally do.

Q. There is also a Management Issue reported here in these minutes related to

and 1516.

MR. KENNEDY: And I'm handing a copy to the Court Reporter and everyone else.

A. Okay.

Q. Mr. Ramadei, have you ever seen the documents in front of you as Government Exhibit 20 before?

A. Only recently.

Q. And when you say "only recently," was that in preparation for your deposition in this matter?

A. Yes.

Q. So these are city reports from the year 2016, would you agree?

MR. LIVINGSTON: The documents speak for themselves as to what dates they are.

A. Yes.

Q. Did you see any of these documents in the year 2016?

A. No.

Q. So again, I'm going to do the same thing I did previously.

J. RAMADEI

Q. If a child was crying in somebody's apartment, could you hear it in the hall?

A. Sure.

Q. If someone was conducting a loud conversation on the telephone, could you hear them in the hall?

A. Somewhat. It would have to be pretty loud.

Q. Did the Rutherford ever look into the possibility of installing soundproof doors?

A. We have fireproof doors.

Q. What is the difference between --

A. If there is fireproof, they are soundproof. They are filled with a filling material that allows the fire to exist for almost an hour in the apartment before the door gives way. So they are pretty soundproof.

Q. Is there a way to improve the soundproofing of these doors?

MR. LIVINGSTON: If you know.

A. I don't know.

Q. Did the Board ever look into adding

additional layers of soundproofing to the door to Ms. Lesser's apartment?

A. It's not our problem.

Q. Whose problem is it?

A. Ms. Lesser's problem.

Q. Who were the other Board Members that sat with you that day to try to assess the noise from Apartment 5J?

A. I believe it was Marcia, Nancy, and I can't remember who the fourth one might have been. I don't know if it was Sam or not. I believe it was four of us. And we did it together just to make sure that we all heard the same thing, and then that's why I went up later on my own. But this gets into the question of incidental noise versus persistent noise. So incidental noise, like the ones that you just suggested, a TV, a crying baby, you know, those are nonrecurring. A persistent noise, if, let's say, we had a dog that was barking. If that dog continued to bark and bark and bark, that would be persistent noise and that would be a justified noise complaint. In this case, on

it's mechanical noise, that would be one thing. If it's animal noise, that would be another thing. If it's a TV or a stereo, that's another thing.

Q. There are devices available to co-ops to measure by decibels the amount of sound that is coming from an apartment, right?

MR. LIVINGSTON: Objection. If you know.

A. There are, but so what?

Q. Did the Board, in this case, ever use any of those devices to measure the decibel level of the noise that was coming from Ms. Lesser's apartment?

A. No.

Q. Why not?

A. Why?

Q. Well, are you familiar with the use of decibel readings to establish the level of noise coming from an apartment?

A. We know, yes. I'm aware of that, but I don't know. I could probably toss that back.

J. RAMADEI

MR. LIVINGSTON: No. You are here to answer questions.

THE WITNESS: All right.

A. No.

Q. How would you like to toss that back?

MR. LIVINGSTON: No.

Q. With no promise that I will respond.

A. No. But I mean, did you ever measure the noise inside the apartment?

Q. I'm sorry. I came on this case in 2019, but I appreciate your suggestion. So now we are going to look at Government Exhibit 22 and the number stamp is R-0372 to R-0373.

MR. KENNEDY: I am handing a copy to everyone.

Q. Let me know when you've had a chance to review the document?

A. Okay.

Q. Do you recognize Government Exhibit 22?

A. Yes.

Q. And what is it?

Q. So the approach that the Board took was "the building's engineer will resolve this matter at the shareholder's expense," do you see that?

A. Yes.

Q. Did the Board ever consider having an engineer resolve the noise issues from Ms. Lesser's apartment and then charge those engineering costs back to her?

A. No.

Q. Why not?

A. It was not a structural issue. There is no building code involved in this.

Q. Okay.

A. 10B is a man who was in violation of the code. That, is the building's responsibility.

Q. Turning your attention now to Government Exhibit 23, this is a two-page document that is number-stamped 0370 to 0371.

MR. KENNEDY: I'm handing a copy to everyone.

Q. Again, I think you know what I am going to ask, so let me know when you are

made repeated requests to meet with any complaining tenants and/or the Board in order to come to an amicable solution. Thus far her requests have been ignored."

Do you see that?

A. Yes.

Q. When you read that sentence, did it cause you to question whether Mr. Nicasio had accurately executed your directive to invite Ms. Lesser to meet with the Board?

A. No.

Q. Why not?

A. Because at this point, I was very aware of these patterns of behavior and these types of claims.

Q. Turn to the next page, and this is above the Himmelstein signature. And again, I apologize. There is a Post-it on here. This is how the file was provided to me.

A. Yes.

Q. You should ignore the Post-it. This paragraph begins:

"Finally, Ms. Lesser suffers

from a disability and her parrots
serve as emotional support animals."

Do you see that?

A. Yes.

Q. Did you know whether Ms. Lesser had a disability prior to receiving this letter?

A. No.

Q. Did you know whether Ms. Lesser considered her parrots to be emotional support animals prior to receiving this letter?

A. Yes.

Q. How did you know that?

A. Three months into the proceedings, we received a letter -- I think she sent it to Halstead, actually -- from her therapist that this was the case. We were already three months into the case and all of a sudden, the parrots were magically transformed into emotional support animals.

Q. So it's your view that the parrots were "magically transformed into emotional support animals"?

A. It was quite amazing.

J. RAMADEI

Q. So you don't think that the statement that the parrots were, in fact, emotional support animals was made in good faith?

A. No.

Q. What is your basis for that?

A. Why would she wait three months to tell us something that was that crucial. Two, I mean, it's a little suspect. I will put it this way. We have a lot of animals in our building and I fully believe that everyone in our building is very attached and has great love for the animals in their possession, okay. Now, whether or not they constitute some type of formal title, such as an emotional support animal, that's a different story. It seems to me that this was declared way after the fact and the credibility of the therapist is to be questioned. I have seen these types of letters times many a times in my life.

Q. We will get to the letter in a moment. As of 2016, did the Rutherford have a policy in place that would allow tenants to

request a reasonable accommodation under the Fair Housing Act?

A. A reasonable accommodation for what?

Q. For anything?

A. I don't believe so.

THE WITNESS: I don't --

MR. LIVINGSTON: It's your testimony.

A. Rephrase.

Q. Are you familiar with the possibility that an individual might need a reasonable accommodation under the Fair Housing Act to use and enjoy their apartment? For example, if they are a person with a disability, they may need thresholds to be cut down, they may need grab bars to be installed in the bathroom, they may need to have ramps in particular areas of the building. Have you ever heard of those things?

A. Yes. We make reasonable accommodations where ever we can. We are currently involved in almost a million dollar remodeling of the front of the building for

J. RAMADEI

greater ADA accessibility.

Q. But looking back to 2016, at the time, was there a policy that the Rutherford had under which a tenant could request a reasonable accommodation of their disability?

A. No. Not formally, no.

Q. And looking back to 2016, did the Rutherford have any policies in place allowing people to make requests for emotional support animals?

A. No.

Q. So here, though, in the Himmelstein letter, and this is on page 3 of the Himmelstein letter and this is in the paragraph beginning "finally."

"Ms. Lesser hereby requests that you offer her a reasonable accommodation and not pursue any litigation based upon the Notice."

Do you see that?

A. Yes.

Q. So here, we have Ms. Lesser's attorney requesting a, quote-unquote, reasonable accommodation, right?

A. Yes.

Q. At any point during your time on the Board, did you receive any training on your obligations as a Board Member under Fair Housing laws?

A. No.

Q. Did you ever do any reading on your own regarding the obligations of the Board under Fair Housing laws?

A. No.

Q. Did anyone ever give you guidance as a Board Member regarding the Rutherford's obligations under Fair Housing laws?

A. Only for American Disabilities Act.

Q. What is your understanding of whether the Americans with Disabilities Act applies to individual units in an apartment building?

A. Rephrase.

Q. Is it your understanding that the Americans with Disabilities Act applies to units within an apartment building?

A. That, I'm not aware of, but the units are owned by the shareholders. So if

they need to put in things to accommodate their disability, they are welcome to do so.

Q. At the time you received this letter, did you know what the phrase "reasonable accommodation" meant?

A. No, not in this regard.

Q. Did you ask anyone? And again, if your answer is you asked counsel and counsel said X, Y, and Z, don't tell me the X, Y, and Z. Did you ask anyone whether -- sorry.

Did you ask anyone what the words "reasonable accommodation" meant?

A. No.

Q. Why not?

A. Because this, to me, is not a problem with reasonable accommodation, it's a noise issue.

Q. Okay.

A. Okay. No one asked Ms. Lesser to get rid of her birds, we just asked her to stop the noise.

Q. If a tenant at the Rutherford requests a reasonable accommodation, who decides whether the tenant gets one or not?

A. Who decides?
Q. Yes.
A. The request would be formally brought before the Board.
Q. At any time during your time on the Board, did the Board consider any requests for a reasonable accommodation?
A. We were not presented with any.
Q. Well, here, in this Himmelstein letter, you are presented with a request for a reasonable accommodation. So did the Board make an assessment of this request for a reasonable accommodation?
A. How would we do that?
Q. I'm sorry. I'm asking you, sir. Here, we have somebody making a request for a reasonable accommodation.
A. Well, reasonable accommodation, the accommodation was not denied.
Q. Excuse me?
A. It was not denied. No one asked her to get rid of her parrots. We asked -- this is -- let's be clear here. These were animals that were not controlled. We were

J. RAMADEI

asking her to control her animals. We weren't asking her to get rid of them. No one wanted to kill her little pretty birds, okay.

Q. So was it your view that Ms. Lesser --

A. She could have kept her birds, but the problem was the noise, not the birds.

Q. So was it your view that Ms. Lesser's request for a reasonable accommodation was granted?

MR. LIVINGSTON: Objection.

A. I don't know. I don't think it was a request for a reasonable accommodation. First of all, let me read that sentence one more time.

Q. Sure.

A. I don't see how this request for a reasonable accommodation would cure the problem that we were having with Ms. Lesser.

Q. Well, let's do this step by step. So the Himmelstein letter on page 3 says:

"Ms. Lesser hereby requests that you offer her a reasonable

accommodation."

Did I read that correctly?

A. Mm-hmm.

Q. Is that a yes?

A. Yes.

Q. So would it be fair to say that this letter is a request for a reasonable accommodation?

MR. LIVINGSTON: Objection. The document speaks for itself, but you can answer.

A. Yes.

Q. So given that Ms. Lesser here has made a request for a reasonable accommodation, was the request granted or denied?

A. Neither.

Q. Who decided to neither grant, nor deny?

A. What was the request?

Q. Let's read the rest of the sentence:

"And not pursue any litigation based upon the Notice."

Do you see that?

A. Yes.

Q. So was there litigation based upon the Notice?

A. We are talking about two different things here. I cannot combine the rights of a disabled person with the noise of their animals, okay. I can't take these two things and all of a sudden say, you can do whatever you want because you can say whatever you want no matter how it affects everyone else in the building and the running of the co-op, okay. My business is to run a good business for the co-op, which means all of the neighbors are guaranteed the quiet enjoyment of their apartments, that resale of the apartments is not affected by extraneous noise or conditions in the building, okay. That's my job, okay. I didn't see how, in any way, we were doing anything to hurt Ms. Lesser when she was so afraid to hurt other people in the building, to harm other people in the building with the noise of the birds. So there was no accommodation to consider because we didn't feel that we did anything

J. RAMADEI

one way or the other. We only asked her to keep the birds quiet.

Q. I see. So your view is that you did not consider her request for a reasonable accommodation?

A. Right. What were we supposed to do to cure the situation?

Q. Sir, do you think it might have helped if the Rutherford had a policy on how to make reasonable accommodations to set forth --

A. I will take that going forward, but usually, we don't have these kinds of problems.

Q. And again, just to complete the rest of my sentence. Do you think it might have been helpful if the Rutherford had had a reasonable accommodation policy in place so that there were pre-existing rules to address these kinds of requests?

MR. LIVINGSTON: Objection.

A. I can't answer that.

Q. You also previously made a comment about the letter from the therapist that was

attached to this document?

A. Yes.

Q. And are you referring to the letter from Dr. Adele Tutter on March 14, 2016?

A. Hang on. I don't know. There were a couple of letters. Yes, this one.

Q. So you said a few moments ago that in this case, "the credibility of the therapist is to be questioned," do you recall saying that?

A. Yes.

Q. Now, do you know Dr. Tutter?

A. No.

Q. Do you know anything about her background?

A. No.

Q. Do you know anything about her professional qualifications?

A. No.

Q. Do you know anything about her educational background?

A. It does not matter. I know a lot about these letters.

Q. Okay. How do you know a lot about

these letters?

A. Because I do medical administration and constantly doctors are being hounded for, can I have a letter for my dog to get on an airplane or my cat to get on a train and this and that. And the doctors, in order to keep their patients, they are kind of forced to write these letters in the interest of keeping their businesses healthy. In here, this letter is clearly prescribed because of the way she is talking. There is one sentence here that just sticks out. I mean, I don't know much about her veterinarian education, but she seems to feel free to talk about it here.

"It is important to emphasize that the presence of these animals is necessary for the optimal functioning of Ms. Lesser, works from home, as their presence helps to mitigate the mental health symptoms she experiences. All three birds must be present as they are long-term companions of each other and cannot

be separated without negative consequences."

Who writes something like that?

Q. What is your basis to dispute the accuracy of that statement?

A. I would say that Dr. Tutter has lost her medical objectivity and that she is speaking as a veterinarian rather than as a human therapist.

Q. And what is your basis to question the judgment of Dr. Tutter?

A. Because this letter sounds like a very typical letter that is given to professionals to get out of situations that they need to get out of. I would love to know how many letters like this Dr. Tutter has issued on behalf of her patients.

Q. Do you know?

A. No, I don't. I would love to know. And I'm sure it's probably more than what we would guess.

Q. Do you believe-- whatever your opinion about Dr. Tutter is -- that the presence of these animals -- I'm sorry.

What is your basis to dispute Dr. Tutter's statement that the presence of these animals is necessary for the optimal functioning --

A. Because it's not her place to talk about the relationship that the animals have with each other.

Q. That's not what I asked. Well, let me go back.

A. It's not?

Q. No.

MR. KENNEDY: Actually, read my question back?

(Whereupon, the record was read by the reporter.)

MR. KENNEDY: We lost part of the sentence there.

Q. Let me try again. What is your basis to dispute Dr. Tutter's statement that: "It is important to emphasize that the presence of these animals is necessary for the optimal functioning of Ms. Lesser"?

A. Yeah, keep going.

Q. No. I'm breaking it down.

A. That's the sentence I'm having a problem with.

Q. Right, that's why I'm breaking it up. Do you have any basis to dispute Dr. Tutter's statement that "the presence of these animals is necessary for the optimal functioning of Ms. Lesser"?

A. I don't know if they do or they don't, but I will say if they do, they can be there with her. She can have a fourth parrot, as long as they don't bother anybody else.

Q. The next part of what Dr. Tutter says is:

"Their presence -- meaning the presence of the parrots -- helps to mitigate the mental health symptoms that Ms. Lesser experiences."

Do you see that?

A. Yes.

Q. Do you have any basis to dispute that?

A. I don't know, and I doubt if Dr. Tutter has any basis to even say something

like that. That's just ridiculous.

Q. At the outset of this letter, Dr. Tutter indicates that Ms. Lesser "has a mental health related disability recognized by the Diagnostic and Statistical Manual, 5th Edition." Do you dispute that?

A. I don't know. I'm not privy to Ms. Lesser's medical records.

Q. You indicated that, in your view, these letters are provided by doctors because they are "hounded by their patients," do you recall saying that?

A. Yes.

Q. Do you know whether Ms. Lesser, quote-unquote, "hounded" Dr. Tutter to provide this letter?

A. No, but this letter looks just like all the other letters I have seen.

Q. Because you are drawing a comparison with other letters that you have seen, that you've reached the conclusion that Ms. Lesser "hounded" Dr. Tutter?

MR. LIVINGSTON: Objection.

A. I didn't say hounded.

J. RAMADEI

Q. You didn't say "hounded"?

A. No. I said I wouldn't say hounded, but this definitely is a dictated letter.

Q. When you say "dictated," dictated by whom?

A. To make sure that she says I need all three birds.

Q. So is it your view that Ms. Lesser "dictated" this letter to Dr. Tutter?

A. To an extent.

Q. You also indicated that for these letters, doctors are, quote-unquote, "forced" to write them, do you recall saying that?

A. Not coerced, but it's --

Q. Well, no. I said the word "forced," actually.

A. But I am saying not coerced here, but in the interest of their business, they usually write them because they don't want to lose their patients, especially mental health doctors who have a very hard time getting patients.

Q. So is it your view that Ms. Lesser "forced" Dr. Tutter to write this under pain

of losing her as a patient?

A. I would say that the fact that it arrived three months late definitely makes the letter lose some credibility. If this was the burning issue at-hand, wouldn't Ms. Lesser come to us with that first.

Q. Do you think that your judgment as to whether Ms. Lesser needs this particular accommodation to be superior to Dr. Tutter's?

MR. LIVINGSTON: Objection.

A. I can't comment on that.

Q. I am now going to ask you to look at some guidance issued by the Department of Housing and Urban Development, it's been previously marked as Government Exhibit 29.

MR. KENNEDY: I'm handing a copy to the Court Reporter.

Q. So Mr. Ramadei, have you ever seen Government Exhibit 29 before?

A. Yes.

Q. When did you see it?

A. When I got the papers for the deposition.

Q. So prior to the time that your

Counsel provided you with this document, had you ever seen it before?

A. Let me think. Have I ever seen this before? No.

Q. According to this document, when was this guidance from the Department of Housing and Urban Development issued?

MR. LIVINGSTON: Objection. The document speaks for itself.

A. 2013.

Q. And that's prior to Ms. Lesser's request for a reasonable accommodation in this case, right?

A. Yes.

Q. So let's turn to page 3, it's strangely formatted where it's only two lines. Let me know when you are there?

A. Page 3, you said?

Q. Yes, page 3 of 10. It's got only two lines on it for some reason.

A. Yes.

Q. Well, let me start with the carryover paragraph on page 2. Page 2 says:

"Housing providers are to

J. RAMADEI

evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests. After receiving such a request, the housing provider must consider the following."

Now we turn to page 4. So at the time Ms. Lesser made this request for a reasonable accommodation, did you go through the guidance that HUD has set forth on how to respond to these requests?

A. No.

Q. Why not?

MR. LIVINGSTON: Objection.

You can answer. It's a why question, but you can answer.

A. We didn't feel it was necessary at that point. We thought the problem would be resolved.

Q. Were you aware of this guidance from HUD at the time Ms. Lesser made her request for a reasonable accommodation?

A. No.

Q. So when the Board made a determination with respect to Ms. Lesser's request for a reasonable accommodation, it did not apply any of the guidance provided by HUD in Government Exhibit 29, right?

A. I'm sorry. Repeat that.

MR. KENNEDY: Could you repeat the question, please?

(Whereupon, the record was read by the reporter.)

A. Correct.

Q. So there is a 1 and a 2 up top on page 4 and then there is another 1 and a 2 in a longer paragraph. So I'm going to go through those in turn. So let's go to the 1 at the very top:

"(1) Does the person seeking to use and live with animal have a disability -- i.e., a physical or mental impairment that substantially limits one or major life activities?"

Do you see that?

A. Yes.

Q. Do you dispute that Ms. Lesser has a disability as defined in this document?

A. Do I dispute whether she has a disability?

Q. Yes.

A. I cannot say one way or the other.

Q. Now moving on to paragraph 2:

"(2) Does the person making the request have a disability-related need for an assistance animal? In other words, does the animal work, provide assistance, perform tasks or services for the benefit of a person with a disability, or provide emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability?"

Do you see that?

A. Yes.

Q. Do you dispute whether Ms. Lesser has a disability-related need for an assistance animal?

A. No. I don't see what that has to do

with anything.

Q. Moving on to the second 1 and 2 varied in the paragraph to:

"Where the answers to questions (1) and (2) are 'yes.'"

Then I'm going to ask you to go down to the sentence beginning "the request may also be denied if," so let me know when you are there.

A. Say again.

Q. So because I'm going to read some stuff here, I want to draw your attention to the sentence beginning "the request may also be denied if."

A. Yes, I'm there. Thank you.

Q. Good. So this is another 1 and 2.

"(1) the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation."

Do you see that?

A. Yes.

Q. Was it your understanding that the parrots in Ms. Lesser's apartment posed a direct threat to the health or safety of others?

A. Yes.

Q. To whom did they pose -- - well, let's break that up. Did they pose a threat to anyone's safety?

A. No.

Q. Did they pose a threat to anyone's health?

A. Yes.

Q. Whose health?

A. Ms. Kullen's.

Q. And did Ms. Kullen ever provide you with any documentation or other evidence of any alleged threat to her health?

A. No, not specifically. I didn't ask for any, either.

Q. Next, we move on to the second part of that section.

"(2) the specific assistance animal in question would cause substantial physical damage to the

property of others that cannot be reduced or eliminated by another reasonable accommodation."

Do you see that?

A. Yes.

Q. To your knowledge, was there any prospect of Ms. Lesser's parrots causing "substantial physical damage to the properties of others"?

A. No. No.

Q. So upon receiving the request for a reasonable accommodation in the Himmelstein letter, what did the Board do in response?

A. The Board had no problem. I don't know why you're off on this tangent, Mr. Kennedy, but would you show me the document that asked us to have the parrots removed from the apartment?

Q. All right. Well, I'm now going to provide you with Exhibit 33, it is the Notice of Termination in this case. It's number-stamped R-0123 to R-0124. I'm going to ask you whether you recognize this document?

MR. LIVINGSTON: Is this a one page?

MR. KENNEDY: Well, it's two-sided.

A. Okay.

Q. Do you recognize this document?

A. I do.

Q. Did you sign it?

A. Yes.

Q. And why did you sign it?

A. On the advice of counsel.

Q. Why did the Board terminate or make a motion to terminate Ms. Lesser's proprietary lease?

MR. LIVINGSTON: Objection. You can answer.

A. Why?

Q. Yes.

A. Because we have gotten nowhere. The birds were still making noise.

Q. And your concern here was noise and noise only, right?

A. Right.

Q. Were there any other reasons that

J. RAMADEI

the Board moved to terminate Ms. Lesser's proprietary lease?

A. No.

Q. Just the noise?

A. Just noise.

Q. So there were no other reasons?

A. Persistent noise that interrupted the quiet enjoyment of other people's apartments.

Q. And was there any other reason that the Board had to move to terminate Ms. Lesser's proprietary lease other than noise?

A. No. You mean like in terms of like financial reasons?

Q. Or anything?

A. No.

Q. And was there a vote on whether to file this Notice of Termination? Did the Board vote on it?

A. The Board acknowledged that it was the attorney's final move. There was not a vote. However, we are still on the same topic here.

Q. What do you mean?

A. Well, you are talking about animals and we never asked her to get rid of the animals. Now, I'm still waiting. Because there is an awful lot of paper there and I would like to be home by Saturday. And, you know, if all we are going to talk about is animals, I think we should skip to the part where it's just the noise.

Q. I assure you, sir --

A. We have lots and lots of pets in the building.

Q. I assure you, sir, you will get home by Saturday and you will not be disappointed.

A. Okay.

Q. So I am now going to hand you what has been marked as Government Exhibit 25, the number stamp is R-0368 to R-0369. Let me know when you have had a chance to review?

A. Okay. Go ahead.

Q. Do you recognize this document?

A. Yes. It's the minutes of our meeting for May 18, 2016 and I was present at the meeting.

Q. Excellent. Was the determination to

evict Ms. Lesser ever mentioned in the minutes of this Board?

A. Was the determination?

Q. The determination to evict Ms. Lesser?

A. Yes, it was at this meeting.

Q. Where does it indicate that?

A. In Management Issues, that we "will continue legal action since the shareholder failed to cure the issue."

Q. Why is there no mention of any determination by the Board to evict Ms. Lesser or terminate her proprietary lease?

A. That's just the way the minutes were written.

Q. Did you instruct Mr. Nicasio to write the minutes that way?

A. No.

Q. To your knowledge, this is the only eviction in the history of the Rutherford, right?

A. Since I have been on the Board, yeah.

Q. Wouldn't that be something that you

would want to document as accurately and carefully as possible?

A. When we feel that the documentation -- we didn't feel that the situation was over, to be honest with you. So she still had a chance on the eleventh hour to cure.

Q. And how could she have done that?

A. She could have talked to her attorney.

Q. Another series of Board minutes, Government Exhibit 27, number-stamped R-0366 to R-0367.

MR. KENNEDY: I am handing a copy to everyone.

Q. I think you know the drill. Do you recognize this document?

A. Yes. The minutes of the meeting of August 30, 2016 of which I was present.

Q. And was there a further discussion of the proceeding against Ms. Lesser here?

A. Only what legal steps were taken.

Q. And at the same time that -- well, not at the same time, but at the same meeting that the Board considered the management

Q. Again, just so I understand here. The legal fees that you briefly charged Ms. Lesser in July of 2018, these are fees that the co-op has already paid to counsel or are they fees that the co-op owes to counsel?

A. No, they were paid.

Q. They were paid?

A. Yes, but we pay. We do not accrue fees. We pay pretty well.

Q. At some point, was there an application to buy Ms. Lesser's apartment?

A. I'm sorry?

Q. At some point, was there an application to buy Ms. Lesser's apartment, meaning to buy the shares?

A. Like an outsider buyer?

Q. Yes?

A. Yes.

Q. Could you please describe the application process?

A. It was handed in in usual manner. It went to our closing department and then was distributed to the Board via our -- there is -- I forgot the name of it -- Board

Packager I think it's called.

Q. And Board Packager is an online facility that allows different Board Members to check in and review the packages that have been made, right?

A. Right.

Q. Does online Board Packager enable members of the Board to communicate with each other in the system by making comments or anything like that?

A. I don't know. We don't do that. We don't use that, but I don't think it does, to be honest with you.

Q. Is there a checklist indicating what an applicant must submit in order to apply to live at the Rutherford?

A. Halstead has that.

Q. Halstead has that?

A. Yes.

Q. So I'm going to hand to you what has been previously marked as Government Exhibit 34 number-stamped HAL 0071 to 0072. Let me know once you've had a chance to review it?

A. Yes.

Q. Mr. Ramadei, do you recognize this document?
A. Yes.
Q. What is it?
A. It's the purchase application items that are needed to complete the application.
Q. And is this your handwriting?
A. No.
Q. On the document?
A. No.
Q. Do you recognize the handwriting?
A. No, I don't.
Q. How much did the applicant offer for Ms. Lesser's apartment? Do you recall?
A. I don't. I don't have the application in front of me.
Q. Does the number $467,500 written at the top refresh your memory as to the amount that was offered?
A. It might be, but I need -- there is a letter that comes with the application. I mean, I look at so many of these, I can't keep them in my memory.
Q. I'm now going to hand to the witness

what I hope will be responsive to his recent statement, it's Government Exhibit 85 number-stamped R5199 to 5207. This is certainly something we would want to be very clear is confidential. I will mark that after we get the transcript back, but it's worthwhile making clear on the record that these are confidential documents relating to the applicant's finances and personal information.

A. Yes.

Q. Mr. Ramadei, have you seen this letter and attachment before?

A. Yes.

Q. Was this the application to purchase Ms. Lesser's apartment?

A. It is part of it.

[redacted]

A. Yes.

Q. At any point in 2019, did you discuss with any other Board Members this application to purchase Ms. Lesser's

apartment?

A. No. We don't discuss applications. We take an online vote.

Q. Why don't you discuss the application with each other?

A. Well, we want to see where we are. We only discuss applications that have matters to discuss if there is something of controversy or something that is irregular, but what we do is we first look at the applications. And if they do what is called a "first-pass reading," we all vote. And if the application gets three votes, it moves forward.

Q. Does the Rutherford have a criteria to assess whether an application meets the Rutherford's standards for purchase?

A. Well, we know what we want, but each application is taken on an individual basis.

Q. Does the Rutherford have any written policies indicating what it wants to see in a particular application?

A. (Witness nodding.)

Q. You have to speak your answer.

A. No.
Q. Why not?
A. Because we don't feel the need to memorialize those things.
Q. Do you know what criteria other members of the Board are applying in deciding whether to allow an application to move forward to an interview or not?
A. Well, there are a few simple standards, one of them is that we are an owner-occupied building. We don't allow sales to corporate entities, for instance. Then, when new Board Members come on, although most of them don't leave it, we will review how we look at the financial information and then we talk about the balance between the application in terms of its financial strength and its contribution to the community. In other words, is this a good fit for the community of the building.
Q. Do you know whether the other members of the Board are applying that same criteria?
A. Oh, yes, they do.

Q. And how do you know that?

A. Because when -- first of all, new Board Members come in and we are talking about applications without having any specific application in front of us, these are the items that are discussed with the new members.

Q. So did the Board reject this application to purchase Ms. Lesser's apartment?

A. Yes.

Q. Was there a vote?

A. Well, yes. The vote came in via e-mail.

Q. So I am going to provide you with what I believe to be the most complete set of e-mails on this point. It's been marked as Government Exhibit 86. It's a new exhibit. Peter will recognize it. It's been number-stamped, I guess, for lack of a better word, C0001 through C0003.

MR. KENNEDY: I'm handing a copy to Counsel.

A. Okay.

Q. So do you recognize this series of e-mails, sir?

A. If they were sent to the Board. Hold on. Yes.

Q. So one of these e-mails is from you, right?

A. Mine should be in there.

Q. Turning your attention on Government Exhibit 86, C0001, do you see a very short e-mail from your Gmail account that says simply "rejected Jim"?

A. Yes.

Q. Why did you vote to reject this application?

A. How much time do you have? Well, this was -- we are not blaming Ms. Lesser for this application, by the way, but her broker did not do her justice. There were a lot of problems with this. First of all, we have no idea who was going to live in the apartment. Second of all -- and this is my opinion now -- I had no idea who was buying the apartment. The financials did not match up with the -- let me give you the short answer

on this. We make every applicant give us a balance sheet, an income statement, which is sort of also a cash flow, okay. Then all of the other financial exhibits that come in, bank statements, investment statements, tax returns, all go to support what they stated on those financial records. And in this case, they were terribly mismatched. There was a Trust. There is reference to a Trust income. We don't know the nature of the Trust, if it was a real estate Trust. We didn't know if there was a motion for us to put this application into purchase by the Trust, and then it was rescinded, which means there was always a chance that this would become part of a real estate portfolio, which is not acceptable to us. Once a person becomes a shareholder, undoing that gets to be more and more difficult. So there were a lot of problems. I could not match up the statements on the tax returns with the personal income statements and the financial statements. So when we get an application in that has like a few bumps in it, we often

will just, you know, say we will either ask the applicant to correct one or two bumps, but when we get an application that is with so many holes and missing pieces in it, that's an application submitted in bad faith and we just reject it.

[redacted]

A. Well, who is living in the apartment? Who is buying the apartment? Where is his wife in all of this? What is the position of the Trust in all of this? Why are pertinent financial details missing in his financial statement, but on the tax returns? I mean, to be quite honest, Mr. Kennedy, this application was a mess. It would have been fool-hearted to accept it. We would have been inviting a problem into the building.

Q. If the Board has questions about a particular application package, is it the practice of the Board to ask Halstead to provide -- I'm sorry -- to reach out to the

perspective applicant and ask the applicant to provide information?

A. If there are only like one or two missing pieces or conflicting pieces of information, which sometimes happen, timing issues on statements submitted or things like that, then we ask for an updated bank statement or updated wage statements, for instance, that sort of thing. But when all the documents are quite out of alignment, we don't do that.

Q. You indicated that one of the questions that you had was it was not clear to you who was buying the apartment, right?

A. Right.

[redacted]

A. That's correct, but the fact that the Irrevocable Trust was first mentioned raised my eyebrow. I mean, you are asking my personal opinion.

Q. And that's your personal opinion?

A. Yeah. That, raised my eyebrow. Obviously, he knew he would have to submit the Trust instrument if the Trust was going to buy it. So he skipped that part, changed it back to a personal purchase. But once a shareholder comes in, you can then apply to have the shares put into a Trust and then that gets more difficult when they are already in possession of a shareholder. So I did not feel I wanted to go through that process with this particular applicant down the road.

Q. You also indicated that there was some concern on your part as to who would live in the apartment, right?

A. Yes.

Q. And in particular, you asked where is the wife, right?

A. Yes. Well, the wife, she is like a ghost in the application. She appears and then she is not there, then she is on the tax return, and she is not on this statement. So there is no consistent reporting of the

wife's position on this.

Q. Turning your attention to page R5206?

A. Yes.

Q. Where the applicant was asked to list the names of all persons who will reside in the apartment?

A. Yes.

Q. Do you see the name of the wife here?

A. You are on 5206?

Q. Yes, at the top.

A. Yes.

[redacted]

A. This is a 450 square foot straight line studio apartment, okay, and you have four occupants listed in the apartment.

Q. What leads you to believe that the wife was not going to live in the apartment?

A. No. I said we didn't know what the wife's position was with his finances. Was

she a contributor to income; no, yes? They had rental incomes. The rental income was reported in one place, but not reported in another place. Was this going to become part of that? So there were too many questions. There was just too many questions for me to accept it.

Q. And because, in your view, there were too many questions, you did not ask Halstead for information that could have answered these questions?

A. No. I did not believe that the application was submitted in good faith.

Q. I'm not sure what you mean by it wasn't submitted in good faith. Do you mean that this was some sort of -- this is an application to purchase an apartment in the guise of something else?

A. No. As we say in accounting, there was too much noise in the application.

Q. So that led you to think that it wasn't submitted in good faith?

A. Yeah, honestly.

[redacted]

intend to purchase the apartment?
A. It was a little shady.
Q. You think it's shady?
A. Oh, yeah.
Q. Okay.
A. But again, the broker should have figured a lot of this out, not Ms. Lesser.
Q. Also, on the Board at this time, based upon Government Exhibit 86, was Francesca Cooke, right?
A. Yes.
Q. Did you ever speak to Ms. Cooke as to why she voted to reject the application?
A. No. I think she had the same. I mean, she has a sharper eye than I do, but she probably would have her own reasons.
Q. Did you ever speak to Ms. Benedetto as to the reason that she voted?
A. No.
Q. Did you ever speak to Ms. Okon as to the reason that she voted to reject the application?
A. No. I will say one thing that I said when the application came in and there

A C K N O W L E D G E M E N T

STATE OF NEW YORK)

:ss

COUNTY OF )

I, JAMES RAMADEI, hereby certify that I have read the transcript of my testimony taken under oath on October 3, 2022, that the transcript is a true, complete and correct record of what was asked, answered and said during my testimony under oath, and that the answers on the record as given by me are true and correct.

JAMES RAMADEI

Signed and subscribed to before me, this 6th day of December, 2022.

NOTARY PUBLIC

PETER I. LIVINGSTON
Notary Public, State of New York
No. 02LI4516747
Qualified in New York County
Commission Expires Aug. 31, 2026

# DEPOSITION ERRATA SHEET

| PAGE : LINE | CHANGE TO | REASON FOR CHANGE |
|---|---|---|
| 15:14 | "Ceiling" to Seedlings | incorrectly heard-correct name |
| 15:23 | "Priva to Preva | incorrectly heard-correct name |
| 18:15 | "inviting" to in-fighting | incorrectly heard |
| 32:25 | "aura" to area | incorrectly heard |
| 53:15 | "packet" to package | incorrectly heard |
| 59:22 | -- to do things. "When" | incomplete phrasing |
| 60:02&06 | "okay" to Okay? | interrogative-phrasing |
| 99:21 | "dismiss" to discuss | spelling |
| 118:20 | "rear-wiring" to rewiring | incorrectly heard |
| 128:06 | "the" parrots | phrasing |
| 133:24 | that "they" carry | phrasing |
| 135:13 | "yeah" to yes | incorrectly heard |
| 152:02 | "problem" to apartment | incorrectly heard |
| 152:03 | "has" to have | phrasing |
| 162:11 | usual "method" | phrasing |
| 199:09 | I'm in "no" position... | phrasing |
| 199:22 | "cooperation" to corporation | spelling |
| 210:21 | "so" to not | incorrectly heard |
| 226:18 | "us" to her | incorrectly heard |
| 237:18 | Incomplete from 17 | phrasing |
| 245:23&25 | "Theodore" to Fedor | incorrectly heard-correct name |
| 248:09 | "Giovanni" to Geovany | correct spelling of first name |
| 258:25 | "with the—" to with the tax returns And financial statements | incomplete |
| 260:19 | "fool-hearted" to foolish | incorrectly heard |

PETER A. LIVINGSTON
Notary Public, State of New York
No. 02LI4516747
Qualified in New York County
Commission Expires Aug. 31, 20 25

Signature__________ James Ramadei Date: 12/6/2022