UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------X
UNITED STATES OF AMERICA,

Plaintiff,

- against - Index No.: 21-CIV-10383

RUTHERFORD TENANTS CORP. and JAMES RAMADEI,
Defendants.
---------------------------------------------X

86 Chambers Street
New York, New York

July 29, 2022
9:54 a.m.

DEPOSITION of NANCY BENEDETTO, appearing on behalf of the Defendant herein, taken by the Plaintiff, pursuant to Notice, taken before Nicole L. Basile, a Notary Public within and for the State of New York.

Q. Did you ever ask Ms. Lesser why she had birds?

A. No.

Q. Does the Rutherford allow tenants to maintain animals in their apartments?

A. Yes.

Q. Has that always been the case?

A. As far as I know. Yes.

Q. Are there any restrictions on the kind of animals that residents can keep in their apartment?

A. I suppose there might be some type of restriction. But for the most part it's -- it's -- I mean, I'd have to go back and look at the -- at the bylaws and house rules.

Q. So --

A. To -- to answer that properly.

Q. So if there are restrictions on the kind of animals that residents can keep in their apartment, it would be in the bylaws and/or the house rules, correct?

A. That's correct.

Q. Is there any requirement that residents notify the Board that they have an animal in their

apartment?

A. I believe on -- when -- when someone submits an application to live in the building, there is a question on the application that asked do you have any animals.

Q. Okay.

A. When in fact that -- that's -- that's the best I can tell you right now.

Q. Have you ever had an animal in your apartment while at the Rutherford?

A. Yes.

Q. What animals have you had?

A. A dog. A dog.

Q. A dog. Same dog all the way through?

A. No. Gosh, no. I have a Chihuahuas. Chihuahuas.

Q. Have you had Chihuahuas the entire time you lived at the Rutherford?

A. I have.

Q. And so there's a few generation of Chihuahuas that lived with you, correct?

A. That is correct.

Q. About how many generations of Chihuahuas?

BENEDETTO

Q. All right. Now, I'm not asking you to respond to all the -- the -- the legal stuff in here, but I do want to focus your attention on the paragraph on the signature page where it says "finally".

A. Finally? Okay.

Q. Yup. So I'm just gonna do it sentence by sentence. "Finally, Ms. Lesser suffers from a disability and her parrots serve as emotional support animals." Do you see that?

A. I do.

Q. Did you know that?

A. Did I know what?

Q. That Ms. Lesser suffered from a disability? Let's do that in two parts. Did you ever come to learn that Ms. Lesser suffered from a disability?

MR. LIVINGSTON: Personally learned of it?

Q. Personally learn?

A. No. Personally, no.

Q. Ever? You've never heard that she suffered from a disability?

MR. LIVINGSTON: Objection.

It's a different question.

A. I did not know. I did -- I mean, no, there would be no reason why I would know she suffered from a -- from a disability.

Q. Did there come a time that you learned that she suffered from a disability?

MR. LIVINGSTON: Objection.

A. The only potential on that would be this letter from the -- I don't know if it's a psychologist or psychiatrist.

Q. I think it's the next page if you need to refresh your memory.

A. This letter from -- from Dr. Tutter.

Q. Okay.

A. That would be the only -- the only piece of information that would have been -- stated to me that there was some type of disability.

Q. Dr. Tutter?

A. Correct.

Q. And that's, T-U-T-T-E-R. Okay. And then the second half of the sentence says that, "her parrots serve as emotional support animals."

A. Okay.

Q. Did you know that in 2015?

A. No.

Q. Did there come a time that you learned that the reason she has parrots is to serve as emotional support animals?

A. When I read that letter from Dr. Tutter.

Q. Just because you keep referring to it. So the letter from Dr. Tutter is dated March 14, 2016, right?

A. Okay.

Q. Did you see this letter shortly after it was written on March 14, 2016?

A. I don't recall exactly when I saw it.

Q. All right. And let's just talk about this letter for a bit and then I'll go back to the Himmelstein letter. So you see here that Dr. Tutter indicates that Ms. Lesser has a mental health related disability, right?

A. I see that.

Q. And do you also see where in this letter from Dr. Tutter, she indicates who the parrots are and that Ms. Lesser requires them as emotional support animals, right?

A. Yes.

Q. So turning back to the Himmelstein

letter. So if you go back to the previous page, there's a line here in the paragraph beginning "finally" and it states, "Ms. Lesser hereby requests that you offer her a reasonable accommodation and not pursue any litigation based upon the Notice." Do you see that?

A. I do.

Q. Do you know what a reasonable accommodation is?

A. Under ADA requirements I -- I do.

Q. What do you think the ADA is?

A. What do you mean what do I think it is? American Disabilities Act.

Q. And why do you think the Americans with Disabilities Act applies to a residential home?

A. I don't know if it does apply to a residential building. I mean, I don't know the details of it. It's just that when one refers to a reasonable accommodation now, in this day and age, that's generally what we're referring to.

Q. And what is your understanding of what a reasonable accommodation involved, whether it's under the Americans with Disabilities Act or any other law? I'm asking for your understanding of

BENEDETTO

that.

A. The -- I don't know. Accommodate the individual so that -- on whatever -- whatever level of disability may or may not be affecting that individual.

Q. And what does it mean to accommodate? The words that you just used.

A. Honestly, that's way too complicated for me --

Q. Okay.

A. -- to even address. But -- but in my -- from my point of view, we're talking about something that has no real bearing on anything where this was a noise complaint. It was not an emotional disability support complaint. That's not what the complaint was. We were talking about animals making noise. So you have to adjust and take care of that issue not resolve her emotional -- I mean, her -- no one was saying that she couldn't have animals.

Q. At any point during your time on the Board, did you get any training on your obligations under fair housing law?

A. No.

Q. Did you ever do some reading on your own

regarding your obligations as a Board member under fair housing laws?

MR. LIVINGSTON: Objection as to whether there are any, counsel.

A. I honestly don't know even what we're talking about. The fair housing laws.

Q. Did anyone ever give you guidance as a Board member regarding the Rutherford's obligations under fair housing laws?

A. I have no idea specifically what we're talking about.

Q. And I just want to be clear, so you don't recall seeing the Himmelstein letter, but you do recall seeing the Tutter letter, right?

A. I do.

Q. Sorry, that was a compound question. You don't recall seeing the Himmelstein letter?

A. Right. I don't recall seeing the Himmelstein letter. I do recall seeing the Tutter letter.

Q. Thank you. So the Tutter letter requests that Ms. Lesser have an accommodation so that she can have the parrots, right?

A. Correct.

BENEDETTO

Q. Who decided whether Ms. Lesser was entitled to that accommodation at the Rutherford?

MR. LIVINGSTON: Objection. What accommodation, counsel? It's an abstract term.

MR. KENNEDY: Thank you for your speaking objection.

Q. Who decided whether Ms. Lesser would be allowed to have emotional support parrots at the Rutherford? Who decided that?

A. I don't think anybody. I don't think anyone decided emotional support animals were necessary. I mean, I don't know who we're talking about when you're asking who decided that. I don't know specifically what we're referring to. She had parrots for so many years living in the building. So to me, that's, like, a non-issue. She had the parrots.

Q. If we have Dr. Tutter's letter before us that requests Ms. Lesser be allowed to have the parrots in the building as a reasonable accommodation for her disability, who decides whether Ms. Lesser is entitled to have the parrots or not? Is that the Board's decision, is it a

Halstead decision?

MR. LIVINGSTON: I'm gonna object to the question. That mischaracterizes the letter.

A. I honestly don't know who -- who makes determinations about accommodations. Whatever that term means. I really don't know. I think that's more legal than anything else.

Q. Has it ever happened before, that a resident of the Rutherford said I request a reasonable accommodation for my disability?

A. Not that I -- I don't -- not that I have seen.

Q. Do you know whether the Rutherford has any policies in place to address reasonable accommodations made by people who live there?

A. I don't recall a policy about reasonable accommodations.

Q. After you read Dr. Tutter's letter in March of 2016, do you think it was reasonable for Ms. Lesser to have these parrots in her apartment as a reasonable accommodation for her disability?

A. I'm going to say this one more time. In my opinion, this was a noise issue. It had nothing

to do with emotional support. She had parrots in her apartment for as long as she was living there, which was 17 plus years. So I did not consider her having parrots in there as an emotional support piece. What we were dealing with, as a Board, was noise complaints.

Q. So now I'm going to go out of order a little bit again and ask you to look at Exhibit 29.

A. Okay.

Q. And this is a notice from the Department of Housing and Urban Development. Do you see it?

A. I do.

Q. Now, there's a lot of legal stuff in here that, you know, I'm not going to ask you about. But on Government Exhibit 29, I'm going to ask you to turn to page two and I'm simply going to read what this is and ask you whether some of the statements in here are true of Ms. Lesser and her parrots. So bottom of page two going onto page three, "housing providers are to evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests. After receiving such a

request, the housing provider must consider the following." Do you see that on page two and page three?

A. Yup.

Q. Rest of page three is blank for some reason so we're going to turn to page four.

A. Okay.

Q. All right. So on the top of page four there is a two part test, "one, does the person seeking to use and live with the animal have a disability, i.e., a physical or mental impairment that substantially limits one or more major life activities?" Do you see that?

A. I see it.

Q. Did you have any opinion as a Board member, on whether Ms. Lesser had a disability?

A. I had no knowledge of her disability.

Q. So even after reading Dr. Tutter's letter of March 2016, you did not have an opinion on whether or not Ms. Lesser had a disability?

A. That is correct.

Q. All right. Point two on this document says, "does the person making the request have a disability-related need for an assistance animal?

In other words, does the animal work, provide assistance, perform tasks or services for the benefit of a person with a disability, or provide emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability?" Do you see that?

A. I do.

Q. And did you have an opinion back in 2016, as to whether Ms. Lesser had a disability-related need for an assistance animal?

A. I had no opinion about it.

Q. All right. So skip a paragraph and then turning to the paragraph that begins, "where the answers to questions one and two are yes" then there's some further verbiage. Then there's a sentence beginning, "the request may also be denied if" and do you see that?

A. Yup.

Q. All right. So let's do them one by one. So point one says, "the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation." Do you see that?

BENEDETTO

A. Yes.

Q. Did Ms. Lesser's parrots pose a direct threat to the health or safety of others?

A. I don't know.

Q. Do you have any basis to believe that they did?

A. I -- I don't know. I don't know anything about the parrots. I did not see them. I don't know how they behaved with people. I only heard them.

Q. The second half of this is, "or two, the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation." Do you know whether Ms. Lesser's parrots would cause substantial physical damage to the property of others?

A. I do not know that.

Q. All right. You can put that to the side. Once the Board saw the letter from Dr. Tutter -- sorry. At some point, the Board saw Dr. Tutter's letter of March 2016, right?

A. Correct.

Q. Did the Board do anything about the --

MR. KENNEDY: Strike that.

Q. Did the Board change it's opinion as to how to respond to complaints coming from 5J as a result?

A. I'm not really following.

Q. I'll rephrase it. Did Dr. Tutter's letter do anything to change the opinion of the Board, as to Ms. Lesser's parrots?

A. I cannot speak on behalf of the whole Board. I can speak on behalf of myself.

Q. Right.

A. It did not change my opinion, because we were dealing with a noise complaint. Not a disability or an emotional support complaint.

Q. Okay.

A. We never had that complaint.

Q. I got it. All right. Exhibit 24 is not for you so you can skip that.

A. Yay. Where are we now?

Q. Did the Board vote, at some point, to begin eviction proceedings against Ms. Lesser?

A. We did.

Q. When did the Board do that?

A. I'd have to look at, you know, something

Q. Were there any questions and comments about the fact that the Board had just voted to evict one of the shareholders?

A. I don't recall hearing -- remembering anything about that.

MR. LIVINGSTON: Can we take a break for five minutes?

MR. KENNEDY: Of course.

(A recess was taken.)

MR. KENNEDY: Okay. So we are back on the record.

Q. And I would actually like to ask a more narrower and more fine-tuned verse of a question I previously asked relating to Government Exhibit 29. So can you get that back in front of you?

A. Okay.

Q. And again, we're looking at page four and we're looking at the second one and two in the large paragraph beginning "where the answers to" do you see that?

A. Mm-hmm.

Q. My intern actually pointed it out to me and I should have asked this in a better way so I thank her for that. So point one says, "the

specific assistance animal in question poses a direct threat to the health or safety of others --

A. Wait a minute.

Q. Right. So I will -- let's -- let's -- I'll give you some time to get back into it. So it's page four, right?

A. Yeah.

Q. It's Exhibit 29.

A. I got that.

Q. And then the paragraph beginning "where the answers"?

A. Oh, okay.

Q. And then the sentence starts "the request may also be denied" so are you there?

A. Yes.

Q. So quote "one, the specific assistance animal in question poses a direct threat to the health and safety of others that cannot be reduced or eliminated by another reasonable accommodation." Do you see that?

A. Yes.

Q. To your knowledge, did Ms. Lesser's parrots pose a direct threat to the safety or safety of others, to your knowledge?

BENEDETTO

A. Not to my knowledge.

Q. And then the second half of this sentence is, "two, the specific assistance animal in question would cause substantial physical damage to the property of others". To your knowledge, did Ms. Lesser's parrots cause substantial physical damage to the property of others?

A. Not that I'm aware of.

Q. All right. Good. All right. You can put that to the side. Thank you very much. All right. Did there come a time that Ms. Lesser moved out of her apartment?

A. Yes.

Q. Do you know when that was?

A. I don't specifically recall when that was, no.

Q. Was it summer of 2016?

A. Unless I have it in front of me, I'm not going to remember specifically when the date is.

Q. Fair. Do you remember learning, at some point, that Ms. Lesser had moved out of her apartment?

A. Yes.

Q. How did you learn that?

BENEDETTO

A. I do believe so.

Q. And who made that decision?

A. Don't recall. I don't recall.

Q. Did you object to taking the legal fees off her monthly maintenance bill?

A. I think that once --I think it was -- it was -- I don't recall how that occurred.

Q. Did there come a point in time that there was an application to purchase Ms. Lesser's apartment?

A. Yes.

Q. Can you please describe the application process if somebody wants to reside at the Rutherford --

A. Sure.

Q. As a cooperator not --

A. Sure. As a co-op. Yeah. So there's a rather lengthy application that needs to be completed and it includes financials [sic], background information, why you want to be at the Rutherford. There's appraisals that are put in, the contracts are in there, references. It can be rather lengthy.

Q. Does the application process include an

BENEDETTO

interview?

A. The application process -- well, first you have the application and then once you review it, we make a decision as to whether or not we want to proceed and move to interview. Getting the application does not mean that an interview occurs.

Q. So is it fair to say it's a two step process where there's an application review and then if the Board decides that person then moves onto the interview and then following further consultation by the Board, the Board votes whether or not to allow the person to live at the Rutherford?

A. That is correct.

Q. Is there a checklist indicating what an applicant must submit?

A. I'm sure there's a checklist. We don't see the applications.

Q. Who does?

A. Halstead does.

Q. Halstead?

A. Halstead provides it.

Q. So turning your attention to Government Exhibit 34. I think we are now fully caught up in sequence. Government Exhibit 34 is a two page

document number stamped HAL_71 to 72.

A. Got it.

Q. All right. Have you ever seen this document before and let me talk about the document itself and then I'm going to talk about the writing on it separately. So minus the handwriting, have you ever seen this document before that's in front of you as Government Exhibit 34?

A. I mean, I know what it is. I can read what it is. But probably nothing that I really paid attention to.

Q. To your knowledge, does the printed portion of Government Exhibit 34 accurately set forth the things that are needed to make an application to purchase shares in the Rutherford?

A. Yeah. You mean the numbers one through 29? Yes. Yeah.

Q. And just to be clear, on the second page there's additional numbers that -- that refer to fees?

A. Correct.

Q. Okay. Good. All right. So do you recognize the handwriting that's on Exhibit 34?

A. I do not.

BENEDETTO

Q. Do you recall what the proposed purchased price was for Apartment 5J in 2019?

A. What Meril was requesting or what the --

Q. Or what the applicant was proposing to pay?

A. -- applicant -- I guess it's pretty close to this amount that's up here.

Q. That was going to be my next question. Does the number at the top, 467,500 refresh your memory as to what it was?

A. That would pretty -- I mean, exactly I -- I would say that would be pretty close to what the amount would be. Yeah.

Q. Do you remember the name of the individual who proposed to purchase Apartment 5J in 2019?

A. I don't recall his name. I'm going blank on his name.

Q. If you're going blank on his name, that's fine. Let's just call this person the applicant. Fair?

A. Okay. Yeah.

Q. So when I say the applicant --

A. I'll know.

BENEDETTO

Q. Obviously there's -- you've dealt with a million applicants, but when I say the applicant, we understand each other, right, that when I say the applicant it's the person?

A. I know you're referring to this person.

Q. All right. What is Boardpackager.com?

A. It's a software application for financial for these -- what they use for these applications.

Q. And I take it the Rutherford uses Boardpackager.com to facilitate its review of applications?

A. Yes.

Q. All right. So this next thing is a little out of order. I'm sorry. But there's very little left. So Government Exhibit 41, number stamped HAL_0053.

A. 41?

Q. 41.

A. The last one.

Q. The last one.

MR. KENNEDY: And this is a new document, Peter, but obviously it's been previously provided to you during

BENEDETTO

discovery.

[redacted]

Q. Okay. Good. Al right. So at the top it says via Board packager. Do you see that?

A. Yes.

Q. So have you seen this particular letter before?

A. Yes.

Q. How did this letter arrive to you? Does it arrive hard copy, do you log in --

A. E-mail.

Q. E-mail? Okay. So this comes as a PDF. How does -- how does it come?

A. Yeah. It's our -- it's an e-mail. Oh, this particular piece would be part of the package, I think.

Q. So I've never used Boardpackager.com so you'll just have to take me through the technicalities of it. So do you log onto a website such as boardpackager.com and then you look at

things or --

A. Yeah. So basically Halstead would send us an e-mail and say applicant -- an application for 5J is -- is in the Board package, please open and so we each -- we have our own password and we open up the package.

Q. When you say you open up the package, you're opening up a PDF, you're opening up --

A. A PDF.

Q. -- a database?

A. A PDF.

Q. And what does the PDF contain?

A. All of these things.

Q. So Boardpackager.com allows you to review documents, right?

A. Yes.

Q. Does Boardpackager.com allow you to comment on documents?

A. No.

Q. In other words, can you say highlight or mark up a particular piece of an application for others to see?

A. Not that I'm aware of. I mean, potentially that could be. I have no real idea.

BENEDETTO

Q. Does Boardpackager.com allow Board members to communicate with each other about applications?

A. No.

Q. In other words, is there any sort of messages that occurs within Boardpackager.com?

A. Not that I'm aware of.

Q. At any point in 2019, did you have discussions with any Board members about the application to purchase Ms. Lesser's apartment?

A. No.

Q. How does the Board go about making a decision on whether to grant an application to purchase a property?

A. So each of us look at our -- look at the Board packager application individually and then e-mail as to whether or not you approve to move forward with the application to the next step, which would be interview, or not, or if you request additional information.

Q. Does each Board member make their own individual decision as to whether to move forward with a particular application?

A. Yes.

BENEDETTO

Q. Do you discuss with each other your decision as to whether to move forward or not?

A. No.

Q. Why not?

A. I'm looking at it from my point of view. When I review the application, I'm making a decision as to whether or not I believe that that individual would be someone we would like to have into our building.

Q. But you would never discuss that with another Board member?

A. Generally that's just not how we do business. That's not how we -- we operate it individually and then we -- and then based on that, you'd see whether or not we're moving forward or not moving forward based on how many people either agree or don't agree.

Q. So if, for example, you were to move forward on an application and the other members of the Board vote against, you would have no idea why they voted the way they did?

A. We generally do not discuss the reasons behind that.

Q. Why not?

BENEDETTO

A. We're not required to under the co-op.

Q. I mean, we've seen Board minutes where you discuss a whole manner of things with each other, right?

A. Yes.

Q. Why don't you discuss applications to purchase shares in cooperatives with each other?

A. Well, if I'm reviewing it and I agree that we should move forward, then -- or if I disagree that we should move forward, I couldn't state because I wanted additional information. But that doesn't change other people's views.

Q. Did there come a time that you voted on [redacted]

A. Yes. That was that I made my own decision. Yes. Absolutely.

Q. And how did you vote?

A. I -- I recommended not to move forward.

Q. And is that e-mail before you as Government Exhibit 37 number stamped US_1587?

A. Yup.

Q. And that's a screen shot of your e-mail?

A. Yup.

BENEDETTO

Q. Deciding not to move forward on this?

A. Yup.

Q. Why did you not recommend moving forward?

A. I was concerned about a couple of things. One being the irrevocable trust direction, the second being I didn't get a sense of why he really wanted to move or even seriously wanted to move and buy this apartment. The -- there was nothing that indicated any strong reason why he was moving there. And the third was that it was -- that I was concerned about -- well, those were the primary pieces.

Q. Well, what were the other pieces in your mind?

A. There was -- the only thing I saw in there was mention of his two daughters and two dogs, all of whom would be in the apartment and I was just concerned about the fact that -- what we were -- it would be not -- it's not a home and we don't -- I, personally, did not want our building and -- and generally that's my own thought. It was not an open policy. It's not a hotel. People should not just be coming and going. It's my home and that's not how I

want the apartments to be. So that's my personal view on how I view purchases.

Q. I understand your personal view, but -- but what was -- I don't understand what you thought the proposal was, [redacted] would be living with two daughters and two dogs?

A. I didn't know. That's the point. I wasn't -- I wasn't clear what the direction and why there was this interest. There was nothing that he stated that was clear to me that he loved the neighborhood, loved the building, loved the apartment. It was just -- I don't know why he was wanting to buy the apartment. So it did not give me any sense of -- and it just didn't give me a sense of comfort.

Q. Turning your attention to what is already in front of you as Government Exhibit 34, where is there a required here any sort statement as to why the person particularly wants to live in New York City or at the Rutherford?

A. Why is there? Where is it?

Q. Yeah. Is there any requirement in this checklist that a person make some sort of statement of interest as to why they want to live at the

Rutherford?

A. I'm not sure. I'd have to look and see if there's anything here that would fit into that rule, but it doesn't -- it -- it -- every application I've -- I've reviewed, the buyers or potential buyers generally state why they want to live in our building.

Q. Couldn't you have simply asked him that question at an interview?

A. I don't know. I suppose.

Q. Why didn't you?

A. At the interview? No. It would have been prior to an interview. You'd have to, you know, we -- we -- requesting additional information.

Q. Did you request additional information --

A. No.

Q. -- as to why, [redacted] want to live in the neighborhood?

A. No. I did not.

Q. Why not?

A. I don't know. Just did not. I wasn't comfortable. I thought -- I just wasn't -- I -- I was uncomfortable with the financial disclosure

piece and the fact that it would be an apartment for two -- potentially two young girls. That's basically what he was talking about, his -- his two daughters. He mentioned two daughters. So I'm just assuming that's who would be in the apartment.

Q. What concerned you about the prospect of having two daughters in the apartment?

A. College students living in -- in our building as opposed to a family. Young people going to school. We prefer -- we generally like to have individuals who are working.

[redacted]

A. No. It was open door. He has an established home in -- in Florida or wherever it

was. I don't recall exactly where he was living. I did not get the sense that he was leaving that practice and coming to New York to live in a straight studio.

Q. So couldn't you have simply asked him, are you coming to live here or is it just your two daughters?

A. I suppose I could have just asked him. I did not.

Q. Why not?

A. Just did not.

Q. If all of these questions need to be resolved at the screening level, then what's the purpose of the interview?

A. At the interview you get to speak directly with people after reviewing finances and all of the other paperwork where you have a sense that this is someone or an individual that you would like to have living in the building. So it's more of a face to face to get a sense of who you are.

Q. You also indicated that you had a concern about an irrevocable trust?

A. I do.

Q. What was that concern?

A. Well, one -- one gets involved with a irrevocable trust in order to bypass taxes or sales, capital gains, et cetera, et cetera.

Q. Okay.

A. And it's not something that we look at positively prior to the sale. It is something that occurs potentially after you've purchased an apartment. So we don't sell apartments to the trust.

Q. Did the applicant working with Halstead alter his application in any way to address these issues relating to the irrevocable trust?

A. Yes. I do believe that that was changed.

Q. That was changed so. And is that reflected on Government Exhibit 41 there's an asterisks as to who the purchaser is. The purchases [redacted] Not the irrevocable trust.

A. Yes. I do -- I do recall seeing that.

Q. So just to go to your list of issues, your first issue was you didn't like the irrevocable trust but that was addressed by the applicant, right?

A. Right.

BENEDETTO

Q. So that issue is -- is resolved to your satisfaction, right?

A. That was resolved.

Q. The second issue was, there was nothing that indicated his particular interest in living at the Rutherford, right?

A. Correct.

Q. But you did not ask Halstead to reach out to him to have him explain what his interest was in living at the Rutherford?

A. Correct.

Q. And again, you're just nodding so I needed to wait for your answer.

A. I'm sorry. I know that. I understand. I realized that. That's why I'm starring at you and you at me and I'm realizing I did not open my mouth.

Q. It was awkward but --

A. There you go. It's okay.

Q. But again, so you could have had Halstead reach out [redacted] and say why do you want to live here?

A. Yeah. So generally you could do that. So that says, okay, he didn't tell us really some real good information. That's not generally how

BENEDETTO

that -- I would have liked -- I want to see that ahead of time. I want people to truly want to live in our building.

Q. Okay.

A. I didn't get a good warm and fuzzy feeling there.

Q. I see. And the third reason was this issue of the two daughters?

[redacted]

A. Yeah. And the two dogs.

Q. And the two dogs. Okay. Well, you have dogs, right?

A. I do. A dog.

Q. A dog. So what was your concern about the two dogs?

A. Nothing. Just that we were going to have two young -- young people and their dogs live nothing the apartment. That's all.

Q. Okay.

A. We would've had to met the dogs anyway. We do that.

BENEDETTO

Q. You were going to meet the dogs?

A. Well, we would.

Q. Well, that actually is an excellent step.

A. We interview dogs.

Q. That's a good practice. But again, I just want to try to understand your concern as to -- you said it wasn't a home with a doctor, two daughters, two dogs?

A. Yeah. I got the sense --

Q. What about that arrangement doesn't make it a home?

A. No. It's not that it doesn't make it a home. It's that it sounded more to me a dorm type living activity for two young people. It just wasn't -- it wasn't that his -- it wasn't -- that's how I was viewing it. That's -- I mean, that's basically what it comes down to. That's how I was viewing it.

Q. Do you ordinarily vote to reject applications from families with college aged students?

A. Generally if the parent is living there, then it doesn't matter the age of the student.

Q. All right.

A. But we don't sell to the college students.

Q. Do you know whether Mr. Ramadei voted to reject the application?

A. I don't know for sure what Mr. Ramadei did. I know what I did and I know -- I recall -- and I think I recall seeing -- I just -- I know what I did. Generally speaking, we send that off and then the president makes the statement that the application is going forward to interview or is not.

Q. The president does that?

A. Well, I mean he's the receiver of all the e-mails.

Q. And the president of the Board at this point in time is Mr. Ramadei, right?

A. Correct.

Q. All right. Do you know why Ms. Okon -- well, do you know how Ms. Okon voted on this application?

A. I'm going to assume she voted no, because it did not go forward.

MR. LIVINGSTON: I don't want you guessing.

A. Okay. Then I'm not making assumptions here so don't ask me that question. Nope.

Q. So what vote is required for an application to proceed?

A. You need three. Is that what you mean?

Q. Yeah.

A. Three out of five.

Q. So again, we're telling you not to assume things, but, like, if it's three out of five, if they vote no, then that's it. Do you know who the no votes were other than you?

A. No.

Q. At this point in time, somebody named Francesca Cooke was on the Board, right?

A. Oh, Yes. Yes.

Q. Do you know how Ms. Cooke voted?

A. I don't.

Q. Is Ms. Cooke still on the Board?

A. No.

Q. Where is Ms. Cooke? Does she still at the Rutherford?

A. She lives in the building. I don't know whether -- yeah. She still lives in the building.

Q. Do you know whether she sent an e-mail

BENEDETTO

similar to yours saying whether or not she would move forward on the application or not?

A. I'm sure she responded. I don't know.

Q. Now, if you could look for a moment at Government Exhibit 39 and you can put away the ones that don't concern you. 38 does not.

A. Can I put away 34 and 35 or not?

Q. Yes. And 38 does not concern you.

A. 36 is done.

Q. And let's go to 39?

A. 38 does no concern me and 39. Got it.

Q. All right. So -- and Government Exhibit 39 is in front of you as US_1588.

A. Oh, Steven Troy. Go ahead. I'm sorry.

Q. Right. That's my question. So it's Mr. Troy who says --

A. Is president. Right.

Q. -- "after careful review the Board has rejected this applicant"?

A. Right.

Q. Do you see that e-mail?

A. I see that e-mail.

Q. Why did Mr. Troy --

A. Because then he was president then.

Q. Mr. Troy was president of the Board at the time?

A. If -- if he wrote this letter to Julie, then that's what that indicates.

Q. So that means Mr. Ramadei was no longer president at --

A. That time.

Q. In December 2019?

A. Yeah. Things change.

Q. Sorry, I'm now actually going back to Government Exhibit 35.

A. All right.

Q. So it's a bunch of minutes that would look familiar to you.

A. 34. Okay. 35, here we are.

Q. All right. So there's a batch of these. So Government Exhibit 35, just to make, you know, to speed things up, I put them all together. So the number stamp is HAL_120, 121, 118, 119, 116, 117, 114 and 115.

A. Okay.

Q. All right. So I'm going to ask you two interrelated questions. I'm going to ask you first for each of these -- well, sorry, I should lay a

foundation first. Do you recognize these documents?

A. I do.

Q. What are they?

A. These are minutes of Board meetings from September to December of 2019.

Q. And I'm going to ask you two questions about these minutes and it would be easier for you to know the two questions are as you go through them. For each of the Board meetings occurring in September 2019, October 2019, November 2019 and December 2019, first, was there an update on the legal proceedings involving 5J and second, was there any discussion of the application to purchase 5J?

A. In September the -- it was ongoing. Says 5J was still ongoing and October same thing, 5J was still an ongoing issue. Same occurred for November of 2019, 5J was still an ongoing issue. And same occurred in December of 2019, ongoing issue.

Q. But in none of these minutes is there any reflection that there was a pending application to purchase Apartment 5J, right?

A. Correct.

Q. Why not?

BENEDETTO

complained to the doorman was Kullen, Okon or Keany?

A. I honestly don't know who it is.

MR. KENNEDY: No further questions.

(WHEREUPON, the examination of this witness was concluded at 1:07 p.m.)

Nancy A Benedetto
------------------------------------
NANCY BENEDETTO

Subscribed and sworn to before me

this 21 day of Sept , 2022.

------------------------------------
NOTARY PUBLIC

PETER R. LIVINGSTON
Notary Public, State of New York
No. 02LI4516747
Qualified in New York County
Commission Expires Aug. 31, 20 25

ERRATA SHEET FOR THE TRANSCRIPT OF:

Nancy Benedetto

Case Name: UNITED STATES OF AMERICA vs. RUTHERFORD TENANTS CORP. and JAMES RAMADEI

Deposition Date: July 29, 2022

Deponent: Nancy Benedetto

Place: 86 Chambers Street, New York, New York

CORRECTIONS

| PG | LN | NOW READS | SHOULD READ | REASON FOR |
|---|---|---|---|---|
| 32 | 7-8 | I get paid | I don't get paid | |
| 39 | 3 | to the -- | to the managing agent about | |
| 59 | 7 | the -- | the problem | |
| 70 | 11 | Specific -- | Specific role | |
| 131 | 17 | NO | yes | |
| 141 | 10 | then -- | then no need | |
| 141 | 11 | I couldn't | I could | |
| 172 | 6 | absolutely lately true | absolutely true | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |