UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA,

Plaintiff,

Civil Action No.:
21-CV-10383 (PGG)

-against-

RUTHERFORD TENANTS CORP. and JAMES RAMADEI,

Defendants.
- - - - - - - - - - - - - - - - x

August 2, 2022
10:00 a.m.

VIRTUAL DEPOSITION of MARCIA OKON, a Defendant, taken by the Plaintiff, in the above-entitled action, held at the above time and place, pursuant to Notice, taken before AMY BOGUSZEWSKI, a Shorthand Stenotype Reporter and Notary Public within and for the State of New York.

A. Correct.
Q. Is this a separate, new issue that requires the building's engineer to take a look at Apartment 10B?
A. I don't recall the specifics, so I can't comment.
Q. Do you recall the building's engineer needing to attend to Apartment 10B on issues other than replacing the fuse box with a circuit breaker?
A. I don't recall.
Q. Government Exhibit 23 we can skip because I have dealt with that with another witness.
So Government Exhibit 24, I'm going to ask you to take a look at it, it's Bates-stamped US_1585. It appears to be an e-mail from you dated May 15, 2016. Can you look at it and let me know whether that's, in fact, what it is?
A. Yes, that is what it is.
Q. So what led you to make this complaint?
A. The screeching ear-piercing volume

of that bird in 5J.

Q. Am I correct that this is the only occasion that you put a complaint in writing about noise from 5J?

A. No, you are not correct.

Q. Okay. What other complaints did you put in writing relating to 5J?

A. There was another complaint.

Q. When was that other complaint?

A. I don't recall if it was the month before or the month after. I think it was sometime in April of '16, but I have to go back and check.

Q. So you put a complaint in writing?

A. Correct.

Q. And is that reflected in the exhibit that is in front of you as Government Exhibit 7?

A. You mean both of them?

Q. Yes.

A. There is only one reflected in Government Exhibit 24.

Q. Right. How about this, if you could turn to Government Exhibit 7, and I

apologize.
A. Okay.
Q. At R-0064.
A. Hold on. Okay.
Q. And go to R-0064.
A. I'm sorry. Yes, that is the other complaint. You are correct. I knew it was a month apart.
Q. So other than Government Exhibit 7, page R-0064, and then Government Exhibit 24, are there any other occasions that you put any complaints in writing about noise from 5J?
A. I don't believe so.
Q. I have one follow-up question about this e-mail.
A. Which e-mail, the one in 7?
Q. No, the one in Government 24.
A. Hang on a second. I have to go back.
Q. I'm sorry about that.
A. Okay. 24. Yup.
Q. So this is from a different e-mail account, and I'm not sure how to pronounce

M. OKON

"Finally, Ms. Lesser suffers from a disability and her parrots serve as emotional support animals. Ms. Lesser's treating psychiatrist, Dr. Adele Tutter, emphasizes that the presence of these animals is necessary for my client's mental well-being. Ms. Lesser hereby requests that you offer her a reasonable accommodation and not pursue any litigation based upon the Notice."

Do you see that?

A. I do.

Q. Did anyone advise you at any point prior to you receiving this packet of information in preparation for your deposition that Ms. Lesser suffered from a disability?

A. No.

Q. Did anyone advise you or did you ever hear prior to receiving this information in preparation for your deposition, that Ms. Lesser wanted the parrots as emotional

support animals?

A. No.

Q. Did anyone advise you prior to your receiving of this information in preparation for your deposition that Ms. Lesser was requesting "a reasonable accommodation for her disability"?

A. No.

Q. Do you know what a reasonable accommodation is?

A. No.

Q. Does the Rutherford have any policies or practices in place that apply once a tenant requests a reasonable accommodation for a disability?

MR. LIVINGSTON: Objection. The question suggests information which may or may not have occurred. First of all, I think you first have to determine if there ever was a request as opposed to the way you phrased it.

MR. KENNEDY: No, I like the way I phrased it.

Q. Does the Rutherford have any policies or practices in place to govern what happens if a tenant makes a reasonable accommodation?

MR. LIVINGSTON: I will object to the question. You can answer it.

A. I don't know.

Q. And during your time on the Board, has any resident made a request for a reasonable accommodation relating to a disability?

A. Not that I recall.

Q. Does it concern you now sitting here that there was a request for a reasonable accommodation for a disability that you didn't see at the time it was made?

MR. LIVINGSTON: Objection. I'm not sure what you mean by "concern."

Q. Does it bother you in any way that one of the shareholders made a request for a reasonable accommodation for her disability and this past weekend is the first time that you learned that she was disabled and that

she had requested a reasonable accommodation?

MR. LIVINGSTON: Objection.

A. I'm not quite sure how to answer. I don't know how I feel. I would have to think about that.

Q. So please think about it and then let me know what your thought is.

MR. LIVINGSTON: Why don't you leave a space in the transcript, David.

MR. KENNEDY: No.

MR. LIVINGSTON: All right.

MR. KENNEDY: I can wait.

A. I would say that -- I'm not sure who this letter was directed to. Who was this letter directed to? Okay. So my response would be since this letter was sent to the co-op's counsel, I would have every confidence that it would be handled properly.

Q. Do you think you, as a Board member, had any responsibility to make decisions -- strike that.

Do you think that you, as a Board member, should have known that a shareholder

in your building was stating that she had a disability and that she was making a request for a reasonable accommodation?

MR. LIVINGSTON: Objection.

A. I'm not sure about that because the point is I don't know enough. I mean, I'm not a psychiatrist, and I believe that's what that Dr. Tutter is. I'm not sure since I am not a psychiatrist that, you know, what exactly this means and whether or not it would be pertinent to be knowledgeable about it as a Board member.

Q. Well, you mentioned Dr. Tutter, so let's go to Dr. Tutter's letter, which is attached to the Himmelstein letter. So if you would just turn the page and look at Dr. Tutter's letter that is dated March 14, 2016, do you see that?

A. Yes.

Q. Again, I'm not going to read the whole thing, but in the first paragraph, do you see whether it indicates that Ms. Lesser:

"Has a mental health related disability recognized by the

Diagnostic and Statistical Manual, 5th Edition."

Do you see that?

A. I see that's written here, yes.

Q. Of course, I understand that you are not a psychiatrist and I am not, either but would it have been relevant to the discharge of your duties as a Board member to know that a psychiatrist had concluded that one of your shareholders had a mental health-related disability?

MR. LIVINGSTON: Objection.

A. I don't know if that would have made a difference, no.

Q. And in the second paragraph, there is a sentence beginning "in order to."

"In order to function optimally, Ms. Lesser requires the presence of three emotional support animals."

Do you see that language in Dr. Tutter's letter?

A. Yes.

Q. Do you have any basis to doubt the

accuracy of Dr. Tutter's assessment that Ms. Lesser needs emotional support animals in order to function optimally?

A. No.

MR. LIVINGSTON: Objection.

A. No. I have no basis to doubt it or confirm.

Q. And do you think it would have been relevant to the discharge of your duties as a Board member back in 2016 to know that the parrots were not simply pets, but that a psychiatrist had recommended them "in order to function optimally," and that that refers to Ms. Lesser, would that have been relevant for you to know that, do you think?

MR. LIVINGSTON: Objection.

A. I don't think. I can't say if that would have made a difference.

Q. Do you think that the disputes over the noise coming from Ms. Lesser's apartment in 5J might have turned out differently if the members of the Board had seen Mr. Himmelstein's letter of March 28, 2016 and the attachment from Dr. Tutter dated

whether to evict Ms. Lesser, you had seen neither the Himmelstein letter of March 2016, nor the Tutter report also of March 2016?

A. Correct. I had not seen either of those prior to receiving this package from you.

Q. Again, I'm going to prevail on you to go out of order and I'm going to ask you to look at Government Exhibit 29. Let me know when you are there. I'm going to take you through certain sections of it. So I'm not going to ask you if you recognize it, although maybe you will.

A. Number 29, yup.

Q. Let me know when you are there.

A. Yes, I'm there.

Q. So Government Exhibit 29 is a ten-page document dated April 25, 2013 on the letterhead of U.S. Department of Housing and Urban Development. Have you ever seen this document before?

A. Not prior to receiving the package that you sent.

Q. So I'm not going to take you through

the whole thing, I am going to take you to a section of it. So I am going to ask you to turn to the bottom of page 2 and focus on the very bottom of the page on page 2 starting with the phrase "housing providers." Let me know when you are there.

A. Okay.

Q. So what I'm going to do is I'm going to read this and I am going to ask you questions about it.

"Housing providers are to evaluate a request for a reasonable accommodation to possess an assistance animal in a dwelling using the general principles applicable to all reasonable accommodation requests. After receiving such a request, the housing provider must consider the following:"

And then you can skip over to the next page, which is page 4. So you can see on page 4, there is a paragraph one, paragraph 2, and then later there is another 1 and 2. I need to take you through the 1 and the 2 and then

M. OKON

the other 1, too.

Q. So paragraph 1, top of page 4:

"Does the person seeking to use and live with the animal have a disability - i.e., a physical or mental impairment that substantially limits one or more major life activities?"

Do you know whether Ms. Lesser had a disability, mainly a physical or mental impairment that substantially limits one or more major life activities?

A. I did not know.

Q. Do you dispute whether Ms. Lesser is a person with a disability?

A. I can't comment on that. Again, I am not a psychiatrist or a psychologist who could evaluate that.

Q. Do you have any basis to doubt Dr. Tutter's assessment in that memo I placed in front of you from March of 2016 that Ms. Lesser has a disability?

MR. LIVINGSTON: Objection.

A. Hang on a second, gentlemen. I'm

going into low-battery mode.

Q. Sure.

A. Can you repeat the question, please?

Q. Yes, of course.

A. I'm there.

Q. Paragraph 1, I believe I already read it to you.

A. Right.

Q. Do you have any basis to doubt Dr. Tutter's assessment as to whether Ms. Lesser has a disability?

A. I believe I answered that, but I will answer it again. I don't have the psychiatric or psychological expertise to validate one way or the other, validate or invalidate.

Q. Paragraph 2 reads:

"Does the person making the request have a disability-related need for an assistance animal? In other words, does the animal work, provide assistance, perform tasks or services for the benefit of a person with a disability, or provide

emotional support that alleviates one or more of the identified symptoms or effects of a person's existing disability?"

Do you see that?

A. Yes.

Q. Do you know of whether that is true or not of Ms. Lesser?

A. Again, I can't substantiate one way or the other. I don't have the professional expertise to make a determination as to whether or not she had a disability.

Q. Now I'm going to ask you some questions about some of the language in the paragraph beginning "where the answers to questions 1 and 2 are yes," so let me know when you are at that paragraph.

A. Okay.

Q. So about midway down the paragraph, there is a sentence that begins regarding the 1 and the 2, "the request may also be denied," so let me know when you are there.

A. Well, there is more than one 1 and 2, so I'm not sure where you are.

M. OKON

Q. That's a fair point. So I'm looking at the sentence that begins "the request may also be denied."

A. There it is. Okay. Yup. I see it. Yup.

Q. I am going to do these one by one.

" The request may also be denied if (1): The specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation."

Do you see that?

A. Yes.

Q. To your knowledge, did Ms. Lesser's parrots pose a direct threat to the health or safety of others?

A. Well, I can only speak for myself there and I would answer that as a yes.

Q. And how did they pose a direct threat to your health or safety?

A. As a result of the unpredictability of their high-pitched screeching, I

encountered a lot of stress when I came home. I wasn't sure what was going to happen when those elevator doors opened. I was very tense as a result of that and I would consider that a health issue, potentially.

Q. Did you seek any medical treatment for these alleged threats to your health?

A. No.

Q. Did you seek any psychiatric treatment for these alleged threats to your health?

A. No.

Q. Did you take any medication to address these alleged threats to your health?

A. No. But I did increase my physical activity exercise routine, is what I'm getting at, to try to alleviate the stress or mitigate.

Q. So the sentence has an "or" in it, so the health or safety. At any time, did Ms. Lesser's parrots pose a direct threat to your safety?

A. I did not feel that that was the case, no.

M. OKON

Q. And the second half of the sentence refers to any threats of the health "that cannot be reduced or eliminated by another reasonable accommodation," do you see that?

A. Yes.

Q. Do you know whether if Ms. Lesser had been able to implement all of the soundproofing to her apartment that was discussed in the Himmelstein letter, the threat to your health might have been reduced?

MR. LIVINGSTON: Objection.

THE WITNESS: Do you want me to answer, Peter?

MR. LIVINGSTON: Yes.

A. I don't know.

Q. So the second half of the sentence says:

"Or, (2) the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation."

M. OKON

Do you see that?

A. Yes.

Q. To your knowledge, did Ms. Lesser's parrots cause substantial physical damage to the property of others?

A. Not to my knowledge.

Q. Prior to your receiving these exhibits in advance of your deposition, had you ever seen Government Exhibit 29?

A. No.

Q. Do you know whether any member of the Board had reviewed any HUD guidance on reasonable accommodations under the Fair Housing Act prior to making the decision to evict Ms. Lesser?

A. I don't know.

Q. Was there any time at a Board meeting that members of the Board raised the possibility that there might be guidance from the Department of Housing and Urban Development as to how to handle situations like that coming from 5J?

A. I don't recall.

Q. Put that to the side. Did the Board

vote at some time to file eviction proceedings against Ms. Lesser?

A. I don't recall that.

Q. I am now, again, going to ask you to go a little out of sequence and look at Exhibit 33. It is number-stamped R-0123 to R-0124 and let me know once you have had a chance to look at it.

A. I have it.

Q. Have you ever seen this document before?

A. Not before it arrived in the package.

Q. And again, receiving the package, you are referring to the package of exhibits in advance of your deposition this past weekend?

A. Correct.

Q. Got it. Whose signature is on Government Exhibit 33?

A. Mr. Ramadei.

Q. And do you recognize that as his signature?

A. I don't know if I have ever seen his

number-stamped HAL_0053, do you see it?
A. Yes.
Q. It's on the letterhead of Halstead and it comes in via Board Packager, do you see that?
A. Yes.
Q. Just briefly, because I have spoken to a few people about this, how do you interact with Board Packager to make an assessment of an application?
A. The package is uploaded to Board Packager. We would be notified by Halstead via e-mail that there was a package for X, Y, Z apartment to be reviewed or it could be a sublet package, as well. It may not be a purchase package exclusively, is what I'm getting at. And we would then access the materials in the package for review.
Q. So looking at what is in front of you as Government Exhibit 41, does this refresh your memory as to the timing of the application to purchase Apartment 5J?
A. No. It confirms what I thought, that it was in the later part of the year of

'19.

Q. How did you vote on this particular application?

A. I voted to reject it.

Q. And I'm going to have you very, very briefly look at what I understand your vote to reject. Is your vote to reject the document that is marked for identification as Government Exhibit 38, number-stamped US_1589?

A. Yes.

Q. Why did you vote to reject the application?

A. After my review or as a result of my review, I had the following issues. The letter of introduction, which is one of the required elements, had no date, it wasn't addressed to anyone, it had no "Dear Board of Directors" or some variation on that theme. It had text. It had no closing, like sincerely. But most importantly, it was not signed. I was not convinced that the applicant actually wrote this. You know, the

[redacted]

education. I was finding it hard to believe that he didn't know how to write a letter and it caused me to question how real his interest in moving into the building was.

Additionally, in the information sheet, there is a question about who is going to be living in the apartment. The application indicated that it was going to be for a couple, their two daughters, who were between the ages of 25 and 30, and two dogs. Four adults and two dogs living in a straight studio apartment. I had some concerns about security and safety. And that information conflicted with what was in the letter of introduction. In the introductory letter, it said that the daughters were settled in the East Village. Now, their dad was preparing this application. I was really struggling with how he could say their daughters were settled and were going to live in the apartment at the same time. It, again, made me wonder at whether or not or how really involved he really was in preparing this application, which reinforced my concerns

about the sincerity of his interest in living in the building.

[redacted]

statements set to review for the month of September. And between that and the concerns that I have expressed about the sincerity of interest in living in the building and whether or not the applicant himself was the one who completed the application, I rejected it.

Q. So that was a lot of detail that you just gave. When was the last time you looked at the package that the applicant submitted?

A. Within the last month.

Q. So within the last month, you looked at the documents that the applicant -- we might as well use his name. You looked at documents [redacted] submitted in connection in purchasing Apartment 5J?

A. Yes.

Q. Ms. Okon, do you recall at the beginning of the deposition, I asked you what documents you reviewed prior to this deposition?

A. I'm not sure if I recall that, but I'm going to believe that you did, yes.

Q. Did you mention that you had

PAGE 1 OF 2



DEPOSITION ERRATA SHEET

Page No. 12 Line No. 3 Change to: CHANGE DATE TO DATA ENTRY JOB
Reason for change: INCORRECT LANGUAGE

Page No. 16 Line No. 8 Change to: SHIRLEY TO CHARLOTTE
Reason for change: WRONG NAME

Page No. 28 Line No. 7 Change to: MEETING MINUTES
Reason for change: INCORRECT LANGUAGE

Page No. 40 Line No. 10-11 Change to: AFTER "TO BE" ADD WORD ADDRESSED
Reason for change: MISSING WORD

Page No. 42 Line No. 3 Change to: CHANGE GMAILS TO EMAILS
Reason for change: WRONG WORD

Page No. 45 Line No. 7 Change to: CHANGE "DO DIRECT" TO INTERACT
Reason for change: INCORRECT LANGUAGE

Page No. 97 Line No. ~~10~~ 7 Change to: OKON/LABATT-SIMON, INC.
Reason for change: INCORRECT SPELLING

Signature: [signature] DATE: SEPT, 26, 2022

MARCIA OKON

PETER I. LIVINGSTON
Notary Public, State of New York
No. 02LI4516747
Qualified in New York County
Commission Expires Aug. 31, 20 22

MARCIA OKON

DEPOSITION ERRATA SHEET

PAGE# 133 LINE# 9 CHANGE TO:
CHANGE TIME TO TEAM
REASON FOR CHANGE: INCORRECT LANGUAGE
PAGE# 156 LINE# 11 CHANGE TO:
CHANGE UPDATED TO UPDATE
REASON FOR CHANGE: WRONG WORD
PAGE# 156 LINE# 14 CHANGE TO
CHANGE I GET TO IT IS
REASON FOR CHANGE: INCORRECT LANGUAGE
PAGE# 156 LINE# 15 CHANGE TO
CHANGE "A" to "AN"
REASON FOR CHANGE : WRONG WORD
PAGE# 171 LINE# 5 CHANGE TO
OKON/LABATT-SIMON, INC.
REASON FOR CHANGE; WRONG SPELLING

SIGNATURE; [signature] DATE: SEPT. 26, 2022

[signature]

PETER I. LIVINGSTON
Notary Public, State of New York
No. 02LI4516747
Qualified in New York County
Commission Expires Aug. 31, 20 26

**Livingston, Peter**

---

**From:** Peter Livingston <peterlivingston6@icloud.com>
**Sent:** Sunday, July 31, 2022 5:51 PM
**To:** Livingston, Peter
**Subject:** Type of plug provided by Ms Lesser



Sent from my iPhone

August 2, 2022.
TRANSCRIPT
MARCIA OKON
PAGE 173
LINE 3