UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

RUTHERFORD TENANTS CORP. and
JAMES RAMADEI,

        Defendants.

21 Civ. 10383 (JHR) (OTW)

---

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF
THE UNITED STATES OF AMERICA'S MOTION FOR
SUMMARY JUDGMENT AND IN RESPONSE TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033
Email: david.kennedy2@usdoj.gov

DAVID J. KENNEDY
Assistant United States Attorney
    - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ....................................2

ARGUMENT............................................................................................................5

   I.   THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT
       SHOULD BE GRANTED AS TO THE DISCRIMINATION CLAIM ...........................5

       A.     Defendants Misstate the Test for a Reasonable Accommodation Claim................5

       B.     Defendants Do Not Dispute the First Three Elements of the
              Government's Reasonable Accommodation Claim..................................................6

       C.     The Accommodation Complainant Requested Was Reasonable............................7

             1.     Defendants Do Not Contend that Accommodating Complainant Imposed
                    an Undue Financial Burden, Caused Property Damage, or Fundamentally
                    Altered Their Services .................................................................................8

             2.     Defendants Fail to Demonstrate a Direct Threat to Others' Health and
                    Concede That Any Alleged Threat Could Have Been Reduced by a
                    Reasonable Accommodation ........................................................................9

             3.     Defendants' Argument That State Law Overrides Federal Law
                      Demonstrates That the Government Is Entitled to Summary Judgment....14

       D.     Defendants Concede They Denied the Reasonable Accommodation Request......16

  II.   THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE
       GRANTED AS TO THE RETALIATION CLAIM.........................................................18

       A.     Defendants Do Not Dispute the First Three Elements of the Retaliation Test......18

       B.     The Government Has Demonstrated a Causal Connection Between
               Complainant's Protected Activities and Defendants' Adverse Actions ...............19

             1.     Defendants Misstate the Standard for Retaliation ....................................19

             2.     Defendants Showed Retaliatory Motives and Concede the Causal
                      Connection as to All Three Adverse Actions ............................................20

              3.     The Defendants' Articulated Reasons Are Pretextual ...............................22

CONCLUSION.......................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(s)**

*40 West 67th Street v. Pullman,*
    100 N.Y.2d 147 (2003) ................................................................................ 12

*61 W. 62 Owners Corp. v CGM EMP LLC*, 906 N.Y.S.2d 549 (1st Dep't 2010),
    *aff'd as modified and remanded*, 16 N.Y.3d 822 (2011) .................................. 12

*Andover Hous. Auth. v. Shkolnik,*
    820 N.E.2d 815 (2005)........................................................................... 15, 16

*Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.,*
    620 F.3d 62 (1st Cir. 2010)...................................................................... 14

*Austin v. Town of Farmington,*
    826 F.3d 622 (2d Cir. 2016)..................................................................... 19

*Bell v. City of New York,*
    No. 20 Civ. 9664 (LLS), 2021 WL 76599 (S.D.N.Y. Jan. 7, 2021) ................ 20

*Birch Fam. Servs., Inc. v. Wlody,*
    No. 21-1553, 2022 WL 1468160 (2d Cir. May 10, 2022) ............................ 6

*Birch Family Servs. v. Wlody,*
    Dkt. No. 19 Civ. 3301 (DLI)(PK), 2021 WL 2312852 (E.D.N.Y. June 7, 2021) ........... 23

*Burris v. Hous. & Servs. Inc.,*
    No. 17 Civ. 9289 (JGK), 2019 WL 1244494 (S.D.N.Y. Mar. 18, 2019) .......... 9

*Cabrera v. Jakabovitz,*
    24 F.3d 372 (2d Cir. 1994)....................................................................... 20

*Chertkova v. Conn. Gen. Life Ins. Co.,*
    92 F.3d 81 (2d Cir. 1996)......................................................................... 19

*Dickerson v. BPP PCV Owners LLC,*
    No. 21-CV-9003 (RA), 2022 WL 4538281 (S.D.N.Y. Sept. 28, 2022) .......... 19

*Doninger v. Niehoff,*
    642 F.3d 334 (2d Cir. 2011)................................................................ 18, 25

*Favourite v. 55 Halley St., Inc.,*
    381 F. Supp. 3d 266 (S.D.N.Y. 2019) ...................................................... 18

*Gilead Cmty. Servs., Inc. v. Town of Cromwell,*
    604 F. Supp. 3d 1 (D. Conn. 2022)........................................................... 20

*Henny v. New York State,*
    842 F. Supp. 2d 530 (S.D.N.Y. 2012) ....................................................... 19, 21

*Hous. Rts. Initiative v. Compass, Inc.,*
    No. 21 Civ. 2221 (SHS), 2023 WL 1993696 (S.D.N.Y. Feb. 14, 2023) ............................ 6

*Howlett v. Rose,*
    496 U.S. 356 (1990) ........................................................................... 15

*Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk,*
    687 F. Supp. 2d 237 (E.D.N.Y. 2010) .......................................................... 15

*Littlejohn v. City of New York,*
    795 F.3d 297 (2d Cir. 2015) ................................................................... 23

*Martinez v. Lexington Gardens Assocs.,*
    336 F. Supp. 3d 270 (S.D.N.Y. 2018) .................................................. 6, 15, 17

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ............................................................................ 6

*MHANY Mgmt., Inc. v. Cnty. of Nassau,*
    819 F.3d 581 (2d Cir. 2016) ................................................................... 20

*Olsen v. Stark Homes, Inc.,*
    759 F.3d 140 (2d Cir. 2014) .................................................................... 6

*Owners Corp. v CGM EMP LLC,*
    906 N.Y.S.2d 549 (1st Dep't 2010) ............................................................ 12

*Palmer v. Fannie Mae,*
    755 F. App'x 43 (2d Cir. 2018) ................................................................ 20

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,*
    294 F.3d 35 (2d Cir. 2002) .................................................................... 19

*S & R Dev. Ests. v. Town of Greenburgh, N.Y.,*
    336 F. Supp. 3d 300 (S.D.N.Y. 2018) .................................................. 5, 14, 15

*Shelley v. Kraemer,*
    334 U.S. 1 (1948) ............................................................................. 14

*Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven,*
    645 F.3d 152 (2d Cir. 2011) .................................................................... 9

*Taylor v. Harbour Pointe Homeowners Ass'n,*
    690 F.3d 44 (2d Cir. 2012) .................................................................... 17

*Taylor v. The Hous. Auth. of New Haven*,
  267 F.R.D. 36 (D. Conn. 2010) ...................................................................... 9

*TSI W. 14, Inc. v. Samson Assocs.*,
  778 N.Y.S.2d 29 (2004) ................................................................................... 12

*United States v. 111 E. 88th Partners*,
  No. 16 Civ. 9446 (PGG), 2020 WL 1989396 (S.D.N.Y. Apr. 27, 2020) ........................ 16

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ............................................................................ 5

*Warren v. Delvista Towers Condo. Ass'n, Inc.*,
  49 F. Supp. 3d 1082 (S.D. Fla. 2014) ............................................................... 15

*Wiltz v. New York Univ.*,
  No. 19 Civ. 3406 (GHW) (SDA), 2019 WL 8437456 (S.D.N.Y. Dec. 23, 2019),
  *report and recommendation adopted*, 2020 WL 614658 (S.D.N.Y. Feb. 10, 2020)........ 19

*Woodside Vill. v. Hertzmark*,
  1993 WL 268293 (Conn. Super. Ct. June 22, 1993).................................................. 15, 16

## STATUTES

42 U.S.C. § 3604.............................................................................................. 1, 6, 7

42 U.S.C. § 3615.............................................................................................. 15

42 U.S.C. § 3617.............................................................................................. 18, 22

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. VI, cl. 2.....................................................................................5, 15

Plaintiff United States of America (the "Government"), by and through its attorney Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum in further support of its motion for summary judgment, and in opposition to the motion for summary judgment filed by Rutherford Tenants Corp. and its President James Ramadei ("Defendants").

## PRELIMINARY STATEMENT

Defendants' brief concedes all the material facts at the core of the Government's claims. They concede that Meril Lesser ("complainant" or "Lesser") requested to live with her assistance animals as an accommodation on March 28, 2016. (Defendants' Memorandum of Law, June 21, 2023 ("Def. Mem.") at 9.) They concede that she supported her request with documentation from her psychiatrist. (*Id*.) They concede that they denied the request and instead moved forward with eviction proceedings. (*Id*. at 10.) They concede that they sought to collect legal fees in response to her efforts to assert her rights and seek an accommodation. (*Id*. at 11.) Although they purport to dispute one element of the Government's discrimination claim under 42 U.S.C. § 3604 (f)(3)(b) — that the accommodation Lesser requested was reasonable — their suggestion that Lesser "submit an alteration agreement" proves that they knew a reasonable accommodation to reduce the noise was possible. (Def. Mem. at 15-16; Ramadei Decl. ¶ 73.) They simply chose not to provide it. And while Defendants now raise objections to the application to purchase Lesser's unit in 2019, they concede that there are no contemporaneous records that support the objections they make, which are in any event contradicted by the manner in which they reviewed a dozen other applications within the same time frame. Because Defendants raise no genuine dispute as to any material fact, the Court should grant the Government summary judgment on all claims.

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

As a comparison of the parties' statements of undisputed facts make clear, a consistent yet avoidable series of bad decisions by Defendants bring this case before this Court:

First, at the time of the events of this case, Defendants did not have any reasonable accommodation policy of any kind, whether for people with disabilities generally or for service animals specifically, contrary to the opinion of their own expert that they should have had such a policy in place.[1] (Government's 56.1 Statement of Undisputed Facts, June 21, 2023 ("Gov. 56.1 Stat."), ¶ 4.) Defendants simply assert that their building was "pet friendly" (Government Resp. to Defendants' 56.1 Statement of Undisputed Facts, August 10, 2023 ("Resp. 56.1 Stat."), ¶ 6), which fails to address their compliance with federal law and allows problems such as this one to arise.

Second, while the appropriate role of the Board would have been to defuse disputes between neighbors, in this case certain Board members instead sought to escalate these tensions. Chief among them was James Ramadei, President of the Board in 2016 (Gov. 56.1 Stat. ¶ 2; Resp. 56.1 Stat. ¶ 2), who advised Charlotte Kullen ("Kullen") to find other complainants, saying, "I need some help here." (Kennedy Decl. Exh. 9, at US_01336.)

Third, the Board never engaged in due diligence to document, record, and specifically assess the merits of Kullen's noise complaint through decibel testing or other objective indicia, instead relying on a series of subjective judgments. (Gov. 56.1 Stat. ¶ 44.) Similarly, the Board never retained the services of a noise prevention consultant, architect, engineer, or anyone with

---

[1] Defendants' putative expert Deborah Riegel, whom the Government has moved to strike, testified: "It's my view that any owner, a cooperative or a traditional rental owner should have a reasonable accommodation policy in place." (Kennedy Resp. Decl. Exh. 5, at 28:14-16.)

qualifications or experience in soundproofing, instead demanding that complainant, who has no knowledge, skills, or experience in the area, soundproof her own apartment to her neighbor's satisfaction — an impossible demand. (Gov. 56.1 Stat. ¶ 46; Resp. 56.1 Stat. ¶¶ 15-16.)

Fourth, the Board was given a fresh opportunity to make things right in accordance with federal law when it received a request for a reasonable accommodation from complainant's lawyer on March 28, 2016. (Gov. 56.1 Stat. ¶¶ 32-33.) The request would have placed any reasonable lawyer on notice that it was not enough to simply point to noise complaints; to the contrary, the Defendants were obliged to follow the Guidance of the Department of Housing and Urban Development ("HUD") and caselaw. Instead, the Board and its counsel doubled down on their wrongheaded approach, denied the accommodation on the ground that it was "axiomatic" that a person with a disability cannot maintain an animal if that animal bothers other tenants (Resp. 56.1 Stat. ¶ 60), which is contrary to HUD's Guidance (*see, e.g.*, Kennedy Decl. Exh. 29), and relied solely on noise complaints. (*See, e.g*., Kennedy Decl. Exh. 13., at US_01336.) Rather than pausing to consider the import of complainant's assertion of her rights under federal law, Defendants ignored complainant's request and promptly went to housing court, serving complainant with a Notice of Termination on May 17, 2016, and a Notice of Eviction on June 13, 2016. (Gov. 56.1 Stat. ¶¶ 34-35.) Defendants' failure to make any effort to comply with federal law in 2016, coupled with their intermittent efforts in 2023 to recast their actions as compliant with federal law, demonstrates that the Government is entitled to summary judgment on the discrimination claim.

Fifth, Defendants refused to drop the housing court proceeding even after Lesser and her birds moved out of the apartment in July 2016, thereby abating the alleged nuisance, because they could not abide spending $6,286.26 on legal fees (Gov. 56.1 Stat. ¶ 52), even

though Defendants got what they claim to have wanted — an end to any bird noises at the Rutherford. In their motion papers, Defendants inappropriately rely upon conversations between complainant and her lawyer (*see* Livingston Declaration Exh. II) to suggest that complainant was unreasonable not to compensate Defendants for the pleasure of being hassled out of her home. But if Defendants' goal was merely to end the noise, they achieved that goal in July 2016 — yet have continued to spend over $100,000 in legal fees (Response Declaration of David J. Kennedy, Aug. 10, 2023 ("Kennedy Resp. Decl."), Exh. 4 (Ramadei Dep.) 240:8-11)), and over seven years in litigation, all the while causing profound yet completely unnecessary psychological harm to complainant.[2]

Sixth, even after Lesser gave Defendants what they claim to have wanted, they sought to increase pressure upon her by adding legal fees to her monthly maintenance statements in July 2018, thus retaliating against Lesser for seeking a reasonable accommodation in March 2016 and filing a complaint with HUD in May 2018 (Gov. 56.1 Stat. ¶¶ 54-55). Defendants further retaliated against Lesser by rejecting a purchaser for her unit on December 16, 2019 (Gov. 56.1 Stat. ¶ 61), three days after a HUD representative sought a status update. (Kennedy Resp. Decl. Exh. 6.)

Seventh, while receiving a charge of discrimination from HUD might have caused some to reflect upon their conduct, Defendants instead escalated the matter further by electing to have this case heard in federal court. Here, Defendants' approach has been to further harass Lesser, including by mocking her for her disability in her deposition, *see* Gov. Mem. 13 (quoting Kennedy Decl. Exh. 3 (Lesser Dep. 109:11-110:12)); retaining a purported expert

---

[2] Although Defendants agreed to a stipulation on July 19, 2023, staying the housing court case, the stipulation has not yet been entered as an Order of the Court. (Dkt. no. 90.)

4

witness solely upon legal issues, contravening the Second Circuit's directive in *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("As a general rule an expert's testimony on issues of law is inadmissible.");[3] and arguing in their motion for summary judgment that their duties under New York law transcend their obligations under federal law, specifically the Fair Housing Act, an argument that one court in this district has characterized as "verg[ing] on the ridiculous." *S & R Dev. Ests. v. Town of Greenburgh, N.Y.*, 336 F. Supp. 3d 300, 314 (S.D.N.Y. 2018) (internal quotation marks omitted) (citing, *inter alia*, U.S. Const. art. VI, cl. 2 (Supremacy Clause)).

## ARGUMENT

## POINT I

## THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AS TO THE DISCRIMINATION CLAIM

### A.     Defendants Misstate the Test for a Reasonable Accommodation Claim

For the Government to prevail on its claim that Defendants discriminated against Lesser by failing to accommodate her disability, the Government as plaintiff must show:

> (1) that [Complainant] . . . had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation.

*Olsen v. Stark Homes, Inc*., 759 F.3d 140, 156 (2d Cir. 2014); Gov. Mem. at 10. Defendants incorrectly imply that this claim is subject to the burden-shifting framework developed in the

---

[3] Even though Defendants' expert opined solely on the strength on the strength of the Government's legal arguments, Defendants nowhere rely upon or even refer to their supposed expert in their moving papers. The expert opinion should in any event be stricken for the reasons set forth in the Government's Motion to Strike, filed on June 21, 2023. (Dkt. no. 79.)

Title VII context. Def. Mem. at 16; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Second Circuit uses the *McDonnell Douglas* framework to evaluate FHA claims only when they are premised on theories of disparate impact or intentional discrimination, including retaliation claims such as the one in this case. *See, e.g.*, *Hous. Rts. Initiative v. Compass, Inc.*, No. 21 Civ. 2221 (SHS), 2023 WL 1993696, at *20 (S.D.N.Y. Feb. 14, 2023) (disparate impact); *see also Birch Fam. Servs., Inc. v. Wlody*, No. 21-1553, 2022 WL 1468160, at *1 (2d Cir. May 10, 2022) (intentional discrimination under 42 U.S.C. § 3617); Gov. Mem. at 22 (same). The framework does not apply to a claim premised on a failure to provide a reasonable accommodation, the first claim raised here by the Government. *Martinez by Martinez v. Lexington Gardens Assocs.*, 336 F. Supp. 3d 270, 278 n.3 (S.D.N.Y. 2018); *see also* 42 U.S.C. § 3604 (f)(3)(B). Defendants therefore cannot raise "legitimate, nondiscriminatory reasons" (Def. Mem. at 16) as a defense to this claim, even if such reasons existed, because the only relevant inquiry is the five-prong test set forth in *Olsen*. Defendants cannot defeat summary judgment on this claim because they do not articulate the legal standard, much less meet it.

B.  **Defendants Do Not Dispute the First Three Elements of the Government's Reasonable Accommodation Claim**

Defendants raise no genuine issue of material fact as to the *Olsen* test. They concede that on March 28, 2016, they received a letter from Lesser's psychiatrist, Dr. Adele Tutter, describing Lesser's birds as emotional support animals. (Def. Mem. at 9.) The letter established that Lesser "has a mental health related disability" and "requires the presence of . . . emotional support animals . . . to mitigate the mental health symptoms she experiences." (Gov. 56.1 Stat. ¶ 32; Kennedy Decl. Exh. 1A.) These facts prove the first three elements of the *Olsen* test. Defendants speculate that the letter "did not appear to meet the legal requirements," including a

"nexus between Lesser's alleged disability and the need for emotional support animals to maintain the use of her apartment." (Def. Mem. at 9.) But no such "requirements" exist. (*See* Gov. Mem. at 11 (citing cases rejecting demands for "magic words" in a request).) The HUD Guidance is clear that a "housing provider may not deny a reasonable accommodation request because he or she is uncertain whether or not the person seeking the accommodation has a disability or a disability-related need for an assistance animal" and that documentation from a psychiatrist "is sufficient if it establishes that an individual has a disability and that the animal in question will provide some type of disability-related assistance or emotional support." (Kennedy Decl. Exh. 29 at 4.) Dr. Tutter's letter met these requirements. And all of the four available Board members admitted that they had no evidence contradicting Dr. Tutter's analysis. (*See* Gov. Mem. at 16 (chart of deposition testimony).)

**C.      The Accommodation Complainant Requested Was Reasonable**

Defendants stake their argument on the fourth element of the *Olsen* test, claiming that Lesser's requested accommodation was unreasonable. (Def. Mem. at 2.) They are mistaken as a matter of law. Indeed, Defendants create a straw man by concocting "the Government's mistaken contention that 42 U.S.C. § 3604 (f)(3)(B) grants Lesser with the unfettered right to obtain any accommodation — no matter how unreasonable — providing her with a carte-blanche exemption to violate the Rutherford's 'no-noise' rule." (Def. Mem. at 1-2.) (emphasis omitted) To the contrary, the Government has repeatedly relied upon the Guidance issued by HUD in this case and has taken Board members through this Guidance in at least four depositions. (*See* Gov. Mem. at 16-18 (chart of deposition testimony).) The FHA requires that housing providers accommodate assistance animals, unless one of the following exceptions apply:

. . . [if] doing so would impose an undue financial and administrative burden or would fundamentally alter the nature of the housing provider's services. The request may also be denied if: (1) the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation, or (2) the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation.

(Kennedy Decl. Exh. 29.)[4] Obviously, these criteria are neither "unfettered," "unreasonable," nor "carte blanche." And in any event, none of these exceptions applies here.

1. **Defendants Do Not Contend that Accommodating the Complainant Imposed an Undue Financial Burden, Caused Property Damage, or Fundamentally Altered Their Services**

Defendants do not argue that allowing Lesser to keep assistance animals "would impose an undue financial and administrative burden," a phrase they quote without ever explaining whether it is applicable here. They do not argue that her birds "would cause substantial physical damage to the property of others"; nor could they, given that four Board members testified to the contrary. (*See* Gov. Mem. at 16-18 (chart of deposition testimony).) And they do not argue that the accommodation would "fundamentally alter" the nature of their services, despite their curious choice to emphasize this language when quoting a court's analysis of land-use regulations irrelevant here. (Def. Mem. at 13.) In any event, the presence of Lesser's birds does not "fundamentally alter" the Rutherford's housing services. Courts in this Circuit have sustained challenges to FHA requests on the grounds that the accommodations would "fundamentally alter" the providers' services only where the request changed the providers' eligibility criteria. *Burris v. Hous. & Servs. Inc.*, No. 17 Civ. 9289 (JGK), 2019 WL 1244494, at

---

[4] Defendants' presentation of the HUD Guidance, although stylized as a direct quote, paraphrases these standards in Defendants' own language. (Def. Mem. at 13-14.)

*8 (S.D.N.Y. Mar. 18, 2019) (holding that "the defendants would have to change fundamentally the nature of . . . . their program from one providing housing and services to HIV-positive persons" if made to accommodate an HIV-negative plaintiff); *Taylor v. The Hous. Auth. of New Haven*, 267 F.R.D. 36, 75 (D. Conn. 2010), *aff'd sub nom. Taylor ex rel. Wazyluk v. Hous. Auth. of City of New Haven*, 645 F.3d 152 (2d Cir. 2011) (holding that "it would be a fundamental alteration" for a housing authority using money from Section 8 "to fund modifications to units owned by [private] entities"). Here, the Rutherford would remain a residential cooperative even after providing an accommodation to Lesser.

## 2. Defendants Fail to Demonstrate a Direct Threat to Others' Health and Concede That Any Alleged Threat Could Have Been Reduced by a Reasonable Accommodation

Defendants now contend that Lesser's birds posed a threat to the health of Charlotte Kullen, who alleges that listening to the birds "was worse than being hit by a car" and speculates that the noise indirectly caused her need for medical and dental care six years after Lesser vacated the apartment. (Kennedy Decl., Exh. 39 (Kullen Dep.) at 164:19-165:8, Ramadei Decl. Exh. I at 43:16-47:4; Def. Mem. at 15.) Their defense fails for two reasons: Defendants concede not only that they denied Lesser's request without relying on any objective or documentary evidence of a threat to Kullen's health, but also that the alleged threat could have been reduced with another reasonable accommodation.

Under the HUD Guidance, housing providers may deny accommodation requests if the assistance animal "poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation." (Kennedy Decl. Exh. 29 at 4.) The "determination that an assistance animal poses a direct threat of harm to others . . . must be based on an individualized assessment that relies on objective evidence about the specific

animal's actual conduct — *not* on mere speculation or fear about the types of harm . . . an animal may cause." (*Id*.) (emphasis added)

Here, Defendants concede that they did not apply the Guidance when they denied Lesser's accommodation request. (Kennedy Decl. Exh. 35 (Deposition of James Ramadei), at 221:23-222:2 ("Q. Were you aware of this guidance from HUD at the time Ms. Lesser made her request for a reasonable accommodation? A. No.").) Defendants now assert that "Kullen has been under the care of dental and medical professionals caused by sleep deprivation and stress which resulted in dental problems, issues with her jaw, headaches and neurological problems all caused by the stress" (Def. Mem. at 7), but Kullen never provided anyone with any evidence supporting this claim in 2016:

> Q. . . . . I'm asking you whether you, in fact, at any point, provided the Board of Directors with any medical evidence or records relating to the alleged health effects of Ms. Lesser's parrots upon you?
>
> A. I don't recall providing any medical records.

(Kennedy Decl. Exh. 39, at 281:8–15.) And even now in 2023, Kullen renews her complaints about the noise in her declaration on the present motion, but never says she provided anyone at the Rutherford with doctors' notes or other medical records about the supposed effect upon her health, nor does she indicate whether any such evidence even exists. (Dkt. no. 76.) Similarly, notwithstanding the story that Ramadei now tells the Court, Ramadei testified that the Board did not rely on any evidence of a danger to Kullen's health:

> Q. And did Ms. Kullen ever provide you with any documentation or other evidence of any alleged threat to her health?
>
> A. No, not specifically. I didn't ask for any, either.

(Kennedy Decl. Exh. 35 (Ramadei Dep. 225:7-20).) The other Board members who considered the accommodation request made no pretense of trying to comply with the HUD Guidance:

Nancy Benedetto claimed no knowledge of any harm to anyone's health (Kennedy Decl. Exh. 37 (Benedetto Dep. 100:3-9 ("Q. Did Ms. Lesser's parrots pose a direct threat to the health or safety of others? A. I don't know. Q. Do you have any basis to believe that they did? A. I — I don't know. I don't know anything about the parrots."))); Samuel Keany did point to potential harm to Kullen's health but conceded that the Board never considered any evidence of such (Kennedy Decl. Exh. 36 (Keany Dep. 46:19-47:16) ("Q. Did Ms. Kullen ever provide to the board any evidence of any harm to her health occasioned by Ms. Lesser's birds? A. That I don't recall whether she did or didn't honestly.")); and Marcia Okon could only point to harms to her own health, which she conceded were never substantiated (Kennedy Decl. Exh. 38 (Okon Dep. 116:17-117:19) ("Q. Did you seek any medical treatment for these alleged threats to your health? A. No. Q. Did you seek any psychiatric treatment for these alleged threats to your health? A. No. Q. Did you take any medication to address these alleged threats to your health? A. No."). Kullen herself explained to Ramadei on September 15, 2015 that, "It's *not about anything but* chronic, persistent, ongoing, strident noise." (Kennedy Decl. Exh. 9, at US_01336 (emphasis added).) Defendants cannot rewrite history now to avoid summary judgment.[5]

Moreover, Defendants never address the "objective evidence about the animal's actual conduct" that did exist — reports generated by the New York City Department of Environmental Protection ("NYC DEP"), whose many site visits found no loud, unreasonable, or excessive noises emanating from Lesser's apartment. (Gov. 56.1 Stat. ¶¶ 24, 45.) Defendants

---

[5] There is some evidence that Kullen had reasons of her own to agitate in favor of Defendants' foreclosing on Lesser's unit; on February 1, 2018, Kullen tweeted: "Dream of breaking through & expanding into the apartment next door?" (Kennedy Decl. Exh. 31 (link citation omitted).). That said, the issue on summary judgment was not whether Lesser or Kullen was wrong or right, but whether Defendants can defend their violation of federal law by pointing to state law and the cooperative's policies. They cannot. *See infra* Section I.C.3.

complain that some of the visits were merely cursory, but that does not address the fact that on

at least five occasions between October 13, 2015, and February 20, 2016, NYC DEP inspectors

came to the fifth floor of the Rutherford, spent from fifteen minutes up to an hour, and did not

hear loud, unreasonable, or excessive noise, even when directly outside Lesser's door. (Gov.

56.1 Stat. ¶ 24.) Defendants now assert that "[t]he unrefuted testimony of [Kullen], clearly

demonstrated …the loud, constant, unrelenting screeching from the parrots" (Def. Mem. at 7).

But the NYC DEP inspections and Lesser's own denials that the birds were excessively loud

directly contradict Kullen's testimony. And in any event, the purpose of the HUD Guidance is

to focus the inquiry on objective evidence of a threat to health, not subjective noise complaints.

Defendants also did not provide any objective evidence through expert testing to

establish that the noise emanating from Lesser's unit exceeded the decibel levels permitted

under the local noise code. (Gov. 56.1 Stat. ¶ 44.) These measurements are routinely provided to

and relied upon by New York courts in noise-related housing litigation. *See, e.g.*, *61 W. 62*

*Owners Corp. v CGM EMP LLC*, 906 N.Y.S.2d 549, 551-52 (1st Dep't 2010), *aff'd as modified*

*and remanded*, 16 N.Y.3d 822 (2011). Defendants' putative expert Deborah Reigel has filed

briefs relying on an acoustical engineer to conduct decibel testing. *See* Brief for Plaintiff-

Appellant at 6, *TSI W. 14, Inc. v. Samson Assocs.*, 778 N.Y.S.2d 29 (2004), 2003 WL

25571483, at *6 (filed by Reigel personally); *see also* Brief for Defendants-Appellants, *40 West*

*67th Street v. Pullman*, 100 N.Y.2d 147 (2003), 2002 WL 32173827, at *12 (filed by Reigel's

law firm). Without such testing, the recordings of bird noises that Defendants submitted to the

Court are worthless because there is no reliable way to know the volume at which the

recordings are to be played. Because Defendants relied solely on subjective noise complaints

and not on any evidence as to the impact of the alleged bird noises upon someone's health, such

as a doctor's note or medical records, nor any technologically valid evidence of how loud the noises were, Defendants denied Lesser's accommodation request "on mere speculation" of harm, not on "objective evidence."

Finally, Defendants concede that a "reasonable accommodation" of soundproofing could have reduced or eliminated the alleged threats the birds posed to Kullen's health. (Def. Mem. at 15-16; Ramadei Decl. ¶ 73.) This concession is fatal to their claim that Lesser's birds posed "a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation." (Kennedy Decl. Exh. 29, at 4.) Housing providers, not occupants, have a duty under the FHA to provide reasonable accommodations and incur the associated costs. *See infra* Section I.D. Defendants were well aware that the Rutherford was poorly insulated against noise, as Board president Stephen Troy testified:

> A. . . . It's common, you know, in Manhattan co-ops that, you know, the walls are thin and sound travels.

> Q. Would you say that the walls are thin in the Rutherford?

> A. Yes.

> Q. Has the Rutherford ever looked into insulation that would reduce the noise between the walls?

> A. No.

> Q. Why not?

> A. It's a common problem that these buildings — the white brick buildings that were built in the 1960s, when they were put up, they did not stress noise mitigation. It would be a tremendous financial undertaking to soundproof every apartment.

> Q. When was the Rutherford built?

> A. In 1960s, I believe. It was originally a rental building and landlords, you know, those developing landlord companies or they put up these buildings, they use

> cheap material, thin walls, you know, because their goal was just to minimize
> their expenses and maximize the rent.

(Kennedy Resp. Decl. Exh. 2 (Troy Dep.) 90:6-91:15.) Thus, Defendants knew there was a

problem but did not evaluate how to insulate even one out of 175 apartments, nor at what cost.

### 3. Defendants' Argument That State Law Overrides Federal Law Demonstrates That the Government Is Entitled to Summary Judgment

At the core of Defendants' argument is the claim that they were justified in enforcing

New York Real Property Law to compel Lesser to abate the alleged noise. (Def. Mem. 15.)

Defendants' argument creates a conflict of law, not fact, between their obligations under state

and federal law, which can be resolved on summary judgment. Federal law prevails.

The Rutherford's contention that its policies, state law, and unspecified "common law"

release it from its duty to comply with the FHA (Def. Mem. at 15; Resp. 56.1 Stat. ¶¶ 18-27) is

a theory that "'verges on the ridiculous.'" *S & R Dev. Ests., N.Y.*, 336 F. Supp. 3d at 314

(quoting *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 70 (1st

Cir. 2010) (rejecting a condominium's claim that local law precluded offering a reasonable

accommodation) (citing *Shelley v. Kraemer*, 334 U.S. 1, 11 (1948) ("It is . . . clear that

restrictions on [housing] of the sort sought to be created by the private agreements in these cases

could not be squared with the requirements of the Fourteenth Amendment if imposed by state

statute or local ordinance.").) In *S & R Dev. Ests.*, the Court held that, where the application of

New York law would limit the availability of affordable housing, the law was preempted by the

FHA. 336 F. Supp. 3d at 315. "Allowing a state law to undermine a federal civil rights claim,"

the Court wrote, "would 'transmute a basic guarantee into an illusory promise; and the

Supremacy Clause of the Constitution insures that the proper construction may be enforced.'"

*Id.* (quoting *Howlett v. Rose*, 496 U.S. 356, 376 (1990)); *see also* U.S. Const. art. VI, cl. 2. As

another Court in this district put it, "requiring a landlord to 'violate its own policies' is *precisely* what a reasonable accommodation may be and what federal law requires." *Martinez*, 336 F. Supp. 3d at 281 (emphasis in original).

Even if Defendants had provided objective evidence of excessive noise, the FHA would preempt the "contractual, statutory, and common law rights" (Def. Mem. at 2) that Defendants purport to rely on. *See* 42 U.S.C. § 3615 (commanding that "*any* law of a State . . . that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid") (emphasis added); *Warren v. Delvista Towers Condo. Ass'n, Inc.*, 49 F. Supp. 3d 1082, 1089 (S.D. Fla. 2014) ("In the present case, if the County ordinance were enforced it would violate the FHA by permitting a discriminatory housing practice. . . . Accordingly, as a matter of law, the Miami–Dade County ordinance is preempted by the FHA in this context."); *Hum. Res. Rsch. & Mgmt. Grp., Inc. v. Cnty. of Suffolk*, 687 F. Supp. 2d 237, 253 n.13 (E.D.N.Y. 2010) ("Thus, to the extent that the challenged provisions of [Suffolk County law] conflict with the FHA, the FHA preempts them.").

Defendants point to no federal precedent establishing that an assistance animal's noise poses an incurable threat to the health of others under the HUD Guidance. Instead, they offer two opinions from state court cases whose facts bear little resemblance to this case: *Woodside Vill. v. Hertzmark*, 1993 WL 268293 (Conn. Super. Ct. June 22, 1993), and *Andover Hous. Auth. v. Shkolnik*, 820 N.E.2d 815 (2005). In *Woodside*, the defendant's dog was not an assistance animal, and it posed a direct threat to the health and safety of other residents because the defendant would not clean its waste from common areas. 1993 WL 268293, at *5. Nonetheless, the housing provider still "made reasonable efforts to accommodate the defendant and his dog," including offers to provide a dog trainer, supervised walks, and a "pooper

scooper." *Id.* By contrast, Lesser's birds are assistance animals; they do not pose "a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation" (Kennedy Decl. Exh. 29, at 4); and Defendants did not make reasonable efforts to accommodate Lesser or her birds. *Andover* is even less apposite. There, the tenants' noises — blaring a radio, yelling, and arguing at night — were unrelated to their diagnoses of shingles pain, lymphoma, dementia, and depression. Their denials that they caused the noise "impeded the authority's efforts to engage in a full interactive dialogue to ascertain and ultimately accommodate [the tenant's] medical conditions." 820 N.E.2d at 826. Finally, the court grounded its decision in Massachusetts caselaw. *Id.* at 824 ("This court has rejected the idea that indefinite requests for 'more time' to address a disabling condition are reasonable."). Here, Lesser's request to keep an assistance animal is related to her disability, Defendants made no efforts to engage in a full interactive dialogue with Lesser and her attorney, and Lesser is not a Massachusetts resident requesting an accommodation that Massachusetts courts have deemed unreasonable.

**D.**     **Defendants Concede They Denied the Reasonable Accommodation Request**

Finally, Defendants concede that they denied the accommodation that Lesser requested. In fact, they offered no accommodation and filed an eviction proceeding. *See United States v. 111 E. 88th Partners*, No. 16 Civ. 9446 (PGG), 2020 WL 1989396, at *17 (S.D.N.Y. Apr. 27, 2020) ("[C]ourts have found constructive denial where landlords pursue eviction proceedings or take other adverse action against tenants after reasonable accommodation requests are made."). Defendants contend that they "suggested a reasonable accommodation by encouraging Lesser to submit an alteration agreement to have her soundproof her apartment." (Def. Mem. at 15-16.) But they cannot offload their obligation to provide equal housing onto Lesser. The FHA and the

HUD Guidance "impose[ ] an affirmative duty upon landlords reasonably to accommodate the needs of handicapped persons." *Martinez*, 336 F. Supp. 3d at 277-78 (internal quotation marks omitted). If soundproofing was required to accommodate Lesser and reduce the alleged threat that her animals posed to others' health, then the Rutherford was responsible for making the alterations and incurring the associated costs. *See id.* at 278; *Taylor v. Harbour Pointe Homeowners Ass'n*, 690 F.3d 44, 49 (2d Cir. 2012) ("A defendant must incur reasonable costs and take modest, affirmative steps to accommodate the handicapped . . . .") (internal quotation marks omitted). But Defendants never considered the extent or cost of their obligation.

The most that Defendants offer in response to this point is the disingenuous assertion that "Rutherford never requested that the parrots be removed or separated only — that [sic] the noise be abated." (Def. Mem. at 8.) To the contrary, Defendants served Lesser with a Notice of Petition for a Court Eviction hearing on June 13, 2016. (Kennedy Decl., Exh. 15.) The removal of Lesser from her own home obviously entails the removal of her service animals. Lesser further testified, directly addressing counsel for Defendants, "Well, you did tell me when I called you when I received the Notice to Cure, you told me that I might have to get rid of my birds." (Kennedy Resp. Decl., Exh. 1 (Lesser Dep. Excerpts), at 112:2-8.) Defendants also falsely assert that they sought to meet with Lesser. (Def. Mem. at 9.) But by email dated May 26, 2015, Lesser contacted Marcia Okon, a member of the Board, and stated that "I spoke to [Halstead] earlier today to see if the board, along with all those with grievances could arrange a time to meet with me in order to work towards a collective solution." (Kennedy Decl., Exh. 7.) *See also* Kennedy Decl., Exh. 3 (Lesser Dep.) at 64:9 ("Nobody would meet with me . . . ."); *id.* at 94:22-95:5 ("you wouldn't speak to me or facilitate a meeting between the Board and I after receiving a Notice to Cure and the Board wouldn't respond to me after my requests to

meet."); Kennedy Resp. Decl., Exh. 1 (Lesser Dep.), at 114:14-15 ("Nobody would ever meet with me or speak with me.").

Because the Government has satisfied all five elements of the *Olsen* test and "there is no genuine dispute as to any material fact," the Court should grant summary judgment in favor of the Government on its discrimination claim. *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

## POINT II

## THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED AS TO THE RETALIATION CLAIM

The FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person . . . on account of his having exercised or enjoyed . . . any right granted or protected" by the FHA. 42 U.S.C. § 3617. "To prevail on a claim of retaliation under the FHA" the Government must show that (1) Lesser "engaged in protected activity" under the FHA; (2) Defendants knew of the activity; (3) Defendants "subsequently took adverse action" against her; and (4) "there is a causal connection between the protected activity and the adverse action." *Favourite v. 55 Halley St., Inc.*, 381 F. Supp. 3d 266, 278 (S.D.N.Y. 2019) (internal quotation marks omitted).

### A. Defendants Do Not Dispute the First Three Elements of the Retaliation Claim

Defendants raise no genuine issue of material fact as to the first three elements of the Government's retaliation claim. First, Defendants do not dispute that Lesser requested a reasonable accommodation on March 28, 2016, and filed a complaint with HUD on May 14, 2018, both protected activities. Second, they do not dispute that they knew of these activities. Third, Defendants do not dispute that they filed eviction proceedings against Lesser in July 2016, added legal fees to her maintenance bill in July 2018, and refused to approve the sale of her unit in December 2019. These are "adverse actions" as a matter of law. *See* Gov. Mem. at

23; *Wiltz v. New York Univ.*, No. 19 Civ. 3406 (GHW) (SDA), 2019 WL 8437456, at \*13 (S.D.N.Y. Dec. 23, 2019), *report and recommendation adopted*, 2020 WL 614658 (S.D.N.Y. Feb. 10, 2020) ("[C]ourts in this Circuit and elsewhere have found that an eviction proceeding can constitute an adverse action under Section 3617.") (internal quotation marks omitted).

### B. The Government Has Sustained Its Burden to Demonstrate a Causal Connection Between Complainant's Protected Activity and Defendants' Adverse Actions

Defendants purport to dispute only the fourth element of the retaliation claim, which requires plaintiffs to demonstrate "a retaliatory motive." *Austin v. Town of Farmington*, 826 F.3d 622, 630 (2d Cir. 2016). Plaintiffs can meet this burden in at least two ways. The first is "by showing direct evidence of discriminatory animus." *Henny v. New York State*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (construing Title VII) (citing *Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 91 (2d Cir. 1996)). Plaintiffs can also meet this burden "indirectly by showing that the protected activity was closely followed in time by the adverse action." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002) (internal quotation marks omitted) (superseded by statute on other grounds); *Dickerson v. BPP PCV Owners LLC*, No. 21-CV-9003 (RA), 2022 WL 4538281, at \*6 (S.D.N.Y. Sept. 28, 2022). Here, the Government has both types of evidence and a concession from Defendants.

#### 1. Defendants Misstate the Standard of Causation

Citing exclusively to cases outside the Second Circuit, Defendants ask the Court to evaluate the Government's retaliation claim using a but-for causation standard. (Def. Mem. at 16.) But decades of Second Circuit law — including the same paragraph of the same case that Defendants cite in the preceding sentence — establish that FHA claims here are analyzed under the mixed-motive standard. *Austin*, 826 F.3d at 630 ("[I]n order to make out a prima facie case under Section 3617, [a] plaintiff must demonstrate that intentional discrimination motivated

19

defendants' conduct, *at least in part*." (emphasis added) (internal quotation marks omitted));

*Bell v. City of New York*, No. 20 Civ. 9664 (LLS), 2021 WL 76599, at *3 (S.D.N.Y. Jan. 7,

2021) ("'[T]o make out a case of discrimination . . . , a plaintiff may not need to prove that [his]

protected status was a but-for cause of the adverse action [he] suffered, but only a motivating

factor'" (quoting *Palmer v. Fannie Mae*, 755 F. App'x 43, 45 (2d Cir. 2018)); *MHANY Mgmt.,*

*Inc. v. Cnty. of Nassau*, 819 F.3d 581, 616 (2d Cir. 2016) (test is "at least in part") (citing

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994)); *Gilead Cmty. Servs., Inc. v. Town of*

*Cromwell*, 604 F. Supp. 3d 1, 16 (D. Conn. 2022) (applying the mixed-motive framework to

retaliation claims under 42 U.S.C. § 3617). The mixed-motive standard applies here.

## 2. Defendants Showed Retaliatory Motives and Concede the Causal Connection

Each of Defendants' three adverse actions against Lesser was motivated, at least in part,

by intentional discrimination. First, Defendants sent Lesser a Notice of Termination on May 17,

2016, within two months of learning, on March 28, 2016, that she had a disability-related need

for an assistance animal (Gov. 56.1 Stat. ¶¶ 32, 34), a temporal proximity supporting an

inference of retaliation. But the Court need not rely on indirect evidence here. Defendant

Ramadei's testimony makes clear that the decision to evict Lesser was motivated, at least in

part, by stereotypes about persons with a disability-related need for emotional support animals.

For example, Ramadei does not believe that Dr. Tutter's characterization of Lesser's birds as

emotional support animals was made in good faith. (Kennedy Decl. Exh. 35, at 201:15-202:22.)

In his view, "doctors are being hounded" by persons with disabilities and are "forced to write

these letters in the interest of keeping their business healthy." (*Id.* at 213:3-214:4.) Ramadei

speculated that Dr. Tutter's letter "sounds like a very typical letter that is given to professionals

to get out of situations that they need to get out of" and was "definitely . . . dictated." (*Id.* at

214:13-18, 218:3-4.) These remarks are grounded in nothing but speculation and prejudice and provide "direct evidence of discriminatory animus" to support an inference of a retaliatory motive. *Henny*, 842 F. Supp. 2d at 553.

Defendants do not challenge the causal connection between Lesser's activity and their second adverse action: Defendants sought, for the first time, to recover their legal fees in the amount of $62,241 via Lesser's maintenance account starting on July 9, 2018, within two months of the date Lesser filed a HUD complaint on May 14, 2018 (Gov. 56.1 Stat. ¶¶ 54-55), precisely because "those fees were attributable" to Lesser's activity. (Def. Mem. at 11.)[6] Ramadei elaborated on this causal connection in his deposition testimony, stating that "[m]ost of our legal fees were the result of bomb-throwing by the part of Ms. Lesser" (Kennedy Resp. Decl. Exh. 4, at 243:8-14), and "We always had to answer to something to one of her many attorneys or HUD, or whatever was being thrown at us . . . ." (*Id.*; *see also id.* at 237:9-243:7.) Here, Ramadei shows discriminatory animus by describing Lesser's HUD complaint as "bomb-throwing" and concedes its causal connection to the fees placed on her account.

Third, Defendants' attempt to recover legal fees from Lesser was followed by their denial of Lesser's attempted sale of her unit for $467,500. (Gov. 56.1 Stat. ¶ 57, 61.) There is a close temporal nexus between the HUD investigation and the adverse action: Defendants rejected a buyer for her unit on December 16, 2019 (Gov. 56.1 Stat. ¶ 61), just three days after a

---

[6] Defendants repeatedly misrepresent the Government's arguments in asserting that the retaliation claim relates to "charges for legal fees the Rutherford incurred for two 2015 warning letters." (Def. Mem. at 4 n.1, 11-12.) Those two letters obviously did not result in $62,241 in legal fees. Next, Defendants assert that these "charges were initially sent to Lesser and her attorney in December 2016" (*id.*), but the cited document is not a charge to Lesser's maintenance fees, but an email discussion regarding settlement. (Livingston Decl. Exh. II.) *See also* Ramadei Decl. at 6 n.6 (repeating misrepresentation).

HUD representative sought a status update on December 13, 2019 (Kennedy Resp. Decl. Exh. 6). The temporal proximity between HUD's inquiries and Defendants' retaliatory effort supports an inference of discriminatory motivation — namely, a continued effort to maintain leverage over Lesser for the ultimate purpose of recouping legal fees attributable to her protected activity.

Ramadei's own testimony explains why he is appropriately named as a defendant, notwithstanding Defendants' one-sentence-long argument demanding that he be dismissed from the case. (Def. Mem. at 19.) Ramadei's expressions of animus against Lesser and her accommodation request, ranging from "I need some help here" (Kennedy Decl. Exh. 9, at US_01336), disparaging Dr. Tutter's letter without any qualification or experience to do so, personally signing the Notice to Cure and the Notice of Eviction (Kennedy Decl. Exhs. 12 and 14), specifically testifying that the cooperative sought to recover attorney's fees via Lesser's maintenance account to punish her for "bomb-throwing" by asserting her rights under federal law, and personally voting against the Applicant in 2019, form a through line to Defendants' conduct. Neither § 3604 nor § 3617, in any event, preclude claims against individuals, but are phrased to prohibit conduct, whether committed by a person or a corporation.

### 3. Defendants' Articulated Reasons Are Pretextual

The Second Circuit uses the *McDonnell Douglas* framework to evaluate retaliation claims brought under 42 U.S.C. § 3617. *See supra* Section I.A. Within this framework, if a plaintiff "can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the prima facie requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts" to the defendants. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Defendants must "articulate a legitimate, non-discriminatory reason for their conduct," at which point "the burden shifts back to Plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant[s] were not [their] true reasons, but were a pretext for discrimination." *Birch Family Servs. v. Wlody*, Dkt. No. 19 Civ. 3301 (DLI)(PK), 2021 WL 2312852, at *6, (E.D.N.Y. June 7, 2021).

Here, the Government has more than sustained its minimal burden, and Defendants fail to articulate "a legitimate, non-discriminatory reason" for constructively evicting Lesser despite the NYC DEP's consistent findings that she maintained acceptable levels of noise. Defendants' reason for the fees, meanwhile, is baldly discriminatory: They say that the "ministerial placement of legal fees" is part of their "ordinary activities" (Def. Mem. at 19) — even when, as here, they attribute those fees to an occupant's exercise of her federal civil rights.

Finally, Defendants' articulated reasons for denying Lesser's proposed sale of the unit in 2019 are uncorroborated by contemporaneous evidence, inconsistent with the factual record, and pretextual. (Gov. Mem. at 24; Gov. 56.1 Stat. ¶¶ 66-69.) Despite Defendants' allusions to their "standard business practices," Defendants had no written policies, guidance, or criteria for the Board to use to assess applications. (Gov. 56.1 Stat. ¶ 63; Kennedy Decl., Exh. 35 (Ramadei Dep.), at 254:13-257:15.) There is no contemporaneous documentation of the Board's reasons for rejecting the application. (Gov. 56.1 Stat. ¶ 64; Kennedy Decl., Exh. 35 (Ramadei Dep.), at 254:13-257:15.) Instead, Defendants can point only to post hoc deposition testimony after being sued, offering justifications conclusively rebutted by the Government's expert, Heather Albright, a Certified Fraud Examiner. Notably, although the Government served Defendants with Albright's report on March 9, 2023, and Defendants deposed Albright on April 26, 2023, Defendants do not offer any response to Albright's analysis.

In her initial Report, Albright used the criteria commonly used by New York City co-ops (percent of down payment paid, FICO score, post-closing liquidity ratio, debt-to-income ratio, and housing expense ratio) to assess the thirteen applications reviewed by the Board in the months before and after it considered the Application for Lesser's unit in late 2019. (Kennedy Decl., Exh. 25 (Albright Report ¶¶ 31-39).) Significantly, at the time of her initial Report, Albright did not know which of the applications was the one at issue in this case. (*Id.* ¶ 4.) Albright ranked the applications based on these criteria and ranked the Application in the middle of all accepted applications, at number 6 of 13. (*Id.* ¶ 8.) Only after this initial ranking was Albright provided with Defendants' deposition testimony setting forth their purported reasons for the rejection. (Kennedy Decl., Exh. 26 (Albright Supp. Report ¶ 3).) Albright reviewed this testimony and concluded that: "The explanations given by the Board for rejecting the application for Complainant's unit are inconsistent with my review of that application, and contradictory to their decision to accept many of the other twelve applications." (*Id.* ¶ 5.) Specifically:

- Although Defendants testified that the Application was rejected because it did not clearly indicate who would reside in the unit and when, the same was true for the application that Albright ranked at number 2. Indeed, that application indicated that the applicants lived and worked on the Pacific coast. Similarly, on the application that Albright ranked at number 4, the applicant indicated that they maintained a home in upstate New York where they would reside "whenever [the] opportunity [arose]." (*Id.* ¶¶ 26-29.) As Defendants approved both applications 2 and 4 but not the Application, this justification was pretextual.

- Although Defendants testified that the Application was rejected because the Applicant initially applied as a trust, "[t]here was no doubt in the final application that it was the Applicant as an individual, and not the irrevocable trust, that would be purchasing" Lesser's unit. (*Id.* ¶ 31.) This justification was therefore pretextual.

- Although Defendants testified that they felt the Application contained discrepancies, Albright's independent assessment concluded that the Application contained no material discrepancies, while all of the other applications that the

Board approved during the same term contained equal or greater discrepancies. (*Id.* ¶¶ 33-43).) Specifically, eleven of the twelve other applications had greater under-reporting of their liabilities compared to the Application for Lesser's unit. (*Id.* ¶ 38.) And Albright further concluded that "[w]hile I did not identify material variances between the asset, liability, income and expense balances reported by the Applicant and the underlying supporting documents in the application for Unit 5J, several other applications that were approved by the Board did have significant discrepancies." (*Id.* ¶ 41.) This justification was therefore pretextual.

Because the Government has established all elements of the retaliation claim, Defendants' articulated reasons are either discriminatory or pretexts for discrimination, and "there is no genuine dispute as to any material fact," the Court should grant summary judgment in favor of the Government on its retaliation claim. *Doninger*, 642 F.3d at 344 (quoting Fed. R. Civ. P. 56(a)).

Finally, since Defendants offer no support at all in their papers for their state law defenses (Fifth, Seventh, Eighth, and Twelfth Defenses), these defenses should be dismissed.

## CONCLUSION

The Court should grant the Government summary judgment on all claims and conduct an inquest into damages.

Dated:      New York, New York
           August 10, 2023

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    /s/ David J. Kennedy
DAVID J. KENNEDY
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2733
david.kennedy2@usdoj.gov